1  BARRY A. SMITH (SBN: 48697)
     bsmith@buchalter.com
2  STEVEN M. SPECTOR (SBN: 51623)
     sspector@buchalter.com
3  ANTHONY J. NAPOLITANO (SBN: 227691)
     anapolitano@buchalter.com
4  BUCHALTER, A Professional Corporation
   1000 Wilshire Boulevard, Suite 1500
5  Los Angeles, CA 90017-2457
   Telephone: (213) 891.0700
6  Facsimile: (213) 896.0400

7  Attorneys for Secured Creditor Opus Bank

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  SANTA ANA DIVISION

12  In re                                     Lead Case No. 8:17-bk-13077-TA

    HOAG URGENT CARE-TUSTIN, INC., et al.,    Chapter 11
13
                                              (Jointly Administered with Case Nos. 8:17-
14         Debtors and Debtors in             bk-13078-TA, 8:17-bk-13079-TA, 8:17-bk-
           Possession.                        13080-TA, 8:17-bk-13089-TA, 8:17-bk-
15                                            13090-TA)

16  Affects:                                  DECLARATION OF DAVID P.
                                              STAPLETON IN SUPPORT OF OPUS
17  ☒      All Debtors                         BANK'S MOTION FOR ORDER
                                              (I) PARTIALLY EXCUSING
18  ☐      Cypress Urgent Care, Inc., a California   RECEIVER'S COMPLIANCE WITH
           corporation, ONLY                  11 U.S.C. § 543(a) AND (b); AND
19                                            (II) GRANTING LIMITED RELIEF
    ☐      Hoag Urgent Care- Anaheim Hills, Inc.,   FROM THE AUTOMATIC STAY
20         a California corporation, ONLY      UNDER 11 U.S.C. § 362

21  ☐      Hoag Urgent Care- Huntington Harbour,   Hearing If Shortened Time Granted:
           Inc., a California corporation, ONLY   Date:    August 29, 2017
22                                            Time:    2:00 p.m.
    ☐      Hoag Urgent Care- Orange, Inc., a
23         California corporation, ONLY        Hearing If On Regular Notice:
                                              Date:    September 6, 2017
24  ☐      Hoag Urgent Care- Tustin, Inc., a   Time:    10:00 a.m.
           California corporation, ONLY        Place:   United States Bankruptcy Court
25                                                      Courtroom 5B
    ☐      Laguna-Dana Urgent Care, Inc., a             411 West Fourth Street
26         California corporation, ONLY                 Santa Ana, California 92701

27

28                                     1

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

DECLARATION OF DAVID P. STAPLETON IN SUPPORT OF OPUS BANK'S MOTION FOR ORDER PARTIALLY
EXCUSING RECEIVER'S COMPLIANCE WITH SECTION 543 AND GRANTING LIMITED RELIEF FROM STAY
BN 29851534V1

### DECLARATION OF DAVID P. STAPLETON

I, David P. Stapleton, declare as follows,

1.     I am the state court-appointed receiver over the assets owned by Hoag Urgent Care – Tustin, Inc., and its affiliated debtors (collectively, the "Debtors").[1]  I have personal knowledge of the matters stated in this Declaration, and if called upon as a witness, I could and would testify competently thereto.

2.     I make this declaration in support of Opus Bank's *Motion for Order (I) Partially Excusing Receiver's Compliance with 11 U.S.C. § 543(a) and (b); and (II) Granting Limited Relief from the Automatic Stay Under 11 U.S.C. § 362* (the "Motion").

3.     I am the founder and President of the Stapleton Group. I, and the Stapleton Group, provide fiduciary and consulting services including: receiverships, bankruptcy cases, forensic accounting, expert witness engagements, and business and real estate management. I have extensive experience serving as a federal court receiver, a state court receiver and as a trustee in chapter 11 bankruptcy cases. I am also a Certified Public Accountant (inactive). Attached hereto as **Exhibit 1** is a true and complete copy of my resume.

4.     On May 25, 2017, the California Superior Court, County of Orange, in the action designated as *Opus Bank v. Hoag Urgent Care-Tustin, Inc., et al.*, Case No. 30-2017-00911945-CU-BC-CJC (the "Hoag State Court Action"), appointed me as the receiver, and ordered me to take possession, custody and control of the property of the Hoag Borrowers.[2]

5.     Also, on May 25, 2017, the California Superior Court, County of Orange, in the action designated as *Opus Bank v. Laguna-Dana Urgent Care, Inc., et al.*, Case No. 30-2017-00912132-CU-BC-CJC (the "Cypress-Laguna State Court Action"), appointed me as the receiver, and ordered me to take possession, custody and control of the property of the Cypress-Laguna Borrowers.

---

[1]  The Debtors include Hoag Urgent Care – Tustin, Inc. (Case No. 8:17-bk-13077-TA), Hoag Urgent Care – Huntington Harbour, Inc. (Case No. 8:17-bk-13078-TA); Hoag Urgent Care – Orange, Inc. (Case No. 8:17-bk-13079-TA); Hoag Urgent Care – Anaheim Hills, Inc. (Case No. 8:17-bk-13079-TA); Cypress Urgent Care, Inc. (Case No. 8:17-bk-13089-TA); and Laguna Dana Urgent Care, Inc. (Case No. 8:17-bk-13090-TA).

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**DECLARATION OF DAVID P. STAPLETON IN SUPPORT OF OPUS BANK'S MOTION FOR ORDER PARTIALLY EXCUSING RECEIVER'S COMPLIANCE WITH SECTION 543 AND GRANTING LIMITED RELIEF FROM STAY**

BN 29851534V1

6.      Until the filing of these chapter 11 cases, in my capacity as the state court appointed receiver, I operated the businesses of the Hoag Borrowers and the Cypress-Laguna Borrowers without objection and, indeed, with the cooperation of the Debtors.

7.      Following my appointment, after a series of protracted negotiations, in which Dr. Amster and the Debtors sporadically participated through counsel (now bankruptcy counsel), I, in my capacity as the receiver, entered into a Settlement Agreement dated July 20, 2017 (the "Settlement Agreement") with Opus Bank, Newport and Hoag Memorial.  Attached hereto as **Exhibit 2** is a true and complete copy of the *Receiver's Ex Parte Application for Approval of Settlement Agreement* filed in the Hoag State Court Action.  Attached hereto as **Exhibit 3** is a true and complete copy of the *Receiver's Ex Parte Application for Approval of Settlement Agreement* filed in the Cypress-Laguna State Court Action.  A copy of the Settlement Agreement is included within Exhibit 2 and Exhibit 3 hereto.

8.      The Settlement Agreement resolved many things respecting the clinics of the Hoag Borrowers.  It provided for Newport/Hoag Memorial to be the new operator of the clinics.  It settled a dispute between Opus Bank and Newport over the equipment.  It settled the financial issues respecting the clinics.  It resulted in Opus Bank receiving payment of the appraised liquidation value of the equipment.  It allowed the employees of the clinics to continue to be employed.  It ended the receivership over the clinics (except for collecting receivables).  Most importantly, it did not impact receivables.  They were to be collected by me. in my capacity as the receiver, for the benefit of Opus Bank.

9.      Approval of the Settlement Agreement from the state court was required.  As a result, I filed and served the ex parte motions for approval of the Settlement Agreement on August 1, 2017 in the Hoag State Court Action and the Cypress-Laguna State Court Action obtaining a hearing date of August 2, 2017 at 1:30 p.m.

10.     The Hoag Borrowers' bankruptcy cases were filed about 12:30 p.m. on August 2, 2017, an hour before the state court hearing to approve the sale transaction that was to take place (which, of course, did not occur).

3

**DECLARATION OF DAVID P. STAPLETON IN SUPPORT OF OPUS BANK'S MOTION FOR ORDER PARTIALLY
EXCUSING RECEIVER'S COMPLIANCE WITH SECTION 543 AND GRANTING LIMITED RELIEF FROM STAY**

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.  Executed on August 11, 2017 at Islip, New York.

_____

DAVID P. STAPLETON

4

**DECLARATION OF DAVID P. STAPLETON IN SUPPORT OF OPUS BANK'S MOTION FOR ORDER PARTIALLY EXCUSING RECEIVER'S COMPLIANCE WITH SECTION 543 AND GRANTING LIMITED RELIEF FROM STAY**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 29851534V1

# EXHIBIT 1

STAPLETON
GROUP

# DAVID P. STAPLETON

david@stapletoninc.com                                                    515 S. Flower Street, 36th Floor
1.213.235.0601                                                                 Los Angeles, CA 90071

## BUSINESS

**Stapleton Group**                                    *Los Angeles, San Diego, Seattle, & Phoenix*
*President*                                                                          *2008 – Present*

Provide fiduciary and consulting services including: receivership, bankruptcy, forensic accounting, expert witness, business and real estate management.

- Provide receivership and consulting services to over 100 companies and real estate assets with values in excess of $1 billion.
- Serve as Receiver for Surgery Center and medical offices. Manage billing, collections, staffing, etc. Review policies and implement procedures for narcotics, controlled substances, licensing, HIPPA, medical records and compliance management. Work with third parties to ensure same. Review and manage medical billing providers, payroll and accounting
- Serve as financial advisor to Hospital and Independent Physicians Association (IPA) to review and forecast cash flow, practice growth and profitability.
- Supervise care for private fiduciary clients at skilled nursing and memory care facilities.
- Serve as a bankruptcy fiduciary to manage, reposition and sell over $35 million in commercial and land real estate throughout Southern California. Manage the leasing, tenant improvements, deferred maintenance, construction and ultimately the sale and disposition of the assets. Resolve multiple litigation matters, preference and fraudulent transfer issues.
- Serve as Receiver for multimillion dollar company with three divisions. Successfully sell underperforming company through global investment banking process and refinance two other divisions. Payoff secured creditor and restore possession to owners / Defendants.
- Served as a financial advisor to multiple companies to prepare and implement: turnaround plans, disposition and sale strategies, creditor communication / negotiation and cash flow management / improvement. Provide detailed financial management, accounting, reporting and compliance services for fiduciary matters.
- Serve as a Federal Equity Receiver in cases brought by the Security and Exchange Commission. Manage receiverships and forensic accounting for the recovery of funds for investors in funds and Ponzi schemes.
- Served as Receiver for Burke Engineering, a wholesale business with ten locations. Manage the consolidation, sale of the business as a going concern, liquidation of inventory, going out of business sale and collection of accounts receivable.



STAPLETON
GROUP

- Served as a Receiver for Robinson and Robinson, a manufacturing company with over $30 million in annual sales. Successfully managed the liquidation of inventory, accounts receivable and other assets.
- Operated a food manufacturing and distribution company with sales in excess of $20 million. Supervised sales, operations, litigation and collection of delinquent accounts.
- Served as Receiver to manage and sell Vintage Dairy, a $12 million dairy facility permitted for 3,000 cows. Manage Porte Dairy and sell approximately 4,000 cows and related dairy and milking equipment. Manage other diaries and agricultural matters through receivership.
- Serve as Chapter 11 and Chapter 7 bankruptcy trustee, Plan Administrator and Liquidating Trustee for multiple operating businesses and real estate companies.
- Manage and sell intellectual property assets for receivership matters.
- Provide forensic accounting and reporting services.

**HomeFed Corp. / Leucadia National Corp.**                          *California*
*Acquisitions*                                                       *2007 – 2008*

Led team to identify, value, restructure, and acquire real estate assets and companies.

- Identified condo, land, office, retail and land opportunities for potential acquisition throughout the United States.
- Led teams to conduct underwriting, due diligence and financial analysis of acquisition targets. Developed standardized criteria for underwriting.
- Negotiated and closed the purchase of general partnership interests in real estate projects. Managed restructuring through Ch.11 bankruptcy process.
- Analyzed entitlements, land plans, development agreements and tax incremental financing for company assets and acquisition targets.

**DWC**                                                              *California*
*Director, Management & Operations*                                  *2002 – 2007*

Led expansion of company's restructuring and receivership practice from Western United States to a national platform. Led receivership engagements to stabilize and operate multiple troubled assets and loans.

- Managed receiverships and turnarounds for businesses and properties with total value in excess of $2 billion.
- Performed financial analysis and developed workout strategies for multiple troubled companies and assets.
- Managed condo developments, golf courses, residential development communities, hotels, resorts, and multifamily properties in receivership.

**STAPLETON**
GROUP

**PricewaterhouseCoopers LLP**                                        *Various locations;*
*Transaction Services & Advisory*

*London, UK / Frankfurt, Germany*
*1997 – 2001*

Managed a consulting team during the restructuring of Deutsche Telekom's cable
businesses and subsequent sale for approximately €1 billion each.

- Managed purchasers and global banking, legal, and accounting professionals to
  ensure the successful preparation of the OMs and filings of debt registrations.
- Analyzed global sales contracts unique accounting requirements and/or terms
  detrimental to management objectives for Hewlett-Packard, Europe.
- Advised high-tech European clients regarding impacts of purchase transactions
  and valuations of equity instruments.

*Transaction Services & Advisory*                        *New York, NY / California*

- Planned and supervised IPO and disposition engagements for technology
  companies including: Qualcomm and Verance Corporation.
- Prepared and reviewed multiple SEC filings.

**US Army Reserve Officers Training Corps**                    *New Orleans, LA*
*Platoon Leader*                                                *1993 – 1996*

- Received four-year ROTC scholarship and supervised the training and
  development of 30 men and women.

**ACADEMIC** ———————————————————————————————————

- MBA, San Diego State University
- BS, Tulane University

**OTHER**
———————————————————————————————————

- Certified Public Accountant *(2000 – 2007)*
- Organizations: National Association of Federal Equity Receivers (NAFER),
  Turnaround Management Association, CENTS, Bankruptcy & Receiver
  Forums, American Bankruptcy Institute, United Way

# EXHIBIT 2

Exhibit 2, Page 000009

1  David P. Stapleton
   515 South Flower Street
2  36th Floor
   Los Angeles, CA  90071
3  Telephone:  (213) 235-0601
   Email:  david@stapletoninc.com
4

5  Receiver

6

7

8              **SUPERIOR COURT OF CALIFORNIA**

9        **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

10

11  OPUS BANK, a California Commercial Bank,    |  CASE NO. 30-2017-00911945-CU-BC-CJC

12              Plaintiff,                       |  Assigned to Judge James J. Di Cesare
                                                 |  Dept. C16
13        v.
                                                 |  Related to Case No. 30-2017-00912132-CU-
14  HOAG URGENT CARE-TUSTIN, INC., a             |  BC-CJC
    California corporation; HOAG URGENT CARE-
15  ANAHEIM HILLS, INC., a California
    corporation; HOAG URGENT CARE-              |  **RECEIVER'S  EX PARTE
16  HUNTINGTON HARBOUR, INC., a California       |  APPLICATION FOR APPROVAL OF
    corporation; HOAG URGENT CARE-              |  SETTLEMENT AGREEMENT;**
17  ORANGE, INC., a California corporation;
    ROBERT C. AMSTER, an individual; and        |  **MEMORANDUM OF POINTS AND
18  DOES 1 through 50, inclusive,                |  AUTHORITIES IN SUPPORT
                                                 |  THEREOF; AND**
19              Defendants.
                                                 |  **DECLARATIONS OF DAVID P.
20                                               |  STAPLETON AND STEVEN M.
                                                 |  SPECTOR**
21
                                                 |  *Ex Parte* Hearing Date:
22                                               |        August 2, 2017
                                                 |  Time:      1:30 p.m.
23                                               |  Place:     Dept. C-16
                                                 |             700 Civic Center Drive West
24                                               |             Santa Ana, CA  92701

25

26

27
          David P. Stapleton ("Receiver"), the receiver herein, herewith files his Ex Parte
28

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**08/01/2017** at 11:48:00 AM

Clerk of the Superior Court
By Giovanni Galon, Deputy Clerk

1    Application for Approval of Settlement Agreement (the "Application").

2    **BACKGROUND AND SETTLEMENT**

3       This Application resolves the two most significant issues of the receivership:

4       (1) the operation by the Receiver of the three urgent care clinics located at (i) 5355

5 Warner Avenue, Suite 102, Huntington Beach, CA 92649 (ii) 2560 Bryan Avenue, Tustin, CA

6 92782; and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 (collectively, the "Clinics")

7 and (2) settlement of various disputed matters resulting in: (a) an agreement by Opus Bank

8 ("Bank") and Newport Healthcare Center LLC ("Newport"), an affiliate of Hoag Memorial

9 Hospital Presbyterian ("Hoag"), that the Bank will not contest Newport's claim of ownership to

10 the equipment, furniture and inventory and other property located at or associated with Clinics

11 and/or in storage (collectively, the "Settlement Property"); (b) an agreement by the Receiver to

12 transfer the Settlement Property to Newport and Hoag, as the case may be; (c) an agreement by

13 the Receiver to transfer the patient records of the Clinics to Newport; (d) an agreement by Bank

14 not to claim a security interest in the Settlement Property; (e) an agreement by Newport not claim

15 any interest in the accounts receivable (and the proceeds thereof) of the Clinics; (f) an agreement

16 among the Receiver, Newport and Bank that the obligations of Newport, Hoag or the Receiver

17 under various leases, subleases and other agreements are terminated in their entirety and no are

18 longer of any force or effect, and thereupon, possession of the Clinics and any other right, title

19 and interest conveyed pursuant to such agreements are completely and exclusively vested in

20 Newport or Hoag; and (g) an agreement for the Receiver to pay or cause to be paid to Newport

21 certain agreed-upon amounts on account of rent and other items owed under the above-described

22 agreements.[1]

23       The resolution of the above-referenced matters is memorialized in a Settlement

24 Agreement among the relevant parties annexed as Exhibit "B" to the Declaration of David P.

25 Stapleton attached hereto. As the Receiver is a party to the same, this Application seeks Court

26

---

27 [1] There are also numerous subsidiary benefits to the proposed transaction. Among them are the following: (a) elimination of operating losses of about $7,000 per week; (b) termination of employment of employees and payment

28 of benefits related thereto; and (c) elimination of receivership costs and expenses.

1  approval of the Settlement Agreement and the transactions contemplated therein.

2       As set forth in the Complaint in this action, Bank provided financial accommodations to

3  the Clinics which are the subject of this Application.  The loans totaled in excess of $2.3 million.

4  As security for repayment of the loans, the Clinics granted to Bank a security interest in

5  essentially all of their assets.[2]  Conversely, Newport has asserted certain claims to the equipment

6  pursuant to a lease agreement.  In connection with the foregoing, the Receiver has successfully

7  concluded a settlement of the competing claims and has also reached an agreement with Newport

8  to sell/transfer assets of the Clinics to it.  This agreement is memorialized by the Settlement

9  Agreement.  Accounts receivable (and the proceeds thereof) of the Clinics are excluded from the

10  transaction and remain subject to the receivership and security interest of Bank.

11       The Receiver is presently supervising operations of the Clinics.  The actual operations

12  remain with prior management.  However, the Receiver believes the Clinics are incurring

13  operating losses in the aggregate of $7,000 per week.[3]  These losses are at the ultimate expense of

14  Bank and Newport.

15       Upon his appointment, the Receiver was advised of certain claims of Newport to the

16  equipment, the leases and other agreements among the parties.  Newport's claims are based upon,

17  among other things, its assertions that it owns the equipment and leased the same to an affiliate of

18  the Clinics.  In turn, the affiliate subleased the equipment to the Clinics. Newport is also the

19  landlord of the premises where the Clinics operate.  Newport has advised that the leases and other

20  agreements are in substantial default and, as a part of the Settlement Agreement, the Receiver,

21  further to the power granted to him by this Court, will terminate the obligations of Newport and

22  Hoag under such agreements, and thereupon, deliver possession of the Clinics to Newport.

23       Receiver has determined that the settlement evidenced by the Settlement Agreement is in

24  the best interests of the receivership estate and the beneficiary of the estate, Bank, for the

25

26  [2] The security interest granted to Bank was perfected as against third parties by the filing with the California
Secretary of State of Financing Statements (UCC-1 forms).

27  [3] Operating losses do not include the costs, fees and expenses of the receivership, which, of course, exacerbate the
28  losses.

following reasons:

1.      Pursuant to the Settlement Agreement, certain consideration approximately equal to the appraised liquidation value of the equipment will be paid to Receiver and Bank in exchange for not opposing Newport's claim that Newport owns the equipment.

2.      Pursuant to the Settlement Agreement, Newport will obtain possession of the Settlement Property and possession of the Clinics free and clear of any right, title or interest of any other person or entity.

3.      Pursuant to the Settlement Agreement, the Bank will deliver to Newport (i) UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property and (ii) UCC-3 statements reflecting an assignment of any security interest of the Bank in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration.

4.      Pursuant to the Settlement Agreement, the Receiver will pay or cause to be paid to Newport a discounted amount on account of rent and other amounts owed under the leases and other agreements.  This amount will fully settle Newport's claims against the Receiver and receivership estate.

5.      Pursuant to the Settlement Agreement, the obligations of Newport and Hoag under various leases, subleases and other agreements will be terminated in their entirety, and thereupon, possession of the Clinics and any other right, title and interest conveyed pursuant to such agreements are completely and exclusively vested in Newport or Hoag.

6.      "Standard" releases and indemnities among the Receiver, Bank and Newport will be exchanged.

Subject to approval of this Court, the Receiver is a party to the Settlement Agreement.  As a result, based upon the exercise of his business judgment, the Receiver seeks approval by this Court of the Settlement Agreement and the transactions contemplated thereby.  The Receiver also requests this Court to rescind any stay or other order of this Court that may prevent Newport or

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

Exhibit 2, Page 000013

1  Hoag from enforcing their rights under the leases or other agreements with the Defendants, their

2  affiliates or any person or entity related thereto.  Neither the Receiver nor the Bank shall be a

3  party to any enforcement action undertaken by Newport or Hoag.

4        Finally, neither the Clinics nor their affiliate, Your Neighborhood Urgent Care, LLC

5  ("YNUC")  have any economic role in the proposed transaction.  Bank is owed more than $2.3

6  million by YNUC and the Clinics.  The equipment was professionally appraised at $116,000 - the

7  amount which is being paid to the Receiver (and, ultimately, the Bank) by Newport.  Most

8  importantly, the Bank's collateral interest in the accounts receivable of the Clinics - in which

9  Newport has agreed to have no interest-remains unaffected by the proposed transaction.  The

10  Receiver's analysis of the value of the accounts receivable is estimated to be about $900,000.

11  Hence, the value of all assets of the Clinics (about $1,016,000) is far less than the secured debt

12  owed to Bank (at least $2,300,000).

13  **JUSTIFICATION FOR EX PARTE PRESENTMENT OF THIS APPLICATION**

14        Although aware of the burden that ex parte applications have on the Court, the Receiver

15  has determined that ex parte presentment of this Application is justified and warranted for the

16  following reasons:

17        1.       Operating losses at the Clinics are running about $7,000 <u>per week</u>.  Coupled with

18  receivership fees and costs, these losses are more realistically at $12,000 per week or $48,000 per

19  month.  The Clinics do not have either the capital or the prospects of larger receipts to sustain

20  these losses.  Without an identifiable source of funds, the Receiver must close-down operations.

21  A close-down would be disastrous for all involved – including the patients and the communities

22  the Clinics serve.  Hence, ex parte presentment is justified.

23        2.       Unlike private physicians or major hospitals, it is clear to the Receiver that the

24  Clinics provide valuable and necessary medical services to a low income segment of the

25  communities where they are located.  Indeed, the Receiver believes that about 200 patients per

26  day are treated at the Clinics.  The Receiver understands that, upon cessation of operation of the

27  clinics by the Receiver, Newport/Hoag will open their own separate urgent care operations.

28

1  Under the financial circumstances described herein, therefore, the Receiver believes that such the

2  scheduled termination of operation of the Clinics is beneficial to all concerned and justifies the ex

3  parte presentment of this Application.

4    3.    Newport/Hoag Hospital, sensitive to the Hoag brand and reputation in the

5  community, have concluded they should immediately obtain possession of the Clinics' premises

6  in order to reopen the clinics under new management. They support the ex parte presentment.

7    4.    As evidenced by its signature to the Settlement Agreement, the Bank has

8  recognized the urgency of the proposed transaction.

9    For all the foregoing reasons, the Receiver respectfully requests that the Court conclude

10  that ex parte presentment of the Application is warranted and justified.

11    **NOTICE**

12    As set forth in the Declaration of Steven M. Spector, annexed hereto, timely notice of the

13  ex parte presentment of this Application was given to the Plaintiff, the Defendants and to

14  Newport/Hoag.

15    **CONCLUSION**

16    Based upon all of the foregoing, the Receiver respectfully requests the Court approve the

17  Settlement Agreement and the transactions contemplated thereby and rescind any stay or other

18  order of this Court that may prevent Newport or Hoag from enforcing their rights under the leases

19  or other agreements with the Defendants, their affiliates or any person or entity related thereto.

20

21

22

23  DATED: July 28, 2017

24

25    DAVID P. STAPLETON,
      RECEIVER

26

27

28

BUCHALTER

6

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4
59502089.6

## MEMORANDUM OF POINTS AND AUTHORITIES

David P. Stapleton ("Receiver"), the receiver herein, submits the following points and authorities in support of his Ex Parte Application for Approval of Settlement Agreement (the "Application").

### I.

### THIS COURT HAS THE AUTHORITY TO APPROVE

### THE SETTLEMENT OF CLAIMS

This Court appointed the Receiver for the primary purpose of protecting, preserving and selling the assets of the Clinics. Most importantly, under para. 10 of the Receiver Order, the Receiver may "compromise debts" and under para. 8 of the Receiver Order, the Receiver may perform "all acts necessary to liquidating" the Receivership Property. Here, the Receiver, the Plaintiff and Newport/Hoag have determined to settle disputed claims. Therefore, the Receiver's proposed settlement is in compliance with the charge given to the Receiver and is in furtherance of the Receiver Order.

It is clear that this Court has authority to approve a compromise that is in the best interests of the receivership entity. The Court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. (See *Hillman v.* Stults, 263 Cal.App.2d 848, 876 (1968): ["[i]t is well settled that a trial court has broad discretion in its directions and approvals given to a receiver in respect to management of the properties"].)  In addition, "[w]here there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions." (See *City of Santa Monica v. Gonzalez*, 43 Cal.4th 905, 931 (2008) [approving receiver's proposal to the demolition of a building even though owner objected to the receiver's proposal]; *see also, Lesser & Son v. Seymour*, 35 Cal.2d 494, 503 (1950).  Such discretion is necessary for the orderly administration of the receivership estate by the receiver, who is an agent of the Court. (*Id.*; *People v. Stark*, 131 Cal.App.4th 184, 204 (2005)).

The reason underlying the trial court's broad authority concerning administration of the receivership property is because the "main function" of the court is to manage or dispose of the

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

BUCHALTER
59502089.4
59502089.6

Exhibit 2, Page 000016

1  property "in the best manner possible and for the best interest of the parties concerned. <u>To</u>

2  <u>effectually perform that duty necessarily requires some flexibility and continuity of jurisdiction in</u>

3  <u>giving instructions to the receiver as to the manner in which the property should be sold to meet</u>

4  <u>exigencies as they may arise.</u>" (*People v. Stark, supra,* 131 Cal.App.4th at 205.)

5                                    **II.**

6                              **<u>CONCLUSION</u>**

7        Based upon the foregoing, the Receiver believes the relief sought is warranted and the

8  Application should be approved.

9  DATED: _____7/28_____, 2017                Respectfully submitted,

10

11                                                _____
                                                  DAVID P. STAPLETON, RECEIVER
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4
59502089.6

Exhibit 2, Page 000017

# DECLARATION

Exhibit 2, Page 000018

## DECLARATION OF DAVID P. STAPLETON

I, David P. Stapleton, hereby declare:

1.      I am the duly appointed and acting receiver in the above matter pursuant to the certain order of the Court attached hereto as Exhibit "A."

2.      My appointment was made at the request of Opus Bank ("Bank"), the plaintiff herein.[4] Per the verified complaint herein, Bank claims a "blanket" security interest in essentially all for the assets of the "Hoag Urgent Care" clinics (the "Clinics") to secure payment of a debt of greater than $2.3 million.

3.      Upon my appointment, I assumed operational supervision of three of the Clinics: Tustin, Anaheim Hills and Huntington Harbour;[5] a fourth clinic, Orange, was previously closed and its tangible assets are in storage.

4.      Day-to-day operations of the Hoag Clinics are managed by Dr. Robert Amster, the principal of the Clinics and a staff headed by his daughter, Jennifer Amster. Jennifer and her staff have been cooperative and of assistance to me.

5.      Shortly after my appointment, I learned of the relationship among Dr. Amster, his management company, YNUC and the Clinics, on the one hand and Newport Healthcare Center, LLC ("Newport") and its parent company, Hoag Memorial Hospital Presbyterian ("Hoag"), on the other hand.

6.      In short, through a series of lease and sublease agreements, an urgent care agreement and a trademark agreement, Newport/Hoag claimed an interest in the tangible assets of the Clinics, including the stored assets of Orange and also controlled the occupancy of the premises where the Clinics operated and controlled their use of the name "Hoag." Newport

---

[4] Bank is also the Plaintiff in the companion/related action (Case No. 30-2017-009/2132-CU). I am also the receiver in the companion/related action. The foregoing is significant because in the related action, Your Neighborhood Urgent Care, LLC ("YNUC") is a defendant. YNUC claims or had an interest in the Settlement Property referenced herein. Accordingly, while this Application pertains to the interests of the "Hoag Urgent Care" parties in the assets referenced hereinafter, it also pertains to the interest, if any, of YNUC in such assets. As a result, I have filed a mirror of this Application in the companion/related action so that, if approved, the Court will have made an order respecting all parties that have or may have an interest in the assets, the Hoag Urgent Care" parties and YNUC.

[5] I also assumed operational supervision of the companion/related clinics located in Laguna Beach and Cypress. These clinics are not the subject of this Application.

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

BUCHALTER

59502089.4
59502089.6

Exhibit 2, Page 000019

1 advised that all for the foregoing were in substantial default for non-payment.

2       7.       Based on the foregoing, it became clear to me that a dispute between Bank and

3 Newport/Hoag over the Clinic assets was possible. It also became clear to me that neither the

4 Clinics nor YNUC had any financial interest in the Clinics based upon the large delinquent

5 amounts owed to Bank and to Newport/Hoag.

6       8.       As operations of the Clinics continued, I became concerned about what appeared

7 to be operating losses. From the information provided by Jennifer, operating losses for the three

8 operating were running at about $7,000 per week. This excluded the fees and costs of the

9 receivership. When the latter were added to the operating losses, I concluded the losses amounted

10 to between $40,000 and $50,000 per month.

11      9.       Moreover, the losses were exacerbated by cash flow issues as income was, for the

12 most part, received from governmental agencies or insurance companies – both notoriously slow

13 payers. In fact, a third party collector is employed to assist in collections (for a fee).

14      10.      I have reviewed a third party appraisal of the equipment. The liquidation value of

15 the equipment at the three operational Clinics is stated to be $106,000. The value of the stored

16 equipment of the non-operating Clinic-Orange-was agreed to be $10,000. Hence, this total of

17 $116,000 is to be paid to me (and the Bank) by Newport in connection with the settlement. The

18 value of the accounts receivable at $900,000 is based on information provided by Jennifer and my

19 historic assessment of net collectability.

20      11.      Based primarily upon the foregoing,

21          a.  I concluded that operations of the Clinics could not be sustained for a long

22              period of time based on cash flow and the lack of capital in the entities;

23          b.  It would be in the best interest of the people served and the communities if

24              another entity assumed the operations;

25          c.  A settlement of the claims of Bank and Newport over the physical Clinics

26              would be in the best interests of both Bank and Newport/Hoag;

27          d.  The receivables of the Clinics, which are Bank's collateral, were not the

28

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
BUCHALTER
59502089.4
59502089.6
Exhibit 2, Page 000020

1           subject of a dispute with Newport/Hoag so they would remain in receivership

2           and subject to the Bank's security interest;

3       e.  The interests of the Clinics and YNUC in the various leases and agreements

4           with Newport/Hoag needed to be terminated; and

5       f.  The best interest of all parties would be for Hoag/Newport to take over the

6           operations of the Clinics.

7       12.    An agreement was reached respecting the foregoing.  The agreement was then

8   reduced to writing in the form of a Settlement Agreement, attached hereto as Exhibit "B."  I have

9   signed the same subject to Court approval.

10      13.    I believe the Settlement Agreement is in the best interests of the receivership estate

11  and all parties as set forth in paragraph 11, above.  I also believe this Application warrants ex

12  parte presentment for the reasons set forth in the Application.

13      14.    All of the facts set forth in the Application and herein are true and correct to my

14  best knowledge, information and belief.  I have personal knowledge of the same except where

15  otherwise stated or referenced.

16      15.    Based upon the foregoing, I respectfully recommend and request the Court

17  approve the Application (and the Settlement Agreement).

18      I declare under penalty of perjury of the laws of the State of California that the foregoing

19  is true and correct.

20      Executed at Los Angeles, CA on July 2̲8̲, 2017.

21

22                           DAVID P. STAPLETON

23

24

25

26

27

28

BUCHALTER

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4
59502089.6

Exhibit 2, Page 000021

# EXHIBIT A

1    BUCHALTER
     A Professional Corporation
2    BARRY A. SMITH (SBN: 48697)
     STEVEN M. SPECTOR (SBN: 51623)
3    1000 Wilshire Boulevard, Suite 1500
     Los Angeles, CA 90017-2457
4    Telephone: 213.891.0700
     Fax: 213.896.0400
5    E-mail: bsmith@buchalter.com

6    Attorneys for Plaintiff
     OPUS BANK, a California Commercial Bank
7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 25 2017

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

8              SUPERIOR COURT OF CALIFORNIA

9         COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11   OPUS BANK, a California Commercial Bank,       CASE NO. 30-2017-00911945-CU-BC-CJC
                                                    Assigned to Judge James J. Di Cesare
12              Plaintiff,                          Dept. C16

13        v.                                        Related to Case No. 30-2017-00912132-CU-
                                                    BC-CJC
14   HOAG URGENT CARE-TUSTIN, INC., a               n.s. 5-25-17
     California corporation; HOAG URGENT CARE-
15   ANAHEIM HILLS, INC., a California              [~~PROPOSED~~] ORDER APPOINTING
     corporation; HOAG URGENT CARE-                 RECEIVER AND ISSUANCE OF
16   HUNTINGTON HARBOUR, INC., a California          PRELIMINARY INJUNCTION IN AID
     corporation; HOAG URGENT CARE-                 OF RECEIVER
17   ORANGE, INC., a California corporation;
     ROBERT C. AMSTER, an individual; and
18   DOES 1 through 50, inclusive,

19              Defendants.

20

21

22

23

24

25

26

27

28

1    Upon the Stipulation of Plaintiff Opus Bank, a California Commercial Bank ("Plaintiff")

2  and Defendants Hoag Urgent Care-Tustin, Inc., Hoag Urgent Care-Anaheim Hills, Inc., Hoag

3  Urgent Care-Huntington Harbour, Inc. and Hoag Urgent Care-Orange, Inc. (collectively, the

4  "Receivership Defendants") for Appointment of Receiver and Issuance of Preliminary Injunction

5  In Aid of Receiver and good cause appearing therefor:

6    **IT IS HEREBY ORDERED** that David P. Stapleton ("Receiver") be and is hereby

7  appointed receiver over the assets and property of the Receivership Defendants, subject to the

8  conditions that before entering upon his duties as the Receiver, he shall file the oath of office and

9  file a surety bond in the sum of $50,000 to secure faithful performance of his duties as receiver.

10    **IT IS FURTHER ORDERED** that the Receiver shall have the following powers and

11  responsibilities:

12    1.    To enter, gain access, and take possession of the premises of the Receivership

13  Defendants wherever their assets and property are located, including, without limitation, at the

14  following locations:  Hoag Urgent Care Anaheim Hills, 5630 E. Santa Ana Canyon Rd. #100,

15  Anaheim, California; Hoag Urgent Care Huntington Harbor, 5355 Warner Avenue #102,

16  Huntington Beach, California; Hoag Urgent Care Tustin, 2560 Bryan Avenue #A, Tustin,

17  California; and Hoag Urgent Care Orange, 7630B E. Chapman Avenue, Orange, California

18  ("Business Premises"), and to seize, manage, control and collect all of the Receivership

19  Defendants' assets, including, but not limited to, (a) the Collateral as defined in the Commercial

20  Security Agreement attached as Exhibit 3 to Plaintiff's Verified Complaint filed herein; (b) all

21  inventory, equipment and accounts, including, but not limited to, all health-care insurance

22  receivables, chattel paper, instruments, all promissory notes, letter-of-credit rights, letters of

23  credit, documents, deposit accounts, investment property, money, other rights to payment and

24  performance; (c) general intangibles including but not limited to all software and all payment

25  intangibles; (d) all fixtures; (e) all goodwill relating to the foregoing property; (f) all records, data

26  and embedded software relating to the foregoing property; (g) all equipment, inventory and

27  software to utilize, create, maintain and process any such records and data on electronic media;

28  (h) all products and proceeds of the foregoing, including, but not limited to, all insurance

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

1

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

Exhibit 2, Page 000024
BN 28692455V2

1    payments; and (i) all interests which the Receivership Defendants have or may have acquired in
2    or to the Collateral, together with all income, revenue, profits, proceeds and payments derived
3    therefrom (collectively, all of the foregoing are referred to as the "Receivership Property"). To
4    the extent any Receivership Property is located in a location other than the Business Premises, the
5    Receivership Defendants shall notify the Receiver and Plaintiff of the subject items and their
6    location, and provide access to the location(s) or deliver possession of the subject Receivership
7    Property no later than ten (10) calendar days after the entry of this order. The Receiver shall
8    make books and records of the Receivership Defendants available or provide copies of the same
9    to the Receivership Defendants and/or their principals, employees, agents, and professionals
10   within ten (10) calendar days of the receipt of written request for such access.

11         2.    Subject to approval of the Court, the Receiver shall have the right to sell, lease,
12   transfer, collect and convey the Receivership Property.

13         3.    To take any and all steps necessary to receive, collect and review all mail
14   addressed to Receivership Defendants, including, but not limited to, mail addressed to each and
15   every one of their Business Premises and any post office boxes held in the name of Receivership
16   Defendants, and, at the Receiver's discretion, he is authorized to instruct the U.S. Postmaster to
17   re-route, hold and/or release said mail to the Receiver. Copies of mail reviewed by the Receiver
18   in the performance of his duties will promptly be made available for inspection by Receivership
19   Defendants upon request after review by the Receiver. Receiver shall not collect, open or review
20   any mail addressed solely to any individual or entity other than the Receivership Defendants. If
21   any correspondence appears to be confidential or privileged in nature, including, without
22   limitation, any communications from counsel for the Receivership Defendants, Receiver shall
23   immediately notify the Receivership Defendants of the receipt of such correspondence and shall
24   not open or review such correspondence (a) unless and until authorized or instructed to do so by
25   the Receivership Defendants or, (b) if no such authorization is received, five (5) court days have
26   passed since Receiver notified the Receivership Defendants of the receipt of such
27   correspondence. The Receivership Defendants shall have the right to review any potentially
28   confidential or privileged correspondence prior to Receiver's review of the same. The

1    Receivership Defendants shall have the right to withhold any confidential or privileged

2    correspondence or communication if the disclosure of the correspondence or communication to

3    Receiver would violate or render inapplicable any protection(s) for confidential or privileged

4    communications or information under California or federal law. Receiver agrees to maintain the

5    confidentiality of and abide by all laws and regulations with respect to mail he receives, collects

6    and reviews that deal with patient information.

7        4.    To demand, collect, and receive all monies, funds and payments arising from the

8    Receivership Property.

9        5.    To take possession of all bank and deposit accounts of Receivership Defendants

10   wherever located, and to take possession of any money on deposit in said accounts.

11       6.    To establish bank accounts at any bank the Receiver deems appropriate for the

12   deposit of monies and funds collected and received in connection with his administration of the

13   Receivership estate, provided that all funds on deposit are insured by an agency of the United

14   States Government and the account(s) and bank(s) are disclosed to the Receivership Defendants

15   and the court.

16       7.    The Receiver shall have the non-exclusive right to use in the course of the

17   operations of the Receivership Defendants the Federal and State taxpayer identification and

18   account numbers of the Receivership Defendants, including Receivership Defendants' property

19   tax account numbers, NPI numbers and any other billing NPI numbers used by the Receivership

20   Defendants and licensed physicians, whether employees or contractors, and computer network

21   access passwords, keys and any other access controls, computer and software passwords, business

22   licenses, Federal, State and any other licenses currently required to operate, in connection with

23   the Receivership estate, as necessary to perform and/or carry-out the Receiver's duties. The

24   Receivership Defendants, and each of them, shall promptly provide to Receiver the foregoing

25   information and any other information necessary for the operation of the Receivership Defendants

26   or for Receiver to perform or carry-out the Receiver's duties. Notwithstanding anything to the

27   contrary, the obligation to provide information and/or access pursuant to this paragraph 7 shall

28   not apply to the personal accounts of the officers, owners, principals, agents, employees, and/or

1  independent contractors of the Receivership Defendants, or the personal or professional accounts

2  of any professionals or advisors of the Receivership Defendants, including, without limitation,

3  any accounts for the attorneys representing the Receivership Defendants, or any of them, or their

4  respective law firms.

5      8.    To execute and prepare all documents and to perform all acts, either in the names

6  of the Receivership Defendants, or in the Receiver's own name, which are reasonably necessary

7  to preserving, protecting, managing, controlling, and/or liquidating the Receivership Property.

8      9.    To contact the Receivership Defendants' account debtors ("Account Debtors"),

9  and/or their billing departments, insurance companies, governmental agencies or contractors, in

10  order to advise the Account Debtors not to send or transmit further payments to the Receivership

11  Defendants and to instruct the Account Debtors to send or transmit any and all payments due

12  directly to the Receiver.

13      10.    To compromise debts and to incur risks and obligations reasonably necessary to

14  maintain or continue the businesses and enterprises of the Receivership Defendants.

15      11.    To employ servants, agents, employees, appraisers, guards, clerks, accountants,

16  liquidators, auctioneers, locksmiths, computer system experts, attorneys, and management

17  consultants necessary to assist the Receiver in administering the Receivership estate and to

18  protect the Receivership Property and to purchase any necessary materials, supplies and services

19  and to pay therefor at the usual rate and prices out of funds that shall come into his possession.

20  No expenses incurred by the Receiver pursuant to this paragraph shall be the personal obligation

21  of the Receiver but shall be the obligation of the Receivership estate.

22      12.    To procure insurance on the Receivership Property if, in his discretion, there is

23  insufficient insurance coverage thereon, provided the Receiver has funds available to do so.

24  Receiver shall make a determination regarding the adequacy of the insurance coverage and, if

25  deemed deficient, obtain additional coverage, if funds are available to do so, no later than thirty

26  (30) days after the entry of this order.  During said 30-day period, the Receiver shall not be

27  personally responsible for claims arising or for the procurement of insurance.

28

13.    To institute ancillary proceedings in this State or other States as is necessary to obtain possession and control of the Receivership Property, and to participate in any court or other proceedings involving Receivership Defendants. The Receiver may engage the services of counsel in accordance with California Rule of Court ("CRC") 3.1180. The Receiver may pay for such services from the funds of the Receivership estate.

14.    In accordance with CRC 3.1181, the Receiver shall, within thirty (30) days of his appointment, file in this action an inventory of all property of which he has taken possession pursuant to this Order and any supplemental inventory which he subsequently obtains. The Receiver shall provide the parties with a copy of the inventory pursuant to CRC 3.1182.

15.    In accordance with CRC 3.1182, the Receiver shall prepare interim statements every thirty (30) days commencing with his appointment providing any and all information and disclosures required under CRC 3.1182, including, without limitation, the Receiver's fees and administrative costs and expenses incurred for the period in the operation and administration of the Receivership estate. Subject to the requirements and limitations of CRC 3.1183, the Receiver may seek approval to pay from the Receivership estate funds, if any, the amount of said statement, including fees and expenses due to the Receiver and Receiver's counsel, if any. Notwithstanding any interim payment(s) on account of Receiver's fees and administrative expenses, such fees and expenses shall be submitted to the Court for its final approval and confirmation in accordance with CRC 3.1184.

16.    The Receiver shall not be obligated to file on behalf of the Receivership Defendants any federal or state income tax returns, schedules or other forms as required under applicable law. The Receiver shall make any and all documents in his possession, custody or control available to the Receivership Defendants or their agents within ten (10) calendar days of written request.

17.    If reasonably necessary to maintain the operations of the Receivership Defendants and subject to court approval, the Receiver may issue Receivership Certificates totaling no more than $1,000,000 in increments of up to $10,000 bearing interest at no more than eight percent (8%) per annum to any person or party that loans funds to the Receivership estate. Before the

1  Receiver borrows from or issues Receivership Certificates to any party to this action, the Receiver

2  must provide written notice to all parties to this action of his intention to enter into such a

3  transaction, the terms of the transaction, and the terms of any similar transactions with individuals

4  or entities that are not parties to this action.  All funds loaned to the Receiver pursuant to such

5  Receivership Certificate(s) shall be deemed to be a lien and charge of first priority on all assets of

6  the Receivership estate which shall be repaid prior to all other encumbrances and claims, other

7  than costs of administration of the receivership.

8      18.    In their sole and absolute discretion, the Receivership Defendants, and each of

9  them, may file a petition for relief under any chapter of title 11 of the United States Code

10  following the appointment of the Receiver or the term of this order.  Nothing contained herein

11  shall be interpreted to hinder, limit, diminish, divest or transfer the rights of the Receivership

12  Defendants to file a petition for relief under any chapter of title 11 of the United States Code

13  following the appointment of the Receiver or the term of this order.  If any of the Receivership

14  Defendants files a bankruptcy case during the receivership, Plaintiff shall give notice of the

15  bankruptcy case to the Court, to all parties, and to the Receiver by the close of the business day

16  after the day on which Plaintiff receives notice of the bankruptcy filing.

17      19.    If the Receiver receives notice that a bankruptcy has been filed by any or all of the

18  Receivership Defendants and/or that part of any bankruptcy estate includes property that is the

19  subject of this order, the Receiver shall have the following duties:

20        (a)    The Receiver shall immediately contact the party who obtained the

21  appointment of the Receiver and determine whether that party intends to move in the bankruptcy

22  court for an order for (1) relief from the automatic stay (11 U.S.C. § 362), and/or (2) relief from

23  the Receiver's obligation to turn over the property (11 U.S.C. § 543).  If the party has no intention

24  to make such motions, the Receiver shall immediately turn over any and all property in his

25  possession, custody or control subject to this order to the appropriate entity (either to the trustee

26  in bankruptcy if one has been appointed or, if not, to the debtor in possession) and otherwise

27  comply with 11 United States Code section 543.

28

1    (b)    If the party who obtained the receivership intends to seek relief

2  immediately from the automatic stay and/or the Receiver's obligation to turn over the property,

3  the Receiver may remain in possession and preserve the property pending the ruling on those

4  motions (11 U.S.C. § 543(a)). The Receiver's authority to preserve the property shall be limited

5  to the following:

6    (1)    The Receiver may continue to collect rents and other income;

7    (2)    The Receiver may make only those disbursements necessary to

8  preserve and protect the property;

9    (3)    The Receiver shall not execute any new leases or other long-term

10  contracts; and

11    (4)    The Receiver shall do nothing that would effect a material change

12  in the circumstances of the property.

13    (c)    If no motion for relief from the automatic stay or to excuse turnover is filed

14  within ten (10) court days after the Receiver's receipt of notice of the date of the bankruptcy

15  filing, but in no event later than seven (7) court days from the date of the bankruptcy filing, the

16  Receiver shall immediately turn over the property in his possession, custody or control subject to

17  this order to the appropriate entity (either to the trustee in bankruptcy if one has been appointed

18  or, if not, to the debtor in possession) and otherwise comply with 11 United States Code section

19  543.

20    (d)    The Receiver may petition the Receivership Court to retain legal counsel to

21  assist the Receiver with issues arising out of the bankruptcy proceedings that affect the

22  receivership.

23    20.    The Receiver shall be authorized to apply to this Court for further orders

24  instructing the Receiver from time to time, and on due notice.

25    <u>PRELIMINARY INJUNCTION</u>

26    21.    Effective upon entry of this order, the Receivership Defendants, their officers,

27  members, directors, agents, servants, employees and all persons or entities acting under, or in

28

1  concert with them or for them, are ordered to do the following and are restrained and enjoined

2  from engaging in, or performing, directly or indirectly, any or all of the following acts:

3          (a)     Interfering, hindering or molesting in any way whatsoever the Receiver in

4  the performance of the Receiver's duties herein described and in the performance of any duties

5  incident thereto;

6          (b)     Failing or refusing to turnover to or provide the Receiver access to all

7  Business Premises in accordance with the provisions hereof;

8          (c)     Transferring any interest in the Receivership Property by sale, pledge,

9  grant of security interest, assignment, invoice or encumbering in any manner thereof;

10          (d)     Removing any Receivership Property from the Business Premises;

11          (e)     Transferring, concealing, destroying, defacing or altering any of

12  Receivership Defendants' books and records;

13          (f)     Diverting in any of the proceeds from Receivership Defendants' accounts

14  receivable, equipment and/or inventory;

15          (g)     Causing any mail addressed to the Receivership Defendants or payments

16  by Receivership Defendants' Account Debtors to be forwarded to any address other than the

17  Business Premises or any existing post office box or other mailing address in the name of the

18  Receivership Defendants, or otherwise interfering with or intercepting any mail intended for the

19  Receivership Defendants; and

20          (h)     Failing or refusing to immediately turn over to the Receiver the

21  Receivership Property and all monies, checks, funds or proceeds relating to the Receivership

22  Property, or failing to make available to the Receiver all books and records of the Receivership

23  Defendants relating to the Receivership Property.

24       IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of

25  the receivership ordered herein, the Receivership Defendants, and all customers, vendors,

26  principals, investors, collectors, stockholders, lessors, creditors and other persons seeking to

27  establish or enforce any claim, right or interest against or on behalf of the Receivership

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

8

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
BN 28692455V2

Exhibit 2, Page 000031

1   Defendants or any assets or property of the Receivership Defendants be and are hereby stayed

2   from:

3              (a)      Commencing, prosecuting, continuing or enforcing any suit or proceeding

4   against Receivership Defendants, or any of their subsidiaries or affiliates, except such actions

5   may be filed to toll any applicable statute of limitations;

6              (b)      Commencing, prosecuting, continuing or entering into any suit or

7   proceeding in the name or on behalf of Receivership Defendants, or any of their subsidiaries or

8   affiliates;

9              (c)      Accelerating the due date of any obligation or claimed obligation,

10  enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of,

11  any property of the Receivership Defendants, or any of their subsidiaries or affiliates, or any

12  property claimed by any of them or attempting to foreclose, forfeit, alter, or terminate any of the

13  Receivership Defendants or any of their subsidiaries or affiliates interest in property, including,

14  without limitation, the establishment, granting or perfection of any security interest, whether such

15  acts are part of a judicial proceeding or otherwise;

16             (d)      Using self-help or executing or issuing, or causing the execution or

17  issuance of any court attachment, subpoena, replevin, execution or other process for the purpose

18  of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any

19  property, wherever located, owned by or in the possession of the Receivership Defendants, or any

20  of their subsidiaries or affiliates, or the Receiver appointed pursuant to this Order or any agent

21  appointed by said Receiver; and

22             (e)      Doing any act or thing whatsoever to interfere with the Receiver taking

23  control, possession or management of the Receivership Property, or to in any way interfere with

24  the Receiver, or to harass or interfere with the duties of the Receiver, or to interfere in any

25  manner with the exclusive jurisdiction of this Court over the property and assets of the

26  Receivership Defendants, or their subsidiaries or affiliates. Provided, however, nothing in this

27  paragraph shall prohibit any federal or state law enforcement or regulatory authority from

28

1 | commencing or prosecuting an action against the Receivership Defendants, or their subsidiaries

2 | or affiliates.

3 |         (f)     None of the foregoing provisions shall be interpreted in any way to hinder,

4 | limit, diminish, divest or transfer the rights of the Receivership Defendants to file a petition for

5 | relief under any chapter of title 11 of the United States Code following the appointment of the

6 | Receiver or during the term of this order.

7 |     **THE COURT ORDERS** Plaintiff to immediately file a preliminary injunction bond

8 | under Code of Civil Procedure section 529 in the amount of $1,000 and file a Plaintiff's

9 | receivership bond under Code of Civil Procedure section 566(b) in the amount of $1,000.

10 |     **IT IS SO ORDERED.**

11 |

12 | DATED:  **5-25-17**

13 |                                 JUDGE OF THE SUPERIOR COURT

14 |                                   **WALTER SCHWARM**

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28692455V2

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

# EXHIBIT B

Exhibit 2, Page 000034

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "**Agreement**") is entered into as of July 20, 2017 (the "**Effective Date**") by and among (i) David P. Stapleton (the "**Receiver**"), in his capacity as court-appointed receiver in the actions styled *OPUS BANK v. HOAG URGENT CARE-TUSTIN, INC., et al. and OPUS BANK v. LAGUNA-DANA URGENT CARE, INC., et al.* (the "**Actions**"), currently pending in the Superior Court of California, County of Orange (the "**Court**") (ii) Newport Healthcare Center LLC, a Delaware limited liability company ("**Newport**"); and (iii) Opus Bank ("**Bank**"). The Receiver, Newport and Bank are occasionally referred to herein singularly as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.    The following recitals represent a summary of the contentions of the Parties. Many of these contentions are disputed and, therefore, are not to be deemed admissions in any respect:

1.    Certain medical and office equipment, furniture and inventory is located at (i) 5355 Warner Avenue, Suite 102, Huntington Beach, CA 92649; (ii) 2560 Bryan Avenue, Tustin, CA 92782; and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 (collectively, the "**Premises**") and other medical and office equipment, furniture and inventory has been moved from the Premises and placed in storage (collectively, the "**Equipment**").

2.    Each Premises is occupied under a separate sublease between Newport, as sublessor and Your Neighborhood Urgent Care, LLC ("**YNUC**"), as sublessee (collectively, the "**Leases**"). YNUC has subleased the Premises located at (i) 5355 Warner Avenue, Suite 102, Huntington Beach, CA 92649 to Hoag Urgent Care-Huntington Harbour, Inc. ("**HUCHH**"); (ii) 2560 Bryan Avenue, Tustin, CA 92782 to Hoag Urgent Care-Tustin, Inc. ("**HUCT**"); and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 to Hoag Urgent Care-Anaheim Hills, Inc. ("**HUCAH**" and together with HUCT, HUCAH, HUCHH, and Hoag Urgent Care-Orange, Inc. ("**HUCO**"), the "**Affiliates**"), each for the operation of an urgent care facility (collectively, the "**Subleases**").

3.    In connection with the Leases and the Subleases, the following agreements were also entered into: (i) a Master Urgent Care Development Agreement (the "**UrgentCare Agreement**") by and among Robert C. Amster ("**Amster**"), YNUC, Newport and Hoag Memorial Hospital Presbyterian, a California nonprofit public benefit corporation ("**Hoag**"), as may be amended; (ii) Terms and Conditions of Trademark License (the "**Trademark License**") by and between Hoag, YNUC and each Affiliate, as may be amended; and (iii) Guaranty of Sublease Agreement (the "**Guaranty**") made by and among Amster and Robert Amster, M.D., Inc., a California medical professional corporation ("**Amster Corporation**") (jointly, the "**Guarantors**") and in favor of Newport for each Lease, as may be amended (collectively with the Leases and Subleases, the "**Newport/Hoag/YNUC Agreements**").

4.    Newport contends it owns certain of the Equipment and leased the same to YNUC pursuant to the Leases.

5.    Newport, as secured party, filed a Financing Statement (Form UCC-1) with the California Secretary of State on January 26, 2012. The debtor listed on the Newport UCC-1 was YNUC. Newport contends the purpose of filing the Newport UCC-1 was to establish that Newport's interest in the Equipment was perfected as against third parties in the event a

1

Exhibit 2, Page 000035

third party asserted that the Leases were not true leases under the Uniform Commercial Code. Newport's UCC-1 expired on January 26, 2017.

      6.     Bank contends that YNUC and the Affiliates own the Equipment as a result of the Equipment being acquired by a sale transaction.

      7.     Bank contends it has a first priority security interest in the Equipment by virtue of a credit transaction in which Bank provided financial accommodations to YNUC and/or the Affiliates and YNUC and/or the Affiliates granted to Bank a first priority security interest in the Equipment to secure payment of the financial accommodations.

      8.     Bank, as secured party, filed with the California Secretary of State various Financing Statements (Form UCC-1) on September 30, 2013 and October 3, 2013 thereby perfecting its security interest in the Equipment, among other collateral. Bank contends its UCC-1 filings evidence a first priority lien upon the Equipment senior and superior to the interests of any third party to the Equipment.

      9.     Newport contends that YNUC is in default under the terms of the Leases, which default is not curable, and that Newport has the right to, among other things, terminate the Leases and the Subleases. Bank contends that YNUC and the Affiliates are in default in their obligations to Bank which default entitles Bank to pursue its various rights and remedies against the Equipment.

      10.     In the Actions, pursuant to the request of Bank, the Court has appointed Receiver, as receiver over the Equipment and the business and assets of YNUC and the Affiliates.

      B.     Subject to the terms of this Agreement, the Parties desire to settle all claims among the Parties related to the matters set forth in this Agreement.

## AGREEMENT

      **NOW, THEREFORE**, in consideration of the mutual covenants, promises, terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

      1.     <u>Financial/Ownership Settlement Terms</u>. Subject to the terms of this Agreement and upon approval by the Court of this Agreement and the transactions contemplated in this Agreement ("**Court Approval**"):

      1.1.     The Receiver and Bank will not oppose Newport's claim that Newport owns the Equipment.

      1.2.     The Receiver will transfer to Newport all telephone numbers related to the Premises (the "**Telephone Numbers**").

      1.3.     The Receiver and Bank will not claim any ownership or security interest in the Equipment or in the patient records – both hard copies and computer records – of the patients of YNUC or the Affiliates maintained at or for the Premises ("**Patient Records**", and together with the Equipment and the Telephone Numbers, the "**Settlement Property**"). For the avoidance of any doubt, the Settlement Property includes Patient Records and Telephone Numbers of HUCO and the Settlement Property does not include any accounts receivable of

2

Exhibit 2, Page 000036

YNUC or the Affiliates arising on or prior to August 7, 2017 or the proceeds thereof (collectively, the "**Accounts Receivable**"). Newport will not claim any interest in the Accounts Receivable.

      1.4.     The Bank will not claim any security interest in the Settlement Property.

      1.5.     On the Closing Date (as defined below) the Receiver hereby assigns, transfers, conveys and delivers to (a) Newport, all right, title and interest in and to and possession of the Equipment and the Telephone Numbers, and (b) subject to the terms of Section 6 of this Agreement, Hoag (or such other entity designated by Hoag) all right, title and interest in and to and possession of the Patient Records, all of the foregoing free and clear of any right, title or interest of any other person or entity, including but not limited to YNUC, Amster, Amster Corporation or the Affiliates, as applicable that is reflected on the Closing UCC Search (defined hereinafter) ("**Free and Clear**").

      1.6.     On the Closing Date the Bank will deliver to Newport (i) UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property and (ii) UCC-3 statements reflecting an assignment of any security interest of the Bank in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration. If, prior to January 1, 2018, none of YNUC or the Affiliates (i) is or has been the subject of a petition under 11 U.S.C. or the commencement of a bankruptcy or similar proceeding which is not dismissed by January 1, 2018; (ii) is or has been the subject of an involuntary bankruptcy petition or other commencement of a bankruptcy, reorganization or similar proceeding which is not dismissed by January 1, 2018; (iii) is or has been subject to an order for relief under 11 U.S.C.; (iv) is subject to an assignment for the benefit of its creditors; (v) is or has been subject to the approval by a court of competent jurisdiction of a petition in any proceeding for its reorganization instituted under the provisions of any state or federal bankruptcy, insolvency, or similar laws; or (vi) other than as exists as of the date of this Agreement, is or has been subject to the appointment of a receiver of the whole or any substantial part of the properties of any of the same (collectively, a "**Bankruptcy Event**"), then Bank authorizes Newport to cause UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property to be filed with the any applicable Secretary of State or other applicable recording office. If, prior to January 1, 2018, any of YNUC or the Affiliates is or has been the subject of a Bankruptcy Event, then the Bank hereby confirms the assignment of the Bank's security interest in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration is effective and authorizes Newport to cause UCC-3 statements reflecting such assignment to be filed with the any applicable Secretary of State or other applicable recording office. Notwithstanding anything in this Agreement to the contrary, after the Closing Date, if the Receiver and Bank oppose Newport's claim that Newport owns the Settlement Property, then Bank hereby authorizes Newport to cause UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property to be filed with the any applicable Secretary of State or other applicable recording office. If any Equipment is determined in any case or matter related to any Bankruptcy Event (i) not to be the be the sole property of Hoag or (ii) to not be subject to the security interest of the Bank as assigned and described above, the Bank will promptly return to Newport the Settlement Consideration.

3

Exhibit 2, Page 000037

1.7.    The Receiver, Bank and Newport agree that this Agreement constitutes the full and final settlement of claims and contentions respecting ownership of and secured claims among the Parties with respect to the Settlement Property and the Accounts Receivable.

2.    The Newport/Hoag/YNUC Agreements. Subject to the terms of this Agreement, Court Approval and the transactions contemplated in this Agreement:

2.1.    . On the following dates, the Receiver will pay or cause to be paid to Newport the following amounts on account of rent and other amounts owed under the Newport/Hoag/YNUC Agreements:

| Date | Amounts |
|------|---------|
| Closing Date | $30,000 |
| September 1, 2017 | $5,000 |
| October 1, 2017 | $5,000 |
| December 1, 2017 | $5,000 |
| January 1, 2018 | $5,000 |
| February 1, 2018 | $5,000 |
| March 1, 2018 | $1,250 |

2.2.    On the Closing Date, without further payment, the obligations of Newport, Hoag or the Receiver under the Leases, the Subleases, the UrgentCare Agreement and the Trademark License are agreed among them to be terminated in their entirety and no are longer of any force or effect, and thereupon, possession of the Premises and any other rights, title and interests conveyed pursuant to the Leases, the Subleases, the UrgentCare Agreement and the Trademark License are agreed to be finally, completely and exclusively vested in Newport or Hoag (or such other entity designated by Hoag), as the case may be.

2.3.    From and after the Effective Date and at all reasonable times, upon reasonable notice, Newport and its agents, employees, consultants, inspectors, appraisers, engineers and contractors will have the right to enter upon and pass through the Premises during normal business hours to examine and inspect the Settlement Property, as well as conduct reasonable investigations and the like of the Premises and the Settlement Property as Newport deems necessary. Prior to the Closing Date, Newport shall conduct a walk-through inspection of the Premises and may conduct a walk-through inspection of the stored Equipment (the "Inspection") whereby Newport shall prior to the Closing Date approve or disapprove in writing of the state of the Premises or Settlement Property. The failure of Newport to provide its written disapproval as set forth herein within the time set forth herein shall be deemed Newport's approval of the state of the Premises and Settlement Property.

2.4.    On the Closing Date (i) the Receiver, YNUC, Amster, Amster Corporation and the Affiliates, as applicable, must vacate and surrender the Premises to Newport with all improvements, parts, and surfaces clean and free of debris, and in a condition and state of repair as approved by Newport as part of the Inspection; (ii) the Receiver, YNUC, and the Affiliates, as applicable, must remove any and all hazardous materials or substances brought onto the Premises by or for the Receiver, YNUC, Amster, Amster Corporation and the Affiliates, unless otherwise approved by Newport in connection with the Inspection; (iii) the Receiver must return all keys and

4

access cards to the Premises to which the Receiver has access to Newport (or provide the keys to new access locks); and (iv) the Receiver, YNUC and the Affiliates, as applicable, must surrender the Settlement Property (including delivering the stored Equipment to Newport at a mutually agreed location) to Newport or Hoag (or such other entity designated by Hoag), as the case may be, in a condition and state of repair as existed at the time of the Inspection, all of the foregoing Free and Clear.

2.5.    If, on the Closing Date (i) the Premises and all improvements, parts, and surfaces are not in a condition and state of repair existed at the time of Inspection; (ii) all hazardous materials or substances brought onto the Premises by or for the Receiver, YNUC, Amster, Amster Corporation and the Affiliates have not been removed, unless otherwise approved by Newport in connection with the Inspection; (iii) all keys and access cards to the Premises have not been returned to Newport or keys to new access locks provided to Newport; and (iv) the Settlement Property is not surrendered to Newport or Hoag (or such other entity designated by Hoag), as the case may be, in a condition and state of repair as existed at the time of the Inspection, all of the foregoing Free and Clear, then Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. Newport acknowledges its interest in the Settlement Property is "as-is, where-is and how-is".

2.6.    UCC Search. Prior to Closing the Receiver will deliver to Newport at the Receiver's sole cost and expense one or more UCC searches (collectively, the "**Closing UCC Search**") respecting YNUC and the Affiliates. All references herein to "Free and Clear" shall mean the elimination of liens on or attached to the Settlement Property of YNUC or the Affiliates that are set forth on the Closing UCC Search.

3.    Payment of Settlement Consideration. Upon the Closing Date, Newport will deposit $116,000 in good funds (the "**Settlement Consideration**") with the Receiver and Receiver must pay the Settlement Consideration so received to Bank.

4.    Closing.

4.1.    Provided that all of the conditions of this Agreement have been satisfied prior to or on the Closing Date, the closing of this transaction will take place (the "**Closing**"), not later August 7, 2017 (the "**Closing Date**").

4.2.    The following constitute obligations of the Parties identified below and conditions precedent to Newport's obligation to deposit the Settlement Consideration with the Receiver on or before the Closing Date:

4.2.1.  Court Approval.

4.2.2.  The Receiver must have (i) made the assignments, transfers, conveyances and deliveries required pursuant to Section 1.4 of this Agreement; (ii) assigned transferred, conveyed and delivered to Hoag (or such other entity designated by Hoag) all right, title and interest in and to and possession of the Patient Records; (iii) strictly complied with all of the terms of the Newport/Hoag/YNUC Agreements; provided however, payment under the UrgentCare Agreement, the Trademark License, the Leases and the Subleases will be limited as provided in Section 2.1 of this Agreement; (iv) caused to have occurred all of the requirements of Section 2.4 of this Agreement; and (v) complied with all other terms and conditions of this Agreement applicable to him.

59499128.8

4.2.3.    Bank must have complied with Section 1.5 and all other terms and conditions of this Agreement applicable to it.

4.2.4.    All representations and warranties of the Parties made in this Agreement must be true and correct in all material respects as of the Effective Date and the Closing Date.

4.3.    In the event that one or more of the above conditions is not satisfied on or before the Closing Date, then (i) Newport can waive satisfaction of such condition(s) in writing, and the Closing will proceed, or (ii) Newport may terminate this Agreement upon written notice to the Receiver and the Bank and this Agreement and the rights and obligations of Parties under this Agreement will terminate except as and to the extent otherwise expressly provided in this Agreement.

5.    Releases.

5.1.    Definitions:

5.1.1.    "**Damages and/or Claims**" means any and all manner of, any actions, causes of action, suits, claims, counterclaims, demands, costs, debts, dues, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, acknowledgments, extents, executions, liens, remedies, liabilities judgments, defenses, assertions, allegations, rights of setoff, sums of money owed, proceedings, doings, omissions, loss of services, attorneys' fees and expenses, and all expenses and compensation related in any way to all known or unknown injuries or damages resulting, now or later, from this Agreement, whether fixed or contingent, asserted or unasserted, known or unknown, at law or in equity, in contract or tort, unsecured, secured, priority, administrative, or otherwise, suspected or unsuspected, accrued or unaccrued, patent or latent, liquidated or unliquidated, pending or threatened, and all resulting damages, including but not limited to actual damages, compensatory damages, consequential damages, statutory damages, punitive and exemplary damages, pre-judgment and post-judgment interest, attorneys' fees and costs of court, and all other damages, which the releasing Party has, ever had, or may have now or hereafter, against the released Party for, upon, or by reason of any matter, cause or thing whatsoever.

5.1.2.    "**Released Damages and/or Claims**" means any Damages and/or Claims, arising from or out of the matters which are the subject of this Agreement; provided however, Released Damages and/or Claims exclude the released Party's obligations under this Agreement.

5.2.    Upon Closing, Bank knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases Newport and Hoag and their respective officers, directors, employees, contractors, attorneys, successors and permitted assigns (the "**Newport Parties**"), of and from, and remises and waives any Released Damages and/or Claims. Bank knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties in connection with any Damages and/or Claims.

5.3.    Upon Closing, Newport knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases Bank and the Receiver and their respective officers, directors, employees, contractors, attorneys, successors and permitted assigns

6

Exhibit 2, Page 000040

(the "**Bank/Receiver Parties**"), of and from, and remises and waives any Released Damages and/or Claims. Newport knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Bank/Receiver Parties in connection with any Damages and/or Claims.

      5.4.    Upon Closing, the Receiver for himself and his agents, successors and assigns, and any other person or entity acting for or on behalf of the same (each, a "**Releasing Party**," and collectively, "**Releasing Parties**") knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases the Newport Parties and the Bank/Receiver Parties of and from, and remises and waives any Released Damages and/or Claims. The Releasing Parties knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties or the Bank/Receiver Parties in connection with any Damages and/or Claims. Each Releasing Party knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties or the Bank/Receiver Parties in connection with any Damages and/or Claims.

      5.5.    Each Party acknowledges that, subsequent to the execution of this Agreement, it may discover Damages and/or Claims which are unknown or unanticipated as of the Effective Date, including unknown or unanticipated Damages and/or Claims that arose from, or are based upon or relate to, matters for which such Party's release is given under this Section, and that, if known on the Effective Date, may have materially affected such Party's decision to execute this Agreement. Each Party acknowledges that it is assuming the risk of such unknown or unanticipated Damages and/or Claims, and agrees that this Agreement applies thereto. Each Party expressly waives the benefits of any applicable statutory provision prohibiting, conditioning or restricting the release of unknown or future claims or any Damages and/or Claims being released pursuant to this Agreement. It is the intention of the Parties that all of the foregoing releases in this Section will be effective with respect to all Released Damages and/or Claims, and other matters, past and present, known and unknown, suspected and unsuspected. Each Party agrees, represents, and warrants that such Party realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Damages and/or Claims which are presently unknown, unanticipated, and unsuspected; and each Party further agrees, represents and warrants that the waivers and releases in this Agreement have been negotiated and agreed upon in light of that realization and that such Party nevertheless hereby intends to release and discharge the express beneficiary of the applicable release of and from any and all Released Damages and/or Claims. In furtherance of this intention, each Party knowingly and voluntarily expressly waives and relinquishes all rights and benefits afforded by Section 1542 of the Civil Code of the State of California and any other similar provision of applicable law, and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 of the Civil Code of the State of California states as follows:

59499128.8

Exhibit 2, Page 000041

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Bank Initials

Receiver Initials

Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.     HIPAA Obligations and Patient Records. On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.     Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement. Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**"). If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.     Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

Exhibit 2, Page 000042

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_____
Bank Initials

_____
Receiver Initials

_____
Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records.  On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.  Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**").  If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

Exhibit 2, Page 000043

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_____
Bank Initials

_____
Receiver Initials

_____
Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records.  On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.  Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**").  If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

Exhibit 2, Page 000044

notice, to accounts receivable records and such other records of Newport as Receiver and Bank may reasonably need for purposes related to the transaction contemplated by this Agreement or for compliance with applicable law.

       9.    <u>Excluded Liabilities.</u>  This Agreement pertains only to the property rights and obligations expressly set forth herein.  It is expressly understood and agreed that Newport will not assume, pay, or in any way be liable or responsible for any debts, liabilities, or obligations of the Receiver, Bank, YNUC, Amster, Amster Corporation or the Affiliates, or, for debts, liabilities or obligations arising prior to the Closing Date or the date on which Newport or an affiliate assumes responsibility for operation of the Premises or the Settlement Property, whichever is later (the "**Excluded Liabilities**").

       10.    <u>Indemnities.</u>

       10.1.  Subject to the terms and conditions set forth in this Agreement, Bank must indemnify, hold harmless, and defend the Newport Parties from and against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees (collectively, "**Losses**"), that arise out of or result from, in whole or in part, (i) any material misrepresentation or breach of any representation or warranty of Bank, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of Bank contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) the Excluded Liabilities attributable to the Bank; and (iv) enforcement of the indemnification obligations of Bank under this Agreement.

       10.2.  Subject to the terms and conditions set forth in this Agreement, the Receiver must indemnify, hold harmless, and defend the Newport Parties from and against any and all Losses that arise out of or result from, in whole or in part, (i) any material misrepresentation or breach of any representation or warranty of the Receiver, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of the Receiver contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) the Excluded Liabilities attributable to the Receiver; and (iv) enforcement of the indemnification obligations of the Receiver under this Agreement.

       10.3.  Subject to the terms and conditions set forth in this Agreement, Newport must indemnify and defend Bank and any Releasing Party from and against any and all Losses, that arise out of or result directly from (i) any material misrepresentation or breach of any representation or warranty of the Newport, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of the Newport contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) any obligations of Newport related to the Settlement Property which first arise after the Closing Date; and (iv) enforcement of the indemnification obligations of the Newport under this Agreement..

       10.4.  Notwithstanding anything to the contrary in this Agreement, no indemnifying Party is obligated to indemnify, hold harmless or defend any indemnified Party against any claim (whether direct or indirect) if such claim or corresponding Losses arise out of or result from any the indemnified Party's: (i) gross negligence or more culpable act or omission (including recklessness or willful misconduct); or (ii) bad faith failure to comply with any of its

9

obligations set forth in this Agreement.

10.5.    Any indemnified Party must give the indemnifying Party a prompt written notice (a "**Claim Notice**") of any Losses or discovery of facts on which any indemnified Party intends to base a request for indemnification. Any indemnified Party's failure to provide a Claim Notice to indemnifying Party does not relieve the any indemnifying Party of any liability. Indemnifying Party duty to defend applies immediately but in no event will indemnifying Party be liable for any Losses that result directly or indirectly from a delay in providing a Claim Notice.

10.6.    An indemnified Party may assume control of the defense, appeal or settlement of any claim that is reasonably likely to give rise to an indemnification claim (a "**Indemnified Claim**"), at indemnified Party's sole cost and expense, by sending written notice of the assumption to the indemnifying Party on or before 30 days after receipt of a Claim Notice through reputable independent counsel of its own choosing.

10.7.    Notwithstanding anything to the contrary in this Section, an indemnified Party may defend an Indemnified Claim with counsel of its own choosing and without an indemnifying Party's participation if: (i) the Indemnified Claim is one for which the indemnified Party properly gave a Claim Notice under this Section and indemnifying Party fails to assume the defense or refuses to defend the Indemnified Claim under this Section; (ii) the Indemnified Claim seeks only an injunction or other equitable relief against such indemnified Party; or (iii) such indemnified Party reasonably believes (a) that there are one or more legal or equitable defenses available to it that are materially different from or in addition to those available to indemnifying Party; (b) counsel for indemnifying Party could not adequately represent the interest of such indemnified Party because such interest could be in conflict with those of indemnifying Party; or (c) such action or proceeding involves, or could have a material effect on, any material matter beyond the scope of the indemnification or defense obligations of indemnifying Party in this Section. If an indemnified Party assumes control of the defense under this Section, the applicable indemnifying Party must (i) unless otherwise provided above, reimburse such indemnified Party promptly and periodically for the reasonable costs properly incurred in defending against the Indemnified Claim (including reasonable attorneys' fees and expenses); and (ii) remain responsible to such indemnified Party for any Losses indemnified under this Section. Indemnifying Party must give prompt written notice to indemnified Party of any proposed settlement of an Indemnified Claim.    Indemnifying Party may not, without indemnified Party's prior written consent, which indemnified Party may not unreasonably withhold, condition or delay, settle or compromise any Indemnified Claim or consent to the entry of any judgment regarding any Indemnified Claim unless such settlement, compromise or consent: (i) includes an unconditional release of such indemnified Party from all liability arising out of such claim; (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of such indemnified Party; and (iii) does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business of such indemnified Party. An indemnified Party may not settle or compromise any claim or consent to the entry of any judgment regarding which it is seeking indemnification under this Section without the prior written consent of indemnifying Party, which indemnifying Party may not unreasonably withhold, condition or delay, unless: (i) the Indemnified Claim is one for which indemnified Party properly gave indemnifying Party a Claim Notice, and indemnifying Party fails to assume

10

Exhibit 2, Page 000046

the defense or refuses to defend the Indemnified Claim under this Section; or (ii) such settlement, compromise or consent (a) includes an unconditional release of indemnifying Party from all liability arising out of such claim; (b) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of indemnifying Party; and (c) does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business of indemnifying Party.

10.8.    The obligations under this Section will survive the Closing or any earlier termination of this Agreement.

11.    Representations.

11.1.    Each Party represents and warrants as follows: (a) such Party has the legal power, right and authority to enter into this Agreement; (b) the person executing this Agreement on behalf of such Party has the legal power, right and actual authority to bind such Party to the terms and conditions of this Agreement, and no other persons are required to execute this Agreement on behalf of such Party; (c) except as otherwise expressly set forth in this Agreement, no representations, warranties, or promises of any kind have been made, directly or indirectly, to induce such Party to execute this Agreement; (d) such Party has not assigned, transferred or otherwise alienated its interests in or claims related to those certain loans to YNUC and the Affiliates, the Newport/Hoag/YNUC Agreements, the Settlement Property or the Premises to any other entity; (e) such Party has read and fully understands the terms of this Agreement and has had the full opportunity to consult with legal counsel of its own choosing as to the effect and meaning of this Agreement; (f) to the best knowledge of such Party, there are no delinquent taxes or assessments affecting the Settlement Property; (g) assuming due authorization, execution and delivery of this Agreement by the other Parties to this Agreement, this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as such enforcement may be limited by bankruptcy, fraudulent transfer, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights in general and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law); (h) the execution and delivery of this Agreement by such Party and such Party's performance and compliance with the terms of this Agreement will not violate any law or regulation or any administrative decree or order to which it is subject or constitute a default under, or result in the breach of, any material contract, agreement or other instrument to which such Party is a party or which may be applicable to such Party or any of its assets, that in any such case would materially and adversely affect such Party's performance under this Agreement; (i) such Party has not received written notice that any Party has filed or had filed against it any petitions seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency.

11.2.    Bank further represents and warrants as follows: (a) Bank is the sole owner and holder of the Loan, the security interest in the Settlement Property and all related Loan documents, files, accounts, servicing and other related rights (collectively, the "**Loan Rights**"); (b) Bank has not previously conveyed any right, title or interest in the Loan Rights; (c) Bank's interest in the Loan Rights is free and clear of any participation interests; and (d) Bank had good title to, and was the sole owner and holder of, the Loan, free and clear of any and all liens, charges, encumbrances or any other ownership interests on, in or to the Loan.

11

Exhibit 2, Page 000047

12.     Cooperation and Prorations regarding Telephone Numbers; Utilities; Data Services. It is understood and agreed by the Parties that the Receiver's and Bank's cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.  Therefore, subject to the terms and conditions of this Agreement, the Receiver and Bank must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition to Newport of the Telephone Numbers, any utilities related to the Premises and any data services related to the Premises.  All telephone service, utilities related to the Premises and data services related to the Premises, will be prorated based upon estimates using the most recent actual invoices.  The Receiver will receive a credit for the amount of deposits, if any, with companies that are transferable and that are assigned to Newport at the Closing, if any. In the case of non-transferable deposits, Newport will be responsible for making any security deposits required by such companies. At least one business day prior to the Closing, the Parties must agree upon all prorations to be made.  In the event that any prorations or computations made under this Section require final adjustment, then the Parties must make the appropriate adjustments promptly when accurate information becomes available and any Party may be entitled to an adjustment to correct the same; provided that all adjustments pursuant to this Section must be made no later than 90 days following the Closing Date, after which there shall be no further adjustments.   Any corrected adjustment or proration will be paid in cash to the Party entitled thereto. The terms of this Section will survive the Closing.

13.     Attorneys' Fees.  If it is necessary for any Party to employ an attorney to enforce or defend its rights under this Agreement, the non-prevailing Party will reimburse the prevailing Party for its reasonable attorneys' fees and costs of suit.

14.     Notices.  Any approval, disapproval, demand, document or other notice which any Party may desire to give to any other Party must be in writing and will be delivered by hand delivery, by overnight courier, by electronic mail, or by U.S. certified or registered mail (postage prepaid) and will be deemed received when receipted for at the addressee's place of business (in the case of hand delivery), on the date of delivery confirmed by the overnight courier service (in the case of overnight courier delivery), when the sending Party receives an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment in the case of electronic mail), and three days after being posted with the U.S. mail (in the case of certified or registered mail delivery).  All such notices must be delivered to the addresses (or at any other address as a Party may later designate in writing) set forth below:

To Receiver:                515 So. Flower St., 36th Floor,
                            Los Angeles, CA 90071
                            Attention: David Stapleton
                            Email: david@stapletoninc.com

To Bank:                    1000 Wilshire Boulevard, Suite 1500
                            Los Angeles, CA 90017-2457
                            Attention: Barry Smith
                            Email: bsmith@buchalter.com

59499128.8

| | |
|---|---|
| To Newport: | One Hoag Drive, P.O. Box 6100, Newport Beach, CA 92658-6100 Attention: Sandy Smith, Senior Vice President Real Estate, Facilities, Construction and Operations Email: Sandy.Smith@hoag.org |
| With copy to (which will not constitute notice) | St. Joseph Health System 3345 Michelson Drive, Suite 100, Irvine, California 92612 Attention: Tara Cowell, Esq. |
| | 2049 Century Park East, Suite 2900 Los Angeles, CA 90067 Attention: Tim Reimers, Esq. Email: TReimers@Polsinelli.com |

15. <u>Governing Law</u>. The applicable laws of the State of California will govern the validity, enforcement, and interpretation of this Agreement.

16. <u>Integration; Modification; Waiver</u>. This Agreement constitutes the complete and final expression of the agreement of the Parties relating set forth in this Agreement and supersedes all previous contracts, agreements and understandings of the Parties, either oral or written, relating to the Premises or the Settlement Property (including, without limitation, any letter or letters of intent). This Agreement cannot be modified, or any of the terms of this Agreement waived, except by an instrument in writing executed by the Party against whom enforcement of the modification or waiver is sought. No delay on the part of any Party in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege under this Agreement, nor any single or partial exercise of any right, power or privilege under this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege under this Agreement. The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights or remedies which any Party may otherwise have at law or in equity.

17. <u>Counterpart Execution</u>. This Agreement may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (*i.e.*, "pdf" or "tif") format will be effective as delivery of a manually executed counterpart of this Agreement.

18. <u>Headings; Constructions</u>. The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matters to be construed in interpreting this Agreement. Words of any gender used in this Agreement will be held and construed to include any other gender, and words in the singular number will be held to include the plural, and vice versa, unless the context requires otherwise. The provisions of this Agreement will not be construed in favor of or against any Party, but will be construed as if

13

Exhibit 2, Page 000049

all Parties prepared this Agreement.

19.    Time of the Essence.    Time is of the essence for this Agreement and of the obligations of the Parties in this agreement, it being acknowledged and agreed by and between the Parties that any delay in effecting a Closing pursuant to this Agreement may result in loss or damage to the Party in full compliance with its obligations under this Agreement.

20.    Invalid Provisions.    If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, will be held invalid or unenforceable, such provision will be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision will not be affected thereby.

21.    Binding Effect.    This Agreement will be binding upon and inure to the benefit of Parties (and Hoag as an express third party beneficiary of this Agreement), and their respective heirs, administrators, representatives, successors and permitted assigns.

22.    Further Acts.    In addition to the acts recited in this Agreement to be performed by any Party, such Party agrees to perform or cause to be performed at the Closing or after the Closing any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

*[Signatures on following page.]*

14

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

BANK:

Opus Bank

By: _____

Name: _____

Its: _____

S-1

59499128.8

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: SANFORD SMITH

Its: CEO _____

BANK:

Opus Bank

By: _____

Name: _____

Its: _____

S-1

59499128.8

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

BANK:

Opus Bank

By: _____

Name: ____Andrew Davis_____

Its: _____EVP_____

S-1

Exhibit 2, Page 000053

.

# DECLARATION

Exhibit 2, Page 000054

1

## DECLARATION OF STEVEN M. SPECTOR

2    I, Steven M. Spector, hereby declare as follows:

3    1.    I am an attorney duly licensed to practice law in the State of California.  I am a

4    shareholder of the law firm Buchalter, A Professional Corporation ("Buchalter"), counsel for the

5    Plaintiff Opus Bank in the above-captioned action.

6    2.    I am one of the attorneys at Buchalter with responsibility for handling Buchalter's

7    representation of the Plaintiff in the above-captioned action.

8    3.    This declaration is submitted in connection with Receiver's Ex Parte Application

9    for Approval of Settlement Agreement ("Application").

10    4.    This declaration pertains only to Notice respecting the Application pursuant to

11    California Rules of Court ("CRC") 3.1200-3.1207.  My firm represents the Plaintiff in this action.

12    We have worked with Mr. Stapleton to assist him respecting the Application.  Thus, we have

13    notice of the Application and, of course, approve the Application and the relief sought thereby.

14    While no formal appearance of the Defendants has been made, I have had substantial contact with

15    two different lawyers representing the Defendants.  These lawyers are as follows:

16
17    Ashley McDow, Esq.                    Garrick Hollander, Esq.
      Baker & Hostetler                     Winthrop Couchot
17    11601 Wilshire Blvd., Suite 1400      660 Newport Center Drive, Suite 400
18    Los Angeles, CA  90025                Newport Beach, CA  92660
      Tel: 310-442-8846                     Tel:  949-720-4100
19    Email: amcdow@bakerlaw.com            Email:  ghollander@wchlaw.com

20    In addition, the lawyer for Newport/Hoag, with whom I have also had substantial contact,

21    is as follows:

22
      Timothy Reimers, Esq.
23    Polsinelli
      2045 Century Park East
24    Suite 2900
      Los Angeles, CA  90067
25    Tel: 310-203-5316
      Email: treimers@polsinelli.com
26

27    Mr. Reimers has approved the Application and relief sought thereby.

28    5.    Consistent with CRC 3.1204, on July 3⁄ , 2017, I emailed the Application to Ms.

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

BUCHALTER

59502089.4
59502089.6

Exhibit 2, Page 000055

1   McDow, Mr. Hollander and Mr. Reimers.  A true copy of my email transmission is attached as

2   **Exhibit "A."**  The email transaction was reported without error.  The email advises each recipient

3   that the Application would be presented to the Court on August ⟂, 2017 at 1:30 p.m. in Dept.

4   C-16 located at 700 Civic Center Drive West, Santa Ana, CA  92701 (before Judge James J.

5   DiCesare).  A copy of the Application was attached to the email as was a copy of the [Proposed]

6   Order filed concurrently.  As of the execution of this declaration, it is not known whether the

7   Defendants will oppose the Application.

8         I declare under penalty of perjury of the laws of the State of California that the foregoing

9   is true and correct and that this declaration is executed on July 31, 2017, at Los Angeles,

10  California.

11

12                                          STEVEN M. SPECTOR

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

59502089.4

59502089.6

Exhibit 2, Page 000056

# EXHIBIT A

Exhibit 2, Page 000057

# Buchalter

# MEMORANDUM

**VIA E-MAIL**

**To:**     Ashley McDow
           Garrick Hollander
           Timothy Reimers

**From:**   Steven M. Spector

**Date:**    July 31, 2017

**Re:**     Opus Bank v. Hoag (the "Hoag Action")
           Case No. 30-2017-00911945-CU-BC-CJC
           Opus Bank v. Laguna (the "Laguna Action")
           Case No. 30-2017-00912132-CU-BC-CJC

---

Dear Ashley, Garrick and Tim:

     David Stapleton, ("Receiver"), the court-appointed receiver in both the Hoag Action and the Laguna Action, has determined to file an ex parte application (the "Applications") and (Proposed) Order (the "Orders") in both actions.  Copies of the Applications and Orders are attached.

     The Receiver will be presenting the Applications to the Court on Wednesday, August 2, 2017 at 1:30 p.m.  The department is C-16 (Judge James J. DiCesare) and the court is located at 700 Civic Center Drive West, Santa Ana, CA.

     Please advise the Receiver (david@stapletoninc.com) and the undersigned whether you intend to appear at the hearing and whether you oppose the Applications.

     SMS

# EXHIBIT 3

Exhibit 3, Page 000059

1 | David P. Stapleton

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**08/01/2017** at 11:18:00 AM

Clerk of the Superior Court
By Giovanni Galon, Deputy Clerk

2 | 515 South Flower Street
36th Floor
Los Angeles, CA  90071
3 | Telephone:  (213) 235-0601
Email:  david@stapletoninc.com

4

5 | Receiver

6

7

8 | ## SUPERIOR COURT OF CALIFORNIA

9 | ## COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11 | OPUS BANK, a California Commercial Bank,

CASE NO. 30-2017-00912132-CU-BC-CJC

12 | Plaintiff,

Assigned to Judge James J. Di Cesare
Dept. C-16

13 | v.

14 | LAGUNA-DANA URGENT CARE, INC., a California corporation; CYPRESS URGENT
15 | CARE, INC., a California corporation; YOUR NEIGHBORHOOD URGENT CARE, LLC, a
16 | California limited liability company; ROBERT C. AMSTER, an individual; and DOES 1
17 | through 70, inclusive,

RELATED TO CASE NO.
30-2017-00911945-CU-BC-CJC

**RECEIVER'S  EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT;**

18 | Defendants.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
19 | **THEREOF; AND**

20 | **DECLARATIONS OF DAVID P. STAPLETON AND STEVEN M.**
21 | **SPECTOR**

22 | *Ex Parte* Hearing Date:
August  2 , 2017
23 | Time:     1:30 p.m.
Place:    Dept. C-16
24 |          700 Civic Center Drive West
Santa Ana, CA  92701

25

26

27

28

1

2  David P. Stapleton ("Receiver"), the receiver herein, herewith files his Ex Parte

3  Application for Approval of Settlement Agreement (the "Application").

4  **PRELIMINARY STATEMENT**

5  In the companion/related action (Case No. 30-2017-00911945-CU-BC-CTJ), Receiver has

6  filed and will present concurrently with this Application an Ex Parte Application for Approval of

7  Settlement Agreement and related relief among Plaintiff Opus Bank, Newport Healthcare Center,

8  LLC and its parent, Hoag Memorial Hospital Presbyterian and Receiver.  If granted, the effect of

9  the Settlement Agreement is to change owner/operators of the Hoag Urgent Care clinics identified

10  in the companion/relation action to Newport and Hoag.  However, the relationship among the

11  various parties requires that a defendant in this action, Your Neighborhood Urgent Care, LLC

12  ("YNUC"), likewise be the subject of the relief sought by the companion/related ex parte

13  application in order to provide complete relief to Newport and Hoag.  Accordingly, the Receiver

14  has determined to file this Application seeking essentially the same relief as the ex parte

15  application concurrently filed in the companion/related action.  As above, this Application

16  pertains only to YNUC.

17  **BACKGROUND AND SETTLEMENT**

18  YNUC, an affiliate of the Clinics, but not an operator of clinics, entered into various

19  agreements with Newport/Hoag.  Some of these agreements relate to lease or sublease interests in

20  the Premises (defined in the Settlement Agreement).  Some of these agreements related to an

21  urgent care agreement and a trademark agreement (also defined in the Settlement Agreement).

22  The Settlement Agreement resolves all of these matters, and others, as between the

23  Receiver, Bank and Newport/Hoag and the Clinics.  In turn, Newport/Hoag desires to close the

24  circle by terminating the interests of YNUC in the various referenced agreements.  The relief as

25  against YNUC is sought by this Application.

26  Accordingly, Receiver has attached hereto as Exhibit "1" the companion/related ex parte

27  application.  The same is incorporated hereat by reference.  By this Application, the Receiver

28

BUCHALTER

2

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

1  seeks the following relief:

2      1.    As to YNUC, approval of the Receiver's entry into Settlement Agreement and an

3  order requiring that the terms and provisions of the Settlement Agreement the transactions

4  contemplated thereby are ordered to be completed;

5      2.    As to YNUC, an order terminating the obligations of Newport and Hoag under

6  various leases, subleases and other agreements in their entirety, and thereupon, ordering

7  possession of the Clinics and any other right, title and interest conveyed pursuant to such

8  agreements completely and exclusively vested in Newport or Hoag;

9      3.    As to YNUC, the Court's order that the same pertains to, and YNUC is bound by,

10  the terms and provisions of the Settlement Agreement applicable to it; and

11      4.    As to YNUC, modification of the stay imposed by the Receiver Order entered on

12  June 25, 2017 to allow Newport/Hoag to file actions against YNUC.

13      Based upon the foregoing, as expressed in the companion/related action, the Receiver

14  requests that the Court enter its Order granting relief set forth above.

15  ## JUSTIFICATION FOR EX PARTE PESENTMENT OF THIS APPLICATION

16      The Receiver incorporates hereat his statements made in the companion/related action.

17  ## NOTICE

18      As set forth in the Declaration of Steven M. Spector annexed hereto, timely notice of the

19  ex parte presentment of this Application was given to Plaintiff, YNUC and Newport/Hoag.

20  ## CONCLUSION

21      Based upon the foregoing, the Receiver respectfully requests the Court, approve the

22  Settlement Agreement and transaction contemplated thereby as to YNUC and rescind any stay or

23  other order of this Court that may prevent Newport or Hoag from enforcing their rights under

24  leases or other agreements with YNUC.

25

26

27

28

BUCHALTER

3

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

59502089.4
59798300.2

1  DATED: July _28_, 2017

2

3                                              

4                                              DAVID P. STAPLETON,
                                                     RECEIVER
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER

4

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

59502089.4
59798300 2

Exhibit 3, Page 000063

## MEMORANDUM OF POINTS AND AUTHORITIES

David P. Stapleton ("Receiver"), the receiver herein, submits the following points and authorities in support of his Ex Parte Application for Approval of Settlement Agreement (the "Application").

## I.

## THIS COURT HAS THE AUTHORITY TO APPROVE

## THE SETTLEMENT OF CLAIMS

This Court appointed the Receiver for the primary purpose of protecting, preserving and selling the assets of the Clinics and YNUC. Most importantly, under para. 10 of the Receiver Order, the Receiver may "compromise debts" and under para. 8 of the Receiver Order, the Receiver may perform "all acts necessary to liquidating" the Receivership Property. Here, the Receiver, the Plaintiff and Newport/Hoag have determined to settle disputed claims. Therefore, the Receiver's proposed settlement is in compliance with the charge given to the Receiver and is in furtherance of the Receiver Order.

It is clear that this Court has authority to approve a compromise that is in the best interests of the receivership entity. The Court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. (See *Hillman v.* Stults, 263 Cal.App.2d 848, 876 (1968): "[i]t is well settled that a trial court has broad discretion in its directions and approvals given to a receiver in respect to management of the properties.")  In addition, "[w]here there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions." (See *City of Santa Monica v. Gonzalez*, 43 Cal.4th 905, 931 (2008) [approving receiver's proposal to the demolition of a building even though owner objected to the receiver's proposal]; *see also, Lesser & Son v. Seymour*, 35 Cal.2d 494, 503 (1950).  Such discretion is necessary for the orderly administration of the receivership estate by the receiver, who is an agent of the Court. (*Id.*; *People v. Stark*, 131 Cal.App.4th 184, 204 (2005)).

The reason underlying the trial court's broad authority concerning administration of the receivership property is because the "main function" of the court is to manage or dispose of the

1  property "in the best manner possible and for the best interest of the parties concerned. To

2  effectually perform that duty necessarily requires some flexibility and continuity of jurisdiction in

3  giving instructions to the receiver as to the manner in which the property should be sold to meet

4  exigencies as they may arise." (*People v. Stark, supra,* 131 Cal.App.4th at 205.)

5                                    **II.**

6                              **CONCLUSION**

7        Based upon the foregoing, the Receiver believes the relief sought is warranted and the

8  Application should be approved.

9  DATED: ____7/28____, 2017              Respectfully submitted,

10

11                                      _____

12                                      DAVID P. STAPLETON, RECEIVER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER

                                    6
              **EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
              59502089.4
              59798300.2

# EXHIBIT 1

Exhibit 3, Page 000066

1  David P. Stapleton
   515 South Flower Street
2  36th Floor
   Los Angeles, CA 90071
3  Telephone: (213) 235-0601
   Email: david@stapletoninc.com

4

5  Receiver

6

7

8              **SUPERIOR COURT OF CALIFORNIA**

9      **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

10

11  OPUS BANK, a California Commercial Bank,      CASE NO. 30-2017-00911945-CU-BC-CJC

12            Plaintiff,                          Assigned to Judge James J. Di Cesare
                                                  Dept. C16
13        v.
                                                  Related to Case No. 30-2017-00912132-CU-
14  HOAG URGENT CARE-TUSTIN, INC., a              BC-CJC
    California corporation; HOAG URGENT CARE-
15  ANAHEIM HILLS, INC., a California
    corporation; HOAG URGENT CARE-              **RECEIVER'S  EX PARTE**
16  HUNTINGTON HARBOUR, INC., a California       **APPLICATION FOR APPROVAL OF**
    corporation; HOAG URGENT CARE-              **SETTLEMENT AGREEMENT;**
17  ORANGE, INC., a California corporation;
    ROBERT C. AMSTER, an individual; and         **MEMORANDUM OF POINTS AND**
18  DOES 1 through 50, inclusive,                 **AUTHORITIES IN SUPPORT**
                                                  **THEREOF; AND**
19            Defendants.
                                                  **DECLARATIONS OF DAVID P.**
20                                                **STAPLETON AND STEVEN M.**
                                                  **SPECTOR**
21
                                                  *Ex Parte* Hearing Date:
22                                                      August 2, 2017
                                                  Time:     1:30 p.m.
23                                                  Place:    Dept. C-16
                                                            700 Civic Center Drive West
24                                                          Santa Ana, CA  92701

25

26

27
              David P. Stapleton ("Receiver"), the receiver herein, herewith files his Ex Parte
28

**BUCHALTER**
      **EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4                                                Exhibit 3, Page 000067
59502089.6

1   Application for Approval of Settlement Agreement (the "Application").

2   <u>**BACKGROUND AND SETTLEMENT**</u>

3      This Application resolves the two most significant issues of the receivership:

4      (1) the operation by the Receiver of the three urgent care clinics located at (i) 5355

5   Warner Avenue, Suite 102, Huntington Beach, CA 92649 (ii) 2560 Bryan Avenue, Tustin, CA

6   92782; and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 (collectively, the "Clinics")

7   and (2) settlement of various disputed matters resulting in:  (a) an agreement by Opus Bank

8   ("Bank") and Newport Healthcare Center LLC ("Newport"), an affiliate of Hoag Memorial

9   Hospital Presbyterian ("Hoag"), that the Bank will not contest Newport's claim of ownership to

10   the equipment, furniture and inventory and other property located at or associated with Clinics

11   and/or in storage  (collectively, the "Settlement Property"); (b) an agreement by the Receiver to

12   transfer the Settlement Property to Newport and Hoag, as the case may be; (c) an agreement by

13   the Receiver to transfer the patient records of the Clinics to Newport; (d) an agreement by Bank

14   not to claim a security interest in the Settlement Property; (e) an agreement by Newport not claim

15   any interest in the accounts receivable (and the proceeds thereof) of the Clinics; (f) an agreement

16   among the Receiver, Newport and Bank that the obligations of Newport, Hoag or the Receiver

17   under various leases, subleases and other agreements are terminated in their entirety and no are

18   longer of any force or effect, and thereupon, possession of the Clinics and any other right, title

19   and interest conveyed pursuant to such agreements are completely and exclusively vested in

20   Newport or Hoag; and (g) an agreement for the Receiver to pay or cause to be paid to Newport

21   certain agreed-upon amounts on account of rent and other items owed under the above-described

22   agreements.[1]

23      The resolution of the above-referenced matters is memorialized in a Settlement

24   Agreement among the relevant parties annexed as Exhibit "B" to the Declaration of David P.

25   Stapleton attached hereto.  As the Receiver is a party to the same, this Application seeks Court

26

27   [1] There are also numerous subsidiary benefits to the proposed transaction.  Among them are the following: (a) elimination of operating losses of about $7,000 per week; (b) termination of employment of employees and payment

28   of benefits related thereto; and (c) elimination of receivership costs and expenses.

BUCHALTER

2

1    approval of the Settlement Agreement and the transactions contemplated therein.

2    As set forth in the Complaint in this action, Bank provided financial accommodations to

3    the Clinics which are the subject of this Application. The loans totaled in excess of $2.3 million.

4    As security for repayment of the loans, the Clinics granted to Bank a security interest in

5    essentially all of their assets.[2] Conversely, Newport has asserted certain claims to the equipment

6    pursuant to a lease agreement. In connection with the foregoing, the Receiver has successfully

7    concluded a settlement of the competing claims and has also reached an agreement with Newport

8    to sell/transfer assets of the Clinics to it. This agreement is memorialized by the Settlement

9    Agreement. Accounts receivable (and the proceeds thereof) of the Clinics are excluded from the

10    transaction and remain subject to the receivership and security interest of Bank.

11    The Receiver is presently supervising operations of the Clinics. The actual operations

12    remain with prior management. However, the Receiver believes the Clinics are incurring

13    operating losses in the aggregate of $7,000 per week.[3] These losses are at the ultimate expense of

14    Bank and Newport.

15    Upon his appointment, the Receiver was advised of certain claims of Newport to the

16    equipment, the leases and other agreements among the parties. Newport's claims are based upon,

17    among other things, its assertions that it owns the equipment and leased the same to an affiliate of

18    the Clinics. In turn, the affiliate subleased the equipment to the Clinics. Newport is also the

19    landlord of the premises where the Clinics operate. Newport has advised that the leases and other

20    agreements are in substantial default and, as a part of the Settlement Agreement, the Receiver,

21    further to the power granted to him by this Court, will terminate the obligations of Newport and

22    Hoag under such agreements, and thereupon, deliver possession of the Clinics to Newport.

23    Receiver has determined that the settlement evidenced by the Settlement Agreement is in

24    the best interests of the receivership estate and the beneficiary of the estate, Bank, for the

25

26    [2] The security interest granted to Bank was perfected as against third parties by the filing with the California
Secretary of State of Financing Statements (UCC-1 forms).

27    [3] Operating losses do not include the costs, fees and expenses of the receivership, which, of course, exacerbate the

28    losses.

following reasons:

      1.     Pursuant to the Settlement Agreement, certain consideration approximately equal to the appraised liquidation value of the equipment will be paid to Receiver and Bank in exchange for not opposing Newport's claim that Newport owns the equipment.

      2.     Pursuant to the Settlement Agreement, Newport will obtain possession of the Settlement Property and possession of the Clinics free and clear of any right, title or interest of any other person or entity.

      3.     Pursuant to the Settlement Agreement, the Bank will deliver to Newport (i) UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property and (ii) UCC-3 statements reflecting an assignment of any security interest of the Bank in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration.

      4.     Pursuant to the Settlement Agreement, the Receiver will pay or cause to be paid to Newport a discounted amount on account of rent and other amounts owed under the leases and other agreements.  This amount will fully settle Newport's claims against the Receiver and receivership estate.

      5.     Pursuant to the Settlement Agreement, the obligations of Newport and Hoag under various leases, subleases and other agreements will be terminated in their entirety, and thereupon, possession of the Clinics and any other right, title and interest conveyed pursuant to such agreements are completely and exclusively vested in Newport or Hoag.

      6.     "Standard" releases and indemnities among the Receiver, Bank and Newport will be exchanged.

      Subject to approval of this Court, the Receiver is a party to the Settlement Agreement.  As a result, based upon the exercise of his business judgment, the Receiver seeks approval by this Court of the Settlement Agreement and the transactions contemplated thereby.  The Receiver also requests this Court to rescind any stay or other order of this Court that may prevent Newport or

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

1  Hoag from enforcing their rights under the leases or other agreements with the Defendants, their

2  affiliates or any person or entity related thereto.  Neither the Receiver nor the Bank shall be a

3  party to any enforcement action undertaken by Newport or Hoag.

4       Finally, neither the Clinics nor their affiliate, Your Neighborhood Urgent Care, LLC

5  ("YNUC") have any economic role in the proposed transaction.  Bank is owed more than $2.3

6  million by YNUC and the Clinics.  The equipment was professionally appraised at $116,000 - the

7  amount which is being paid to the Receiver (and, ultimately, the Bank) by Newport.  Most

8  importantly, the Bank's collateral interest in the accounts receivable of the Clinics - in which

9  Newport has agreed to have no interest-remains unaffected by the proposed transaction.  The

10  Receiver's analysis of the value of the accounts receivable is estimated to be about $900,000.

11  Hence, the value of all assets of the Clinics (about $1,016,000) is far less than the secured debt

12  owed to Bank (at least $2,300,000).

13  **JUSTIFICATION FOR EX PARTE PRESENTMENT OF THIS APPLICATION**

14       Although aware of the burden that ex parte applications have on the Court, the Receiver

15  has determined that ex parte presentment of this Application is justified and warranted for the

16  following reasons:

17      1.   Operating losses at the Clinics are running about $7,000 per week.  Coupled with

18  receivership fees and costs, these losses are more realistically at $12,000 per week or $48,000 per

19  month.  The Clinics do not have either the capital or the prospects of larger receipts to sustain

20  these losses.  Without an identifiable source of funds, the Receiver must close-down operations.

21  A close-down would be disastrous for all involved – including the patients and the communities

22  the Clinics serve.  Hence, ex parte presentment is justified.

23      2.   Unlike private physicians or major hospitals, it is clear to the Receiver that the

24  Clinics provide valuable and necessary medical services to a low income segment of the

25  communities where they are located.  Indeed, the Receiver believes that about 200 patients per

26  day are treated at the Clinics.  The Receiver understands that, upon cessation of operation of the

27  clinics by the Receiver, Newport/Hoag will open their own separate urgent care operations.

28

1    Under the financial circumstances described herein, therefore, the Receiver believes that such the

2    scheduled termination of operation of the Clinics is beneficial to all concerned and justifies the ex

3    parte presentment of this Application.

4         3.     Newport/Hoag Hospital, sensitive to the Hoag brand and reputation in the

5    community, have concluded they should immediately obtain possession of the Clinics' premises

6    in order to reopen the clinics under new management. They support the ex parte presentment.

7         4.     As evidenced by its signature to the Settlement Agreement, the Bank has

8    recognized the urgency of the proposed transaction.

9         For all the foregoing reasons, the Receiver respectfully requests that the Court conclude

10    that ex parte presentment of the Application is warranted and justified.

11    **NOTICE**

12         As set forth in the Declaration of Steven M. Spector, annexed hereto, timely notice of the

13    ex parte presentment of this Application was given to the Plaintiff, the Defendants and to

14    Newport/Hoag.

15    **CONCLUSION**

16         Based upon all of the foregoing, the Receiver respectfully requests the Court approve the

17    Settlement Agreement and the transactions contemplated thereby and rescind any stay or other

18    order of this Court that may prevent Newport or Hoag from enforcing their rights under the leases

19    or other agreements with the Defendants, their affiliates or any person or entity related thereto.

20

21

22

23    DATED: July 28, 2017

24

25    _____
          DAVID P. STAPLETON,
          RECEIVER

26

27

28

6

BUCHALTER

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4
59502089.6

## MEMORANDUM OF POINTS AND AUTHORITIES

David P. Stapleton ("Receiver"), the receiver herein, submits the following points and authorities in support of his Ex Parte Application for Approval of Settlement Agreement (the "Application").

### I.

## THIS COURT HAS THE AUTHORITY TO APPROVE
## THE SETTLEMENT OF CLAIMS

This Court appointed the Receiver for the primary purpose of protecting, preserving and selling the assets of the Clinics. Most importantly, under para. 10 of the Receiver Order, the Receiver may "compromise debts" and under para. 8 of the Receiver Order, the Receiver may perform "all acts necessary to liquidating" the Receivership Property. Here, the Receiver, the Plaintiff and Newport/Hoag have determined to settle disputed claims. Therefore, the Receiver's proposed settlement is in compliance with the charge given to the Receiver and is in furtherance of the Receiver Order.

It is clear that this Court has authority to approve a compromise that is in the best interests of the receivership entity. The Court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. (See *Hillman v.* Stults, 263 Cal.App.2d 848, 876 (1968): ["[i]t is well settled that a trial court has broad discretion in its directions and approvals given to a receiver in respect to management of the properties"].) In addition, "[w]here there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions." (See *City of Santa Monica v. Gonzalez,* 43 Cal.4th 905, 931 (2008) [approving receiver's proposal to the demolition of a building even though owner objected to the receiver's proposal]; *see also, Lesser & Son v. Seymour,* 35 Cal.2d 494, 503 (1950). Such discretion is necessary for the orderly administration of the receivership estate by the receiver, who is an agent of the Court. (*Id.*; *People v. Stark,* 131 Cal.App.4th 184, 204 (2005)).

The reason underlying the trial court's broad authority concerning administration of the receivership property is because the "main function" of the court is to manage or dispose of the

BUCHALTER

1   property "in the best manner possible and for the best interest of the parties concerned. To

2   effectually perform that duty necessarily requires some flexibility and continuity of jurisdiction in

3   giving instructions to the receiver as to the manner in which the property should be sold to meet

4   exigencies as they may arise." (*People v. Stark, supra,* 131 Cal.App.4[th] at 205.)

**II.**

**CONCLUSION**

7       Based upon the foregoing, the Receiver believes the relief sought is warranted and the

8   Application should be approved.

9   DATED: _____, 2017

                                    Respectfully submitted,

                                    DAVID P. STAPLETON, RECEIVER

BUCHALTER

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

59502089.4
59502089.6

# DECLARATION

Exhibit 3, Page 000075

## DECLARATION OF DAVID P. STAPLETON

I, David P. Stapleton, hereby declare:

1.      I am the duly appointed and acting receiver in the above matter pursuant to the certain order of the Court attached hereto as Exhibit "A."

2.      My appointment was made at the request of Opus Bank ("Bank"), the plaintiff herein.[4] Per the verified complaint herein, Bank claims a "blanket" security interest in essentially all for the assets of the "Hoag Urgent Care" clinics (the "Clinics") to secure payment of a debt of greater than $2.3 million.

3.      Upon my appointment, I assumed operational supervision of three of the Clinics: Tustin, Anaheim Hills and Huntington Harbour;[5] a fourth clinic, Orange, was previously closed and its tangible assets are in storage.

4.      Day-to-day operations of the Hoag Clinics are managed by Dr. Robert Amster, the principal of the Clinics and a staff headed by his daughter, Jennifer Amster. Jennifer and her staff have been cooperative and of assistance to me.

5.      Shortly after my appointment, I learned of the relationship among Dr. Amster, his management company, YNUC and the Clinics, on the one hand and Newport Healthcare Center, LLC ("Newport") and its parent company, Hoag Memorial Hospital Presbyterian ("Hoag"), on the other hand.

6.      In short, through a series of lease and sublease agreements, an urgent care agreement and a trademark agreement, Newport/Hoag claimed an interest in the tangible assets of the Clinics, including the stored assets of Orange and also controlled the occupancy of the premises where the Clinics operated and controlled their use of the name "Hoag." Newport

---

[4] Bank is also the Plaintiff in the companion/related action (Case No. 30-2017-009/2132-CU). I am also the receiver in the companion/related action. The foregoing is significant because in the related action, Your Neighborhood Urgent Care, LLC ("YNUC") is a defendant. YNUC claims or had an interest in the Settlement Property referenced herein. Accordingly, while this Application pertains to the interests of the "Hoag Urgent Care" parties in the assets referenced hereinafter, it also pertains to the interest, if any, of YNUC in such assets. As a result, I have filed a mirror of this Application in the companion/related action so that, if approved, the Court will have made an order respecting all parties that have or may have an interest in the assets, the Hoag Urgent Care" parties and YNUC.

[5] I also assumed operational supervision of the companion/related clinics located in Laguna Beach and Cypress. These clinics are not the subject of this Application.

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4
59502089.6

1   advised that all for the foregoing were in substantial default for non-payment.

2       7.    Based on the foregoing, it became clear to me that a dispute between Bank and

3   Newport/Hoag over the Clinic assets was possible. It also became clear to me that neither the

4   Clinics nor YNUC had any financial interest in the Clinics based upon the large delinquent

5   amounts owed to Bank and to Newport/Hoag.

6       8.    As operations of the Clinics continued, I became concerned about what appeared

7   to be operating losses. From the information provided by Jennifer, operating losses for the three

8   operating were running at about $7,000 per week. This excluded the fees and costs of the

9   receivership. When the latter were added to the operating losses, I concluded the losses amounted

10   to between $40,000 and $50,000 per month.

11       9.    Moreover, the losses were exacerbated by cash flow issues as income was, for the

12   most part, received from governmental agencies or insurance companies – both notoriously slow

13   payers. In fact, a third party collector is employed to assist in collections (for a fee).

14       10.    I have reviewed a third party appraisal of the equipment. The liquidation value of

15   the equipment at the three operational Clinics is stated to be $106,000. The value of the stored

16   equipment of the non-operating Clinic-Orange-was agreed to be $10,000. Hence, this total of

17   $116,000 is to be paid to me (and the Bank) by Newport in connection with the settlement. The

18   value of the accounts receivable at $900,000 is based on information provided by Jennifer and my

19   historic assessment of net collectability.

20       11.    Based primarily upon the foregoing,

21         a.  I concluded that operations of the Clinics could not be sustained for a long

22             period of time based on cash flow and the lack of capital in the entities;

23         b.  It would be in the best interest of the people served and the communities if

24             another entity assumed the operations;

25         c.  A settlement of the claims of Bank and Newport over the physical Clinics

26             would be in the best interests of both Bank and Newport/Hoag;

27         d.  The receivables of the Clinics, which are Bank's collateral, were not the

28

BUCHALTER

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**
59502089.4
59502089.6

subject of a dispute with Newport/Hoag so they would remain in receivership and subject to the Bank's security interest;

   e.   The interests of the Clinics and YNUC in the various leases and agreements with Newport/Hoag needed to be terminated; and

   f.   The best interest of all parties would be for Hoag/Newport to take over the operations of the Clinics.

   12.   An agreement was reached respecting the foregoing. The agreement was then reduced to writing in the form of a Settlement Agreement, attached hereto as Exhibit "B." I have signed the same subject to Court approval.

   13.   I believe the Settlement Agreement is in the best interests of the receivership estate and all parties as set forth in paragraph 11, above. I also believe this Application warrants ex parte presentment for the reasons set forth in the Application.

   14.   All of the facts set forth in the Application and herein are true and correct to my best knowledge, information and belief. I have personal knowledge of the same except where otherwise stated or referenced.

   15.   Based upon the foregoing, I respectfully recommend and request the Court approve the Application (and the Settlement Agreement).

   I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed at Los Angeles, CA on July 2̲8̲, 2017.

_____
DAVID P. STAPLETON

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

BUCHALTER

59502089.4
59502089.6

# EXHIBIT A

1  BUCHALTER
   A Professional Corporation
2  BARRY A. SMITH (SBN: 48697)
   STEVEN M. SPECTOR (SBN: 51623)
3  1000 Wilshire Boulevard, Suite 1500
   Los Angeles, CA 90017-2457
4  Telephone: 213.891.0700
   Fax: 213.896.0400
5  E-mail: bsmith@buchalter.com

6  Attorneys for Plaintiff
   OPUS BANK, a California Commercial Bank

7

**FILED**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 25 2017

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

8              SUPERIOR COURT OF CALIFORNIA

9          COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11  OPUS BANK, a California Commercial Bank,

12              Plaintiff,

13        v.

14  HOAG URGENT CARE-TUSTIN, INC., a
    California corporation; HOAG URGENT CARE-
15  ANAHEIM HILLS, INC., a California
    corporation; HOAG URGENT CARE-
16  HUNTINGTON HARBOUR, INC., a California
    corporation; HOAG URGENT CARE-
17  ORANGE, INC., a California corporation;
    ROBERT C. AMSTER, an individual; and
18  DOES 1 through 50, inclusive,

19              Defendants.

20

CASE NO. 30-2017-00911945-CU-BC-CJC
Assigned to Judge James J. Di Cesare
Dept. C16

Related to Case No. 30-2017-00912132-CU-
BC-CJC

W.S. 5-25-17

[~~PROPOSED~~] ORDER APPOINTING
RECEIVER AND ISSUANCE OF
PRELIMINARY INJUNCTION IN AID
OF RECEIVER

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

BN 28692455V2

Upon the Stipulation of Plaintiff Opus Bank, a California Commercial Bank ("Plaintiff") and Defendants Hoag Urgent Care-Tustin, Inc., Hoag Urgent Care-Anaheim Hills, Inc., Hoag Urgent Care-Huntington Harbour, Inc. and Hoag Urgent Care-Orange, Inc. (collectively, the "Receivership Defendants") for Appointment of Receiver and Issuance of Preliminary Injunction In Aid of Receiver and good cause appearing therefor:

**IT IS HEREBY ORDERED** that David P. Stapleton ("Receiver") be and is hereby appointed receiver over the assets and property of the Receivership Defendants, subject to the conditions that before entering upon his duties as the Receiver, he shall file the oath of office and file a surety bond in the sum of $50,000 to secure faithful performance of his duties as receiver.

**IT IS FURTHER ORDERED** that the Receiver shall have the following powers and responsibilities:

1. To enter, gain access, and take possession of the premises of the Receivership Defendants wherever their assets and property are located, including, without limitation, at the following locations: Hoag Urgent Care Anaheim Hills, 5630 E. Santa Ana Canyon Rd. #100, Anaheim, California; Hoag Urgent Care Huntington Harbor, 5355 Warner Avenue #102, Huntington Beach, California; Hoag Urgent Care Tustin, 2560 Bryan Avenue #A, Tustin, California; and Hoag Urgent Care Orange, 7630B E. Chapman Avenue, Orange, California ("Business Premises"), and to seize, manage, control and collect all of the Receivership Defendants' assets, including, but not limited to, (a) the Collateral as defined in the Commercial Security Agreement attached as Exhibit 3 to Plaintiff's Verified Complaint filed herein; (b) all inventory, equipment and accounts, including, but not limited to, all health-care insurance receivables, chattel paper, instruments, all promissory notes, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance; (c) general intangibles including but not limited to all software and all payment intangibles; (d) all fixtures; (e) all goodwill relating to the foregoing property; (f) all records, data and embedded software relating to the foregoing property; (g) all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; (h) all products and proceeds of the foregoing, including, but not limited to, all insurance

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

BN 28692455V2

Exhibit 3, Page 000081

1  payments; and (i) all interests which the Receivership Defendants have or may have acquired in

2  or to the Collateral, together with all income, revenue, profits, proceeds and payments derived

3  therefrom (collectively, all of the foregoing are referred to as the "Receivership Property").  To

4  the extent any Receivership Property is located in a location other than the Business Premises, the

5  Receivership Defendants shall notify the Receiver and Plaintiff of the subject items and their

6  location, and provide access to the location(s) or deliver possession of the subject Receivership

7  Property no later than ten (10) calendar days after the entry of this order.  The Receiver shall

8  make books and records of the Receivership Defendants available or provide copies of the same

9  to the Receivership Defendants and/or their principals, employees, agents, and professionals

10  within ten (10) calendar days of the receipt of written request for such access.

11    2.    Subject to approval of the Court, the Receiver shall have the right to sell, lease,

12  transfer, collect and convey the Receivership Property.

13    3.    To take any and all steps necessary to receive, collect and review all mail

14  addressed to Receivership Defendants, including, but not limited to, mail addressed to each and

15  every one of their Business Premises and any post office boxes held in the name of Receivership

16  Defendants, and, at the Receiver's discretion, he is authorized to instruct the U.S. Postmaster to

17  re-route, hold and/or release said mail to the Receiver.  Copies of mail reviewed by the Receiver

18  in the performance of his duties will promptly be made available for inspection by Receivership

19  Defendants upon request after review by the Receiver.  Receiver shall not collect, open or review

20  any mail addressed solely to any individual or entity other than the Receivership Defendants.  If

21  any correspondence appears to be confidential or privileged in nature, including, without

22  limitation, any communications from counsel for the Receivership Defendants, Receiver shall

23  immediately notify the Receivership Defendants of the receipt of such correspondence and shall

24  not open or review such correspondence (a) unless and until authorized or instructed to do so by

25  the Receivership Defendants or, (b) if no such authorization is received, five (5) court days have

26  passed since Receiver notified the Receivership Defendants of the receipt of such

27  correspondence.  The Receivership Defendants shall have the right to review any potentially

28  confidential or privileged correspondence prior to Receiver's review of the same.  The

Receivership Defendants shall have the right to withhold any confidential or privileged correspondence or communication if the disclosure of the correspondence or communication to Receiver would violate or render inapplicable any protection(s) for confidential or privileged communications or information under California or federal law. Receiver agrees to maintain the confidentiality of and abide by all laws and regulations with respect to mail he receives, collects and reviews that deal with patient information.

4.    To demand, collect, and receive all monies, funds and payments arising from the Receivership Property.

5.    To take possession of all bank and deposit accounts of Receivership Defendants wherever located, and to take possession of any money on deposit in said accounts.

6.    To establish bank accounts at any bank the Receiver deems appropriate for the deposit of monies and funds collected and received in connection with his administration of the Receivership estate, provided that all funds on deposit are insured by an agency of the United States Government and the account(s) and bank(s) are disclosed to the Receivership Defendants and the court.

7.    The Receiver shall have the non-exclusive right to use in the course of the operations of the Receivership Defendants the Federal and State taxpayer identification and account numbers of the Receivership Defendants, including Receivership Defendants' property tax account numbers, NPI numbers and any other billing NPI numbers used by the Receivership Defendants and licensed physicians, whether employees or contractors, and computer network access passwords, keys and any other access controls, computer and software passwords, business licenses, Federal, State and any other licenses currently required to operate, in connection with the Receivership estate, as necessary to perform and/or carry-out the Receiver's duties. The Receivership Defendants, and each of them, shall promptly provide to Receiver the foregoing information and any other information necessary for the operation of the Receivership Defendants or for Receiver to perform or carry-out the Receiver's duties. Notwithstanding anything to the contrary, the obligation to provide information and/or access pursuant to this paragraph 7 shall not apply to the personal accounts of the officers, owners, principals, agents, employees, and/or

independent contractors of the Receivership Defendants, or the personal or professional accounts of any professionals or advisors of the Receivership Defendants, including, without limitation, any accounts for the attorneys representing the Receivership Defendants, or any of them, or their respective law firms.

8.    To execute and prepare all documents and to perform all acts, either in the names of the Receivership Defendants, or in the Receiver's own name, which are reasonably necessary to preserving, protecting, managing, controlling, and/or liquidating the Receivership Property.

9.    To contact the Receivership Defendants' account debtors ("Account Debtors"), and/or their billing departments, insurance companies, governmental agencies or contractors, in order to advise the Account Debtors not to send or transmit further payments to the Receivership Defendants and to instruct the Account Debtors to send or transmit any and all payments due directly to the Receiver.

10.    To compromise debts and to incur risks and obligations reasonably necessary to maintain or continue the businesses and enterprises of the Receivership Defendants.

11.    To employ servants, agents, employees, appraisers, guards, clerks, accountants, liquidators, auctioneers, locksmiths, computer system experts, attorneys, and management consultants necessary to assist the Receiver in administering the Receivership estate and to protect the Receivership Property and to purchase any necessary materials, supplies and services and to pay therefor at the usual rate and prices out of funds that shall come into his possession. No expenses incurred by the Receiver pursuant to this paragraph shall be the personal obligation of the Receiver but shall be the obligation of the Receivership estate.

12.    To procure insurance on the Receivership Property if, in his discretion, there is insufficient insurance coverage thereon, provided the Receiver has funds available to do so. Receiver shall make a determination regarding the adequacy of the insurance coverage and, if deemed deficient, obtain additional coverage, if funds are available to do so, no later than thirty (30) days after the entry of this order. During said 30-day period, the Receiver shall not be personally responsible for claims arising or for the procurement of insurance.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28692455V2

4

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
Exhibit 3, Page 000084

13.   To institute ancillary proceedings in this State or other States as is necessary to obtain possession and control of the Receivership Property, and to participate in any court or other proceedings involving Receivership Defendants. The Receiver may engage the services of counsel in accordance with California Rule of Court ("CRC") 3.1180. The Receiver may pay for such services from the funds of the Receivership estate.

14.   In accordance with CRC 3.1181, the Receiver shall, within thirty (30) days of his appointment, file in this action an inventory of all property of which he has taken possession pursuant to this Order and any supplemental inventory which he subsequently obtains. The Receiver shall provide the parties with a copy of the inventory pursuant to CRC 3.1182.

15.   In accordance with CRC 3.1182, the Receiver shall prepare interim statements every thirty (30) days commencing with his appointment providing any and all information and disclosures required under CRC 3.1182, including, without limitation, the Receiver's fees and administrative costs and expenses incurred for the period in the operation and administration of the Receivership estate. Subject to the requirements and limitations of CRC 3.1183, the Receiver may seek approval to pay from the Receivership estate funds, if any, the amount of said statement, including fees and expenses due to the Receiver and Receiver's counsel, if any. Notwithstanding any interim payment(s) on account of Receiver's fees and administrative expenses, such fees and expenses shall be submitted to the Court for its final approval and confirmation in accordance with CRC 3.1184.

16.   The Receiver shall not be obligated to file on behalf of the Receivership Defendants any federal or state income tax returns, schedules or other forms as required under applicable law. The Receiver shall make any and all documents in his possession, custody or control available to the Receivership Defendants or their agents within ten (10) calendar days of written request.

17.   If reasonably necessary to maintain the operations of the Receivership Defendants and subject to court approval, the Receiver may issue Receivership Certificates totaling no more than $1,000,000 in increments of up to $10,000 bearing interest at no more than eight percent (8%) per annum to any person or party that loans funds to the Receivership estate. Before the

1    Receiver borrows from or issues Receivership Certificates to any party to this action, the Receiver

2    must provide written notice to all parties to this action of his intention to enter into such a

3    transaction, the terms of the transaction, and the terms of any similar transactions with individuals

4    or entities that are not parties to this action.  All funds loaned to the Receiver pursuant to such

5    Receivership Certificate(s) shall be deemed to be a lien and charge of first priority on all assets of

6    the Receivership estate which shall be repaid prior to all other encumbrances and claims, other

7    than costs of administration of the receivership.

8        18.     In their sole and absolute discretion, the Receivership Defendants, and each of

9    them, may file a petition for relief under any chapter of title 11 of the United States Code

10   following the appointment of the Receiver or the term of this order.  Nothing contained herein

11   shall be interpreted to hinder, limit, diminish, divest or transfer the rights of the Receivership

12   Defendants to file a petition for relief under any chapter of title 11 of the United States Code

13   following the appointment of the Receiver or the term of this order.  If any of the Receivership

14   Defendants files a bankruptcy case during the receivership, Plaintiff shall give notice of the

15   bankruptcy case to the Court, to all parties, and to the Receiver by the close of the business day

16   after the day on which Plaintiff receives notice of the bankruptcy filing.

17        19.     If the Receiver receives notice that a bankruptcy has been filed by any or all of the

18   Receivership Defendants and/or that part of any bankruptcy estate includes property that is the

19   subject of this order, the Receiver shall have the following duties:

20        (a)     The Receiver shall immediately contact the party who obtained the

21   appointment of the Receiver and determine whether that party intends to move in the bankruptcy

22   court for an order for (1) relief from the automatic stay (11 U.S.C. § 362), and/or (2) relief from

23   the Receiver's obligation to turn over the property (11 U.S.C. § 543).  If the party has no intention

24   to make such motions, the Receiver shall immediately turn over any and all property in his

25   possession, custody or control subject to this order to the appropriate entity (either to the trustee

26   in bankruptcy if one has been appointed or, if not, to the debtor in possession) and otherwise

27   comply with 11 United States Code section 543.

28

BUCHALTER
A Professional Corporation
Los Angeles
BN 28692455V2

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

1            (b)    If the party who obtained the receivership intends to seek relief

2 immediately from the automatic stay and/or the Receiver's obligation to turn over the property,

3 the Receiver may remain in possession and preserve the property pending the ruling on those

4 motions (11 U.S.C. § 543(a)). The Receiver's authority to preserve the property shall be limited

5 to the following:

6            (1)    The Receiver may continue to collect rents and other income;

7            (2)    The Receiver may make only those disbursements necessary to

8 preserve and protect the property;

9            (3)    The Receiver shall not execute any new leases or other long-term

10 contracts; and

11           (4)    The Receiver shall do nothing that would effect a material change

12 in the circumstances of the property.

13            (c)    If no motion for relief from the automatic stay or to excuse turnover is filed

14 within ten (10) court days after the Receiver's receipt of notice of the date of the bankruptcy

15 filing, but in no event later than seven (7) court days from the date of the bankruptcy filing, the

16 Receiver shall immediately turn over the property in his possession, custody or control subject to

17 this order to the appropriate entity (either to the trustee in bankruptcy if one has been appointed

18 or, if not, to the debtor in possession) and otherwise comply with 11 United States Code section

19 543.

20            (d)    The Receiver may petition the Receivership Court to retain legal counsel to

21 assist the Receiver with issues arising out of the bankruptcy proceedings that affect the

22 receivership.

23    20.    The Receiver shall be authorized to apply to this Court for further orders

24 instructing the Receiver from time to time, and on due notice.

25 PRELIMINARY INJUNCTION

26    21.    Effective upon entry of this order, the Receivership Defendants, their officers,

27 members, directors, agents, servants, employees and all persons or entities acting under, or in

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

7

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
BN 28692455V2

Exhibit 3, Page 000087

concert with them or for them, are ordered to do the following and are restrained and enjoined from engaging in, or performing, directly or indirectly, any or all of the following acts:

      (a)    Interfering, hindering or molesting in any way whatsoever the Receiver in the performance of the Receiver's duties herein described and in the performance of any duties incident thereto;

      (b)    Failing or refusing to turnover to or provide the Receiver access to all Business Premises in accordance with the provisions hereof;

      (c)    Transferring any interest in the Receivership Property by sale, pledge, grant of security interest, assignment, invoice or encumbering in any manner thereof;

      (d)    Removing any Receivership Property from the Business Premises;

      (e)    Transferring, concealing, destroying, defacing or altering any of Receivership Defendants' books and records;

      (f)    Diverting in any of the proceeds from Receivership Defendants' accounts receivable, equipment and/or inventory;

      (g)    Causing any mail addressed to the Receivership Defendants or payments by Receivership Defendants' Account Debtors to be forwarded to any address other than the Business Premises or any existing post office box or other mailing address in the name of the Receivership Defendants, or otherwise interfering with or intercepting any mail intended for the Receivership Defendants; and

      (h)    Failing or refusing to immediately turn over to the Receiver the Receivership Property and all monies, checks, funds or proceeds relating to the Receivership Property, or failing to make available to the Receiver all books and records of the Receivership Defendants relating to the Receivership Property.

IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of the receivership ordered herein, the Receivership Defendants, and all customers, vendors, principals, investors, collectors, stockholders, lessors, creditors and other persons seeking to establish or enforce any claim, right or interest against or on behalf of the Receivership

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

Defendants or any assets or property of the Receivership Defendants be and are hereby stayed from:

(a)    Commencing, prosecuting, continuing or enforcing any suit or proceeding against Receivership Defendants, or any of their subsidiaries or affiliates, except such actions may be filed to toll any applicable statute of limitations;

(b)    Commencing, prosecuting, continuing or entering into any suit or proceeding in the name or on behalf of Receivership Defendants, or any of their subsidiaries or affiliates;

(c)    Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, any property of the Receivership Defendants, or any of their subsidiaries or affiliates, or any property claimed by any of them or attempting to foreclose, forfeit, alter, or terminate any of the Receivership Defendants or any of their subsidiaries or affiliates interest in property, including, without limitation, the establishment, granting or perfection of any security interest, whether such acts are part of a judicial proceeding or otherwise;

(d)    Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the Receivership Defendants, or any of their subsidiaries or affiliates, or the Receiver appointed pursuant to this Order or any agent appointed by said Receiver; and

(e)    Doing any act or thing whatsoever to interfere with the Receiver taking control, possession or management of the Receivership Property, or to in any way interfere with the Receiver, or to harass or interfere with the duties of the Receiver, or to interfere in any manner with the exclusive jurisdiction of this Court over the property and assets of the Receivership Defendants, or their subsidiaries or affiliates. Provided, however, nothing in this paragraph shall prohibit any federal or state law enforcement or regulatory authority from

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION**

BN 28692455V2

1 | commencing or prosecuting an action against the Receivership Defendants, or their subsidiaries

2 | or affiliates.

3 |         (f)     None of the foregoing provisions shall be interpreted in any way to hinder,

4 | limit, diminish, divest or transfer the rights of the Receivership Defendants to file a petition for

5 | relief under any chapter of title 11 of the United States Code following the appointment of the

6 | Receiver or during the term of this order.

7 |     **THE COURT ORDERS** Plaintiff to immediately file a preliminary injunction bond

8 | under Code of Civil Procedure section 529 in the amount of $1,000 and file a Plaintiff's

9 | receivership bond under Code of Civil Procedure section 566(b) in the amount of $1,000.

10 |     **IT IS SO ORDERED.**

11 |

12 | DATED:    5-25-17

13 |                             JUDGE OF THE SUPERIOR COURT

14 |                             **WALTER SCHWARM**

**ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28692455V2

Exhibit 3, Page 000090

# EXHIBIT B

Exhibit 3, Page 000091

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "**Agreement**") is entered into as of July 20, 2017 (the "**Effective Date**") by and among (i) David P. Stapleton  (the "**Receiver**"), in his capacity as court-appointed receiver in the actions styled *OPUS BANK v. HOAG URGENT CARE-TUSTIN, INC., et al. and OPUS BANK v. LAGUNA-DANA URGENT CARE, INC., et al.* (the "**Actions**"), currently pending in the Superior Court of California, County of Orange (the "**Court**") (ii) Newport Healthcare Center LLC, a Delaware limited liability company  ("**Newport**"); and (iii) Opus Bank ("**Bank**").  The Receiver, Newport and Bank are occasionally referred to herein singularly as a "**Party**" and collectively as the "**Parties.**"

## RECITALS

A.    The following recitals represent a summary of the contentions of the Parties. Many of these contentions are disputed and, therefore, are not to be deemed admissions in any respect:

1.    Certain medical and office equipment, furniture and inventory is located at (i) 5355 Warner Avenue, Suite 102, Huntington Beach, CA 92649; (ii) 2560 Bryan Avenue, Tustin, CA 92782; and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 (collectively, the "**Premises**") and other medical and office equipment, furniture and inventory has been moved from the Premises and placed in storage (collectively, the "**Equipment**").

2.    Each Premises is occupied under a separate sublease between Newport, as sublessor and Your Neighborhood Urgent Care, LLC ("**YNUC**"), as sublessee (collectively, the "**Leases**").  YNUC has subleased the Premises located at (i) 5355 Warner Avenue, Suite 102, Huntington Beach, CA 92649 to Hoag Urgent Care-Huntington Harbour, Inc. ("**HUCHH**"); (ii) 2560 Bryan Avenue, Tustin, CA 92782 to Hoag Urgent Care-Tustin, Inc. ("**HUCT**"); and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 to Hoag Urgent Care-Anaheim Hills, Inc. ("**HUCAH**" and together with HUCT, HUCAH, HUCHH, and Hoag Urgent Care-Orange, Inc. ("**HUCO**"), the "**Affiliates**"), each for the operation of an urgent care facility (collectively, the "**Subleases**").

3.    In connection with the Leases and the Subleases, the following agreements were also entered into: (i) a Master Urgent Care Development Agreement (the "**UrgentCare Agreement**") by and among Robert C. Amster ("**Amster**"), YNUC, Newport and Hoag Memorial Hospital Presbyterian, a California nonprofit public benefit corporation ("**Hoag**"), as may be amended; (ii) Terms and Conditions of Trademark License (the "**Trademark License**") by and between Hoag, YNUC and each Affiliate, as may be amended; and (iii) Guaranty of Sublease Agreement (the "**Guaranty**") made by and among Amster and Robert Amster, M.D., Inc., a California medical professional corporation ("**Amster Corporation**") (jointly, the "**Guarantors**") and in favor of Newport for each Lease, as may be amended (collectively with the Leases and Subleases, the "**Newport/Hoag/YNUC Agreements**").

4.    Newport contends it owns certain of the Equipment and leased the same to YNUC pursuant to the Leases.

5.    Newport, as secured party, filed a Financing Statement (Form UCC-1) with the California Secretary of State on January 26, 2012. The debtor listed on the Newport UCC-1 was YNUC. Newport contends the purpose of filing the Newport UCC-1 was to establish that Newport's interest in the Equipment was perfected as against third parties in the event a

59499128.8

Exhibit 3, Page 000092

third party asserted that the Leases were not true leases under the Uniform Commercial Code. Newport's UCC-1 expired on January 26, 2017.

6.     Bank contends that YNUC and the Affiliates own the Equipment as a result of the Equipment being acquired by a sale transaction.

7.     Bank contends it has a first priority security interest in the Equipment by virtue of a credit transaction in which Bank provided financial accommodations to YNUC and/or the Affiliates and YNUC and/or the Affiliates granted to Bank a first priority security interest in the Equipment to secure payment of the financial accommodations.

8.     Bank, as secured party, filed with the California Secretary of State various Financing Statements (Form UCC-1) on September 30, 2013 and October 3, 2013 thereby perfecting its security interest in the Equipment, among other collateral.  Bank contends its UCC-1 filings evidence a first priority lien upon the Equipment senior and superior to the interests of any third party to the Equipment.

9.     Newport contends that YNUC is in default under the terms of the Leases, which default is not curable, and that Newport has the right to, among other things, terminate the Leases and the Subleases.  Bank contends that YNUC and the Affiliates are in default in their obligations to Bank which default entitles Bank to pursue its various rights and remedies against the Equipment.

10.    In the Actions, pursuant to the request of Bank, the Court has appointed Receiver, as receiver over the Equipment and the business and assets of YNUC and the Affiliates.

B.     Subject to the terms of this Agreement, the Parties desire to settle all claims among the Parties related to the matters set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, promises, terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Financial/Ownership Settlement Terms. Subject to the terms of this Agreement and upon approval by the Court of this Agreement and the transactions contemplated in this Agreement ("Court Approval"):

1.1.    The Receiver and Bank will not oppose Newport's claim that Newport owns the Equipment.

1.2.    The Receiver will transfer to Newport all telephone numbers related to the Premises (the "Telephone Numbers").

1.3.    The Receiver and Bank will not claim any ownership or security interest in the Equipment or in the patient records – both hard copies and computer records – of the patients of YNUC or the Affiliates maintained at or for the Premises ("Patient Records", and together with the Equipment and the Telephone Numbers, the "Settlement Property"). For the avoidance of any doubt, the Settlement Property includes Patient Records and Telephone Numbers of HUCO and the Settlement Property does not include any accounts receivable of

2

YNUC or the Affiliates arising on or prior to August 7, 2017 or the proceeds thereof (collectively, the "**Accounts Receivable**"). Newport will not claim any interest in the Accounts Receivable.

      1.4.    The Bank will not claim any security interest in the Settlement Property.

      1.5.    On the Closing Date (as defined below) the Receiver hereby assigns, transfers, conveys and delivers to (a) Newport, all right, title and interest in and to and possession of the Equipment and the Telephone Numbers, and (b) subject to the terms of Section 6 of this Agreement, Hoag (or such other entity designated by Hoag) all right, title and interest in and to and possession of the Patient Records, all of the foregoing free and clear of any right, title or interest of any other person or entity, including but not limited to YNUC, Amster, Amster Corporation or the Affiliates, as applicable that is reflected on the Closing UCC Search (defined hereinafter) ("**Free and Clear**").

      1.6.    On the Closing Date the Bank will deliver to Newport (i) UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property and (ii) UCC-3 statements reflecting an assignment of any security interest of the Bank in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration. If, prior to January 1, 2018, none of YNUC or the Affiliates (i) is or has been the subject of a petition under 11 U.S.C. or the commencement of a bankruptcy or similar proceeding which is not dismissed by January 1, 2018; (ii) is or has been the subject of an involuntary bankruptcy petition or other commencement of a bankruptcy, reorganization or similar proceeding which is not dismissed by January 1, 2018; (iii) is or has been subject to an order for relief under 11 U.S.C.; (iv) is subject to an assignment for the benefit of its creditors; (v) is or has been subject to the approval by a court of competent jurisdiction of a petition in any proceeding for its reorganization instituted under the provisions of any state or federal bankruptcy, insolvency, or similar laws; or (vi) other than as exists as of the date of this Agreement, is or has been subject to the appointment of a receiver of the whole or any substantial part of the properties of any of the same (collectively, a "**Bankruptcy Event**"), then Bank authorizes Newport to cause UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property to be filed with the any applicable Secretary of State or other applicable recording office. If, prior to January 1, 2018, any of YNUC or the Affiliates is or has been the subject of a Bankruptcy Event, then the Bank hereby confirms the assignment of the Bank's security interest in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration is effective and authorizes Newport to cause UCC-3 statements reflecting such assignment to be filed with the any applicable Secretary of State or other applicable recording office. Notwithstanding anything in this Agreement to the contrary, after the Closing Date, if the Receiver and Bank oppose Newport's claim that Newport owns the Settlement Property, then Bank hereby authorizes Newport to cause UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property to be filed with the any applicable Secretary of State or other applicable recording office. If any Equipment is determined in any case or matter related to any Bankruptcy Event (i) not to the be the sole property of Hoag or (ii) to not be subject to the security interest of the Bank as assigned and described above, the Bank will promptly return to Newport the Settlement Consideration.

59499128.8

1.7.    The Receiver, Bank and Newport agree that this Agreement constitutes the full and final settlement of claims and contentions respecting ownership of and secured claims among the Parties with respect to the Settlement Property and the Accounts Receivable.

2.    The Newport/Hoag/YNUC Agreements. Subject to the terms of this Agreement, Court Approval and the transactions contemplated in this Agreement:

2.1.    . On the following dates, the Receiver will pay or cause to be paid to Newport the following amounts on account of rent and other amounts owed under the Newport/Hoag/YNUC Agreements:

| Date | Amounts |
|---|---|
| Closing Date | $30,000 |
| September 1, 2017 | $5,000 |
| October 1, 2017 | $5,000 |
| December 1, 2017 | $5,000 |
| January 1, 2018 | $5,000 |
| February 1, 2018 | $5,000 |
| March 1, 2018 | $1,250 |

2.2.    On the Closing Date, without further payment, the obligations of Newport, Hoag or the Receiver under the Leases, the Subleases, the UrgentCare Agreement and the Trademark License are agreed among them to be terminated in their entirety and no are longer of any force or effect, and thereupon, possession of the Premises and any other rights, title and interests conveyed pursuant to the Leases, the Subleases, the UrgentCare Agreement and the Trademark License are agreed to be finally, completely and exclusively vested in Newport or Hoag (or such other entity designated by Hoag), as the case may be.

2.3.    From and after the Effective Date and at all reasonable times, upon reasonable notice, Newport and its agents, employees, consultants, inspectors, appraisers, engineers and contractors will have the right to enter upon and pass through the Premises during normal business hours to examine and inspect the Settlement Property, as well as conduct reasonable investigations and the like of the Premises and the Settlement Property as Newport deems necessary. Prior to the Closing Date, Newport shall conduct a walk-through inspection of the Premises and may conduct a walk-through inspection of the stored Equipment (the "Inspection") whereby Newport shall prior to the Closing Date approve or disapprove in writing of the state of the Premises or Settlement Property. The failure of Newport to provide its written disapproval as set forth herein within the time set forth herein shall be deemed Newport's approval of the state of the Premises and Settlement Property.

2.4.    On the Closing Date (i) the Receiver, YNUC, Amster, Amster Corporation and the Affiliates, as applicable, must vacate and surrender the Premises to Newport with all improvements, parts, and surfaces clean and free of debris, and in a condition and state of repair as approved by Newport as part of the Inspection; (ii) the Receiver, YNUC, and the Affiliates, as applicable, must remove any and all hazardous materials or substances brought onto the Premises by or for the Receiver, YNUC, Amster, Amster Corporation and the Affiliates, unless otherwise approved by Newport in connection with the Inspection; (iii) the Receiver must return all keys and

4

access cards to the Premises to which the Receiver has access to Newport (or provide the keys to new access locks); and (iv) the Receiver, YNUC and the Affiliates, as applicable, must surrender the Settlement Property (including delivering the stored Equipment to Newport at a mutually agreed location) to Newport or Hoag (or such other entity designated by Hoag), as the case may be, in a condition and state of repair as existed at the time of the Inspection, all of the foregoing Free and Clear.

       2.5.    If, on the Closing Date (i) the Premises and all improvements, parts, and surfaces are not in a condition and state of repair existed at the time of Inspection; (ii) all hazardous materials or substances brought onto the Premises by or for the Receiver, YNUC, Amster, Amster Corporation and the Affiliates have not been removed, unless otherwise approved by Newport in connection with the Inspection; (iii) all keys and access cards to the Premises have not been returned to Newport or keys to new access locks provided to Newport; and (iv) the Settlement Property is not surrendered to Newport or Hoag (or such other entity designated by Hoag), as the case may be, in a condition and state of repair as existed at the time of the Inspection, all of the foregoing Free and Clear, then Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. Newport acknowledges its interest in the Settlement Property is "as-is, where-is and how-is".

       2.6.    <u>UCC Search</u>. Prior to Closing the Receiver will deliver to Newport at the Receiver's sole cost and expense one or more UCC searches (collectively, the "**Closing UCC Search**") respecting YNUC and the Affiliates. All references herein to "Free and Clear" shall mean the elimination of liens on or attached to the Settlement Property of YNUC or the Affiliates that are set forth on the Closing UCC Search.

       3.    <u>Payment of Settlement Consideration</u>. Upon the Closing Date, Newport will deposit $116,000 in good funds (the "**Settlement Consideration**") with the Receiver and Receiver must pay the Settlement Consideration so received to Bank.

       4.    <u>Closing</u>.

       4.1.    Provided that all of the conditions of this Agreement have been satisfied prior to or on the Closing Date, the closing of this transaction will take place (the "**Closing**"), not later August 7, 2017 (the "**Closing Date**").

       4.2.    The following constitute obligations of the Parties identified below and conditions precedent to Newport's obligation to deposit the Settlement Consideration with the Receiver on or before the Closing Date:

       4.2.1. Court Approval.

       4.2.2. The Receiver must have (i) made the assignments, transfers, conveyances and deliveries required pursuant to Section 1.4 of this Agreement; (ii) assigned transferred, conveyed and delivered to Hoag (or such other entity designated by Hoag) all right, title and interest in and to and possession of the Patient Records; (iii) strictly complied with all of the terms of the Newport/Hoag/YNUC Agreements; provided however, payment under the UrgentCare Agreement, the Trademark License, the Leases and the Subleases will be limited as provided in Section 2.1 of this Agreement; (iv) caused to have occurred all of the requirements of Section 2.4 of this Agreement; and (v) complied with all other terms and conditions of this Agreement applicable to him.

59499128.8

4.2.3.  Bank must have complied with Section 1.5 and all other terms and conditions of this Agreement applicable to it.

4.2.4.  All representations and warranties of the Parties made in this Agreement must be true and correct in all material respects as of the Effective Date and the Closing Date.

4.3.    In the event that one or more of the above conditions is not satisfied on or before the Closing Date, then (i) Newport can waive satisfaction of such condition(s) in writing, and the Closing will proceed, or (ii) Newport may terminate this Agreement upon written notice to the Receiver and the Bank and this Agreement and the rights and obligations of Parties under this Agreement will terminate except as and to the extent otherwise expressly provided in this Agreement.

5.      Releases.

5.1.    Definitions:

5.1.1.  "**Damages and/or Claims**" means any and all manner of, any actions, causes of action, suits, claims, counterclaims, demands, costs, debts, dues, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, acknowledgments, extents, executions, liens, remedies, liabilities judgments, defenses, assertions, allegations, rights of setoff, sums of money owed, proceedings, doings, omissions, loss of services, attorneys' fees and expenses, and all expenses and compensation related in any way to all known or unknown injuries or damages resulting, now or later, from this Agreement, whether fixed or contingent, asserted or unasserted, known or unknown, at law or in equity, in contract or tort, unsecured, secured, priority, administrative, or otherwise, suspected or unsuspected, accrued or unaccrued, patent or latent, liquidated or unliquidated, pending or threatened, and all resulting damages, including but not limited to actual damages, compensatory damages, consequential damages, statutory damages, punitive and exemplary damages, pre-judgment and post-judgment interest, attorneys' fees and costs of court, and all other damages, which the releasing Party has, ever had, or may have now or hereafter, against the released Party for, upon, or by reason of any matter, cause or thing whatsoever.

5.1.2.  "**Released Damages and/or Claims**" means any Damages and/or Claims, arising from or out of the matters which are the subject of this Agreement; provided however, Released Damages and/or Claims exclude the released Party's obligations under this Agreement.

5.2.    Upon Closing, Bank knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases Newport and Hoag and their respective officers, directors, employees, contractors, attorneys, successors and permitted assigns (the "**Newport Parties**"), of and from, and remises and waives any Released Damages and/or Claims. Bank knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties in connection with any Damages and/or Claims.

5.3.    Upon Closing, Newport knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases Bank and the Receiver and their respective officers, directors, employees, contractors, attorneys, successors and permitted assigns

6

(the "**Bank/Receiver Parties**"), of and from, and remises and waives any Released Damages and/or Claims. Newport knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Bank/Receiver Parties in connection with any Damages and/or Claims.

5.4.    Upon Closing, the Receiver for himself and his agents, successors and assigns, and any other person or entity acting for or on behalf of the same (each, a "**Releasing Party**," and collectively, "**Releasing Parties**") knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases the Newport Parties and the Bank/Receiver Parties of and from, and remises and waives any Released Damages and/or Claims. The Releasing Parties knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties or the Bank/Receiver Parties in connection with any Damages and/or Claims. Each Releasing Party knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties or the Bank/Receiver Parties in connection with any Damages and/or Claims.

5.5.    Each Party acknowledges that, subsequent to the execution of this Agreement, it may discover Damages and/or Claims which are unknown or unanticipated as of the Effective Date, including unknown or unanticipated Damages and/or Claims that arose from, or are based upon or relate to, matters for which such Party's release is given under this Section, and that, if known on the Effective Date, may have materially affected such Party's decision to execute this Agreement. Each Party acknowledges that it is assuming the risk of such unknown or unanticipated Damages and/or Claims, and agrees that this Agreement applies thereto. Each Party expressly waives the benefits of any applicable statutory provision prohibiting, conditioning or restricting the release of unknown or future claims or any Damages and/or Claims being released pursuant to this Agreement. It is the intention of the Parties that all of the foregoing releases in this Section will be effective with respect to all Released Damages and/or Claims, and other matters, past and present, known and unknown, suspected and unsuspected. Each Party agrees, represents, and warrants that such Party realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Damages and/or Claims which are presently unknown, unanticipated, and unsuspected; and each Party further agrees, represents and warrants that the waivers and releases in this Agreement have been negotiated and agreed upon in light of that realization and that such Party nevertheless hereby intends to release and discharge the express beneficiary of the applicable release of and from any and all Released Damages and/or Claims. In furtherance of this intention, each Party knowingly and voluntarily expressly waives and relinquishes all rights and benefits afforded by Section 1542 of the Civil Code of the State of California and any other similar provision of applicable law, and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 of the Civil Code of the State of California states as follows:

7

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

---

Bank Initials

---

Receiver Initials

---

Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    <u>HIPAA Obligations and Patient Records</u>. On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    <u>Cooperation Regarding Transition and Employees</u>. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement. Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request (**"Transition Assistance"**). If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    <u>Receiver/Bank Access</u>. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

59499128.8

Exhibit 3, Page 000099

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_A J_

Bank Initials

_____

Receiver Initials

_____

Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records.   On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement. Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**"). If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy as to the Bank and the Receiver. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_____
Bank Initials

_____

_~SCS~_

Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records.  On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement. Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**"). If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

notice, to accounts receivable records and such other records of Newport as Receiver and Bank may reasonably need for purposes related to the transaction contemplated by this Agreement or for compliance with applicable law.

9.    Excluded Liabilities.  This Agreement pertains only to the property rights and obligations expressly set forth herein.  It is expressly understood and agreed that Newport will not assume, pay, or in any way be liable or responsible for any debts, liabilities, or obligations of the Receiver, Bank, YNUC, Amster, Amster Corporation or the Affiliates, or, for debts, liabilities or obligations arising prior to the Closing Date or the date on which Newport or an affiliate assumes responsibility for operation of the Premises or the Settlement Property, whichever is later (the "**Excluded Liabilities**").

10.    Indemnities.

10.1.  Subject to the terms and conditions set forth in this Agreement, Bank must indemnify, hold harmless, and defend the Newport Parties from and against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees (collectively, "**Losses**"), that arise out of or result from, in whole or in part, (i) any material misrepresentation or breach of any representation or warranty of Bank, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of Bank contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) the Excluded Liabilities attributable to the Bank; and (iv) enforcement of the indemnification obligations of Bank under this Agreement.

10.2.  Subject to the terms and conditions set forth in this Agreement, the Receiver must indemnify, hold harmless, and defend the Newport Parties from and against any and all Losses that arise out of or result from, in whole or in part, (i) any material misrepresentation or breach of any representation or warranty of the Receiver, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of the Receiver contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) the Excluded Liabilities attributable to the Receiver; and (iv) enforcement of the indemnification obligations of the Receiver under this Agreement.

10.3.  Subject to the terms and conditions set forth in this Agreement, Newport must indemnify and defend Bank and any Releasing Party from and against any and all Losses, that arise out of or result directly from (i) any material misrepresentation or breach of any representation or warranty of the Newport, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of the Newport contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) any obligations of Newport related to the Settlement Property which first arise after the Closing Date; and (iv) enforcement of the indemnification obligations of the Newport under this Agreement..

10.4.  Notwithstanding anything to the contrary in this Agreement, no indemnifying Party is obligated to indemnify, hold harmless or defend any indemnified Party against any claim (whether direct or indirect) if such claim or corresponding Losses arise out of or result from any the indemnified Party's: (i) gross negligence or more culpable act or omission (including recklessness or willful misconduct); or (ii) bad faith failure to comply with any of its

9

obligations set forth in this Agreement.

10.5.  Any indemnified Party must give the indemnifying Party a prompt written notice (a "**Claim Notice**") of any Losses or discovery of facts on which any indemnified Party intends to base a request for indemnification.  Any indemnified Party's failure to provide a Claim Notice to indemnifying Party does not relieve the any indemnifying Party of any liability. Indemnifying Party duty to defend applies immediately but in no event will indemnifying Party be liable for any Losses that result directly or indirectly from a delay in providing a Claim Notice.

10.6.  An indemnified Party may assume control of the defense, appeal or settlement of any claim that is reasonably likely to give rise to an indemnification claim (a "**Indemnified Claim**"), at indemnified Party's sole cost and expense, by sending written notice of the assumption to the indemnifying Party on or before 30 days after receipt of a Claim Notice through reputable independent counsel of its own choosing.

10.7.  Notwithstanding anything to the contrary in this Section, an indemnified Party may defend an Indemnified Claim with counsel of its own choosing and without an indemnifying Party's participation if: (i) the Indemnified Claim is one for which the indemnified Party properly gave a Claim Notice under this Section and indemnifying Party fails to assume the defense or refuses to defend the Indemnified Claim under this Section; (ii) the Indemnified Claim seeks only an injunction or other equitable relief against such indemnified Party; or (iii) such indemnified Party reasonably believes (a) that there are one or more legal or equitable defenses available to it that are materially different from or in addition to those available to indemnifying Party; (b) counsel for indemnifying Party could not adequately represent the interest of such indemnified Party because such interest could be in conflict with those of indemnifying Party; or (c) such action or proceeding involves, or could have a material effect on, any material matter beyond the scope of the indemnification or defense obligations of indemnifying Party in this Section.  If an indemnified Party assumes control of the defense under this Section, the applicable indemnifying Party must (i) unless otherwise provided above, reimburse such indemnified Party promptly and periodically for the reasonable costs properly incurred in defending against the Indemnified Claim (including reasonable attorneys' fees and expenses); and (ii) remain responsible to such indemnified Party for any Losses indemnified under this Section. Indemnifying Party must give prompt written notice to indemnified Party of any proposed settlement of an Indemnified Claim.  Indemnifying Party may not, without indemnified Party's prior written consent, which indemnified Party may not unreasonably withhold, condition or delay, settle or compromise any Indemnified Claim or consent to the entry of any judgment regarding any Indemnified Claim unless such settlement, compromise or consent: (i) includes an unconditional release of such indemnified Party from all liability arising out of such claim; (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of such indemnified Party; and (iii) does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business of such indemnified Party. An indemnified Party may not settle or compromise any claim or consent to the entry of any judgment regarding which it is seeking indemnification under this Section without the prior written consent of indemnifying Party, which indemnifying Party may not unreasonably withhold, condition or delay, unless: (i) the Indemnified Claim is one for which indemnified Party properly gave indemnifying Party a Claim Notice, and indemnifying Party fails to assume

10

Exhibit 3, Page 000103

the defense or refuses to defend the Indemnified Claim under this Section; or (ii) such settlement, compromise or consent (a) includes an unconditional release of indemnifying Party from all liability arising out of such claim; (b) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of indemnifying Party; and (c) does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business of indemnifying Party.

10.8.   The obligations under this Section will survive the Closing or any earlier termination of this Agreement.

11.   Representations.

11.1.   Each Party represents and warrants as follows: (a) such Party has the legal power, right and authority to enter into this Agreement; (b) the person executing this Agreement on behalf of such Party has the legal power, right and actual authority to bind such Party to the terms and conditions of this Agreement, and no other persons are required to execute this Agreement on behalf of such Party; (c) except as otherwise expressly set forth in this Agreement, no representations, warranties, or promises of any kind have been made, directly or indirectly, to induce such Party to execute this Agreement; (d) such Party has not assigned, transferred or otherwise alienated its interests in or claims related to those certain loans to YNUC and the Affiliates, the Newport/Hoag/YNUC Agreements, the Settlement Property or the Premises to any other entity; (e) such Party has read and fully understands the terms of this Agreement and has had the full opportunity to consult with legal counsel of its own choosing as to the effect and meaning of this Agreement; (f) to the best knowledge of such Party, there are no delinquent taxes or assessments affecting the Settlement Property; (g) assuming due authorization, execution and delivery of this Agreement by the other Parties to this Agreement, this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as such enforcement may be limited by bankruptcy, fraudulent transfer, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights in general and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law); (h) the execution and delivery of this Agreement by such Party and such Party's performance and compliance with the terms of this Agreement will not violate any law or regulation or any administrative decree or order to which it is subject or constitute a default under, or result in the breach of, any material contract, agreement or other instrument to which such Party is a party or which may be applicable to such Party or any of its assets, that in any such case would materially and adversely affect such Party's performance under this Agreement; (i) such Party has not received written notice that any Party has filed or had filed against it any petitions seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency.

11.2.   Bank further represents and warrants as follows: (a) Bank is the sole owner and holder of the Loan, the security interest in the Settlement Property and all related Loan documents, files, accounts, servicing and other related rights (collectively, the "**Loan Rights**"); (b) Bank has not previously conveyed any right, title or interest in the Loan Rights; (c) Bank's interest in the Loan Rights is free and clear of any participation interests; and (d) Bank had good title to, and was the sole owner and holder of, the Loan, free and clear of any and all liens, charges, encumbrances or any other ownership interests on, in or to the Loan.

11

Exhibit 3, Page 000104

12.     Cooperation and Prorations regarding Telephone Numbers; Utilities; Data Services. It is understood and agreed by the Parties that the Receiver's and Bank's cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.  Therefore, subject to the terms and conditions of this Agreement, the Receiver and Bank must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition to Newport of the Telephone Numbers, any utilities related to the Premises and any data services related to the Premises.  All telephone service, utilities related to the Premises and data services related to the Premises, will be prorated based upon estimates using the most recent actual invoices.  The Receiver will receive a credit for the amount of deposits, if any, with companies that are transferable and that are assigned to Newport at the Closing, if any. In the case of non-transferable deposits, Newport will be responsible for making any security deposits required by such companies. At least one business day prior to the Closing, the Parties must agree upon all prorations to be made.  In the event that any prorations or computations made under this Section require final adjustment, then the Parties must make the appropriate adjustments promptly when accurate information becomes available and any Party may be entitled to an adjustment to correct the same; provided that all adjustments pursuant to this Section must be made no later than 90 days following the Closing Date, after which there shall be no further adjustments.  Any corrected adjustment or proration will be paid in cash to the Party entitled thereto. The terms of this Section will survive the Closing.

13.     Attorneys' Fees.  If it is necessary for any Party to employ an attorney to enforce or defend its rights under this Agreement, the non-prevailing Party will reimburse the prevailing Party for its reasonable attorneys' fees and costs of suit.

14.     Notices.  Any approval, disapproval, demand, document or other notice which any Party may desire to give to any other Party must be in writing and will be delivered by hand delivery, by overnight courier, by electronic mail, or by U.S. certified or registered mail (postage prepaid) and will be deemed received when receipted for at the addressee's place of business (in the case of hand delivery), on the date of delivery confirmed by the overnight courier service (in the case of overnight courier delivery), when the sending Party receives an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment in the case of electronic mail), and three days after being posted with the U.S. mail (in the case of certified or registered mail delivery).  All such notices must be delivered to the addresses (or at any other address as a Party may later designate in writing) set forth below:

| To Receiver: | 515 So. Flower St., 36th Floor, Los Angeles, CA 90071 Attention: David Stapleton Email: david@stapletoninc.com |
|---|---|
| To Bank: | 1000 Wilshire Boulevard, Suite 1500 Los Angeles, CA 90017-2457 Attention: Barry Smith Email: bsmith@buchalter.com |

12

| To Newport: | One Hoag Drive, P.O. Box 6100, Newport Beach, CA 92658-6100 Attention: Sandy Smith, Senior Vice President Real Estate, Facilities, Construction and Operations Email: Sandy.Smith@hoag.org |
|---|---|
| With copy to (which will not constitute notice) | St. Joseph Health System 3345 Michelson Drive, Suite 100, Irvine, California 92612 Attention: Tara Cowell, Esq. |
| | 2049 Century Park East, Suite 2900 Los Angeles, CA 90067 Attention: Tim Reimers, Esq. Email: TReimers@Polsinelli.com |

15.     <u>Governing Law</u>.  The applicable laws of the State of California will govern the validity, enforcement, and interpretation of this Agreement.

16.     <u>Integration; Modification; Waiver</u>.  This Agreement constitutes the complete and final expression of the agreement of the Parties relating set forth in this Agreement and supersedes all previous contracts, agreements and understandings of the Parties, either oral or written, relating to the Premises or the Settlement Property (including, without limitation, any letter or letters of intent).  This Agreement cannot be modified, or any of the terms of this Agreement waived, except by an instrument in writing executed by the Party against whom enforcement of the modification or waiver is sought.  No delay on the part of any Party in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege under this Agreement, nor any single or partial exercise of any right, power or privilege under this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege under this Agreement.  The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights or remedies which any Party may otherwise have at law or in equity.

17.     <u>Counterpart Execution</u>.  This Agreement may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (*i.e.*, "pdf" or "tif") format will be effective as delivery of a manually executed counterpart of this Agreement.

18.     <u>Headings; Constructions</u>.  The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matters to be construed in interpreting this Agreement.  Words of any gender used in this Agreement will be held and construed to include any other gender, and words in the singular number will be held to include the plural, and vice versa, unless the context requires otherwise.  The provisions of this Agreement will not be construed in favor of or against any Party, but will be construed as if

13

Exhibit 3, Page 000106

all Parties prepared this Agreement.

19.    <u>Time of the Essence</u>.    Time is of the essence for this Agreement and of the obligations of the Parties in this agreement, it being acknowledged and agreed by and between the Parties that any delay in effecting a Closing pursuant to this Agreement may result in loss or damage to the Party in full compliance with its obligations under this Agreement.

20.    <u>Invalid Provisions</u>.    If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, will be held invalid or unenforceable, such provision will be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision will not be affected thereby.

21.    <u>Binding Effect</u>.    This Agreement will be binding upon and inure to the benefit of Parties (and Hoag as an express third party beneficiary of this Agreement), and their respective heirs, administrators, representatives, successors and permitted assigns.

22.    <u>Further Acts</u>.    In addition to the acts recited in this Agreement to be performed by any Party, such Party agrees to perform or cause to be performed at the Closing or after the Closing any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

*[Signatures on following page.]*

14

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER: _____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____


BANK:

Opus Bank

By: _____

Name: _____

Its: _____

S-1

59499128.8

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions


NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _SANFORD SMITH_____

Its: _CEO_____


BANK:

Opus Bank

By: _____

Name: _____

Its: _____

S-1

Exhibit 3, Page 000109

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective
Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

BANK:

Opus Bank

By: _____

Name: _____  Andrew Javis

Its: _____  FVP

S-1

Exhibit 3, Page 000110

# DECLARATION

Exhibit 3, Page 000111

## DECLARATION OF STEVEN M. SPECTOR

I, Steven M. Spector, hereby declare as follows:

1.      I am an attorney duly licensed to practice law in the State of California.  I am a shareholder of the law firm Buchalter, A Professional Corporation ("Buchalter"), counsel for the Plaintiff Opus Bank in the above-captioned action.

2.      I am one of the attorneys at Buchalter with responsibility for handling Buchalter's representation of the Plaintiff in the above-captioned action.

3.      This declaration is submitted in connection with Receiver's Ex Parte Application for Approval of Settlement Agreement ("Application").

4.      This declaration pertains only to Notice respecting the Application pursuant to California Rules of Court ("CRC") 3.1200-3.1207.  My firm represents the Plaintiff in this action. We have worked with Mr. Stapleton to assist him respecting the Application.  Thus, we have notice of the Application and, of course, approve the Application and the relief sought thereby. While no formal appearance of the Defendants has been made, I have had substantial contact with two different lawyers representing the Defendants.  These lawyers are as follows:

Ashley McDow, Esq.                     Garrick Hollander, Esq.
Baker & Hostetler                        Winthrop Couchot
11601 Wilshire Blvd., Suite 1400          660 Newport Center Drive, Suite 400
Los Angeles, CA 90025                    Newport Beach, CA 92660
Tel: 310-442-8846                        Tel: 949-720-4100
Email: amcdow@bakerlaw.com               Email: ghollander@wchlaw.com

In addition, the lawyer for Newport/Hoag, with whom I have also had substantial contact, is as follows:

Timothy Reimers, Esq.
Polsinelli
2045 Century Park East
Suite 2900
Los Angeles, CA 90067
Tel: 310-203-5316
Email: treimers@polsinelli.com

Mr. Reimers has approved the Application and relief sought thereby.

5.      Consistent with CRC 3.1204, on July 31 , 2017, I emailed the Application to Ms.

1  McDow, Mr. Hollander and Mr. Reimers.  A true copy of my email transmission is attached as

2  **Exhibit "A."**  The email transaction was reported without error.  The email advises each recipient

3  that the Application would be presented to the Court on August 2, 2017 at 1:30 p.m. in Dept.

4  C-16 located at 700 Civic Center Drive West, Santa Ana, CA  92701 (before Judge James J.

5  DiCesare).  A copy of the Application was attached to the email as was a copy of the [Proposed]

6  Order filed concurrently.  As of the execution of this declaration, it is not known whether the

7  Defendants will oppose the Application.

8        I declare under penalty of perjury of the laws of the State of California that the foregoing

9  is true and correct and that this declaration is executed on July 31, 2017, at Los Angeles,

10  California.

11

12                                    _____
                                     STEVEN M. SPECTOR
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

BUCHALTER

59502089.4
59502089.6

Exhibit 3, Page 000113

# EXHIBIT A

# Buchalter

## MEMORANDUM

**VIA E-MAIL**

**To:**     Ashley McDow
              Garrick Hollander
              Timothy Reimers

**From:**   Steven M. Spector

**Date:**   July 31, 2017

**Re:**     Opus Bank v. Hoag (the "Hoag Action")
              Case No. 30-2017-00911945-CU-BC-CJC
              Opus Bank v. Laguna (the "Laguna Action")
              Case No. 30-2017-00912132-CU-BC-CJC

Dear Ashley, Garrick and Tim:

     David Stapleton, ("Receiver"), the court-appointed receiver in both the Hoag Action and the Laguna Action, has determined to file an ex parte application (the "Applications") and (Proposed) Order (the "Orders") in both actions. Copies of the Applications and Orders are attached.

     The Receiver will be presenting the Applications to the Court on Wednesday, August 2, 2017 at 1:30 p.m. The department is C-16 (Judge James J. DiCesare) and the court is located at 700 Civic Center Drive West, Santa Ana, CA.

     Please advise the Receiver (david@stapletoninc.com) and the undersigned whether you intend to appear at the hearing and whether you oppose the Applications.

     SMS

# DECLARATION

Exhibit 3, Page 000116

## DECLARATION OF DAVID P. STAPLETON

I, David P. Stapleton, hereby declare:

1.      I am the duly appointed and acting receiver in the above matter pursuant to the certain order of the Court attached hereto as Exhibit "A."

2.      My appointment was made at the request of Opus Bank ("Bank"), the plaintiff herein. Per the verified complaint herein, Bank claims a "blanket" security interest in essentially all for the assets of the "Hoag Urgent Care" clinics (the "Clinics") and YNUC to secure payment of a debt of greater than $2.3 million.

3.      Upon my appointment, I assumed operational supervision of three of the Clinics: Tustin, Anaheim Hills and Huntington Harbour;[1] a fourth clinic, Orange, was previously closed and its tangible assets are in storage. YNUC does not appear to be operating a clinic.

4.      Day-to-day operations of the Hoag Clinics are managed by Dr. Robert Amster, the principal of the Clinics and a staff headed by his daughter, Jennifer Amster. Jennifer and her staff have been cooperative and of assistance to me.

5.      Shortly after my appointment, I learned of the relationship among Dr. Amster, his management company, YNUC and the Clinics, on the one hand and Newport Healthcare Center, LLC ("Newport") and its parent company, Hoag Memorial Hospital Presbyterian ("Hoag"), on the other hand.

6.      In short, through a series of lease and sublease agreements, an urgent care agreement and a trademark agreement, Newport/Hoag claimed an interest in the tangible assets of the Clinics, including the stored assets of Orange and also controlled the occupancy of the premises where the Clinics operated and controlled their use of the name "Hoag." Newport advised that all for the foregoing were in substantial default for non-payment.

7.      Based on the foregoing, it became clear to me that a dispute between Bank and Newport/Hoag over the Clinic assets was possible. It also became clear to me that neither the Clinics nor YNUC had any financial interest in the Clinics based upon the large delinquent

---

[1] I also assumed operational supervision of the companion/related clinics located in Laguna Beach and Cypress. These clinics are not the subject of this Application.

1   amounts owed to Bank and to Newport/Hoag.

2        8.      As operations of the Clinics continued, I became concerned about what appeared

3   to be operating losses.  From the information provided by Jennifer, operating losses for the three

4   operating were running at about $7,000 per week.  This excluded the fees and costs of the

5   receivership.  When the latter were added to the operating losses, I concluded the losses amounted

6   to between $40,000 and $50,000 per month.

7        9.      Moreover, the losses were exacerbated by cash flow issues as income was, for the

8   most part, received from governmental agencies or insurance companies – both notoriously slow

9   payers.  In fact, a third party collector is employed to assist in collections (for a fee).

10       10.     I have reviewed a third party appraisal of the equipment.  The liquidation value of

11  the equipment at the three operational Clinics is stated to be $106,000.  The value of the stored

12  equipment of the non-operating Clinic-Orange-was agreed to be $10,000.  Hence, this total of

13  $116,000 is to be paid to me (and the Bank) by Newport in connection with the settlement.  The

14  value of the accounts receivable at $900,000 is based on information provided by Jennifer and my

15  historic assessment of net collectability.

16       11.     Based primarily upon the foregoing,

17              a.  I concluded that operations of the Clinics could not be sustained for a long

18                  period of time based on cash flow and the lack of capital in the entities;

19              b.  It would be in the best interest of the people served and the communities if

20                  another entity assumed the operations;

21              c.  A settlement of the claims of Bank and Newport over the physical Clinics

22                  would be in the best interests of both Bank and Newport/Hoag;

23              d.  The receivables of the Clinics, which are Bank's collateral, were not the

24                  subject of a dispute with Newport/Hoag so they would remain in receivership

25                  and subject to the Bank's security interest;

26              e.  The interests of the Clinics and YNUC in the various leases and agreements

27                  with Newport/Hoag needed to be terminated; and

28

f.  The best interest of all parties would be for Hoag/Newport to take over the operations of the Clinics.

12.  An agreement was reached respecting the foregoing.  The agreement was then reduced to writing in the form of a Settlement Agreement, attached hereto as Exhibit "B."  I have signed the same subject to Court approval.

13.  I believe the Settlement Agreement is in the best interests of the receivership estate and all parties as set forth in paragraph 11, above.  I also believe this Application warrants ex parte presentment for the reasons set forth in the Application.

14.  All of the facts set forth in the Application and herein are true and correct to my best knowledge, information and belief.  I have personal knowledge of the same except where otherwise stated or referenced.

15.  Based upon the foregoing, I respectfully recommend and request the Court approve the Application (and the Settlement Agreement).

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed at Los Angeles, CA on July 2\6, 2017.

_____
DAVID P. STAPLETON

BUCHALTER

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

59502089.4
59798300.2

# EXHIBIT A

1    BUCHALTER
     A Professional Corporation
2    BARRY A. SMITH (SBN: 48697)
     STEVEN M. SPECTOR (SBN: 51623)
3    1000 Wilshire Boulevard, Suite 1500
     Los Angeles, CA 90017-2457
4    Telephone: 213.891.0700
     Fax: 213.896.0400
5    Email: bsmith@buchalter.com

6    Attorneys for Plaintiff
     OPUS BANK, a California Commercial Bank

7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 25 2017

DAVID H. YAMASAKI, Clerk of the Court

BY:_____DEPUTY

8         SUPERIOR COURT OF CALIFORNIA

9     COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11    OPUS BANK, a California Commercial Bank,     CASE NO. 30-2017-00912132-CU-BC-CJC

12          Plaintiff,               Assigned to Judge James J. Di Cesare
                                   Dept. C16

13        v.                       RELATED TO CASE NO.
                                   30-2017-00911945-CU-BC-CJC

14    LAGUNA-DANA URGENT CARE, INC., a
     California corporation; CYPRESS URGENT         u.s. 5-25-17
15    CARE, INC., a California corporation; YOUR     [~~PROPOSED~~] ORDER APPOINTING
     NEIGHBORHOOD URGENT CARE, LLC, a       RECEIVER AND ISSUANCE OF
16    California limited liability company; ROBERT    PRELIMINARY INJUNCTION IN AID
     C. AMSTER, an individual; and DOES 1         OF RECEIVER
17    through 70, inclusive,

18          Defendants.

19

20

21

22

23

24

25

26

27

28

BN 28757825v1

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION

Exhibit 3, Page 000121

1    Upon the Stipulation of Plaintiff Opus Bank, a California Commercial Bank ("Plaintiff")

2    and Defendants Laguna-Dana Urgent Care, Inc., Cypress Urgent Care, Inc., Your Neighborhood

3    Urgent Care, LLC (collectively, the "Receivership Defendants") for Appointment of Receiver and

4    Issuance of Preliminary Injunction In Aid of Receiver and good cause appearing therefor:

5    IT IS HEREBY ORDERED that David P. Stapleton ("Receiver") be and is hereby

6    appointed receiver over the assets and property of the Receivership Defendants, subject to the

7    conditions that before entering upon his duties as the Receiver, he shall file the oath of office and

8    file a surety bond in the sum of $50,000 to secure faithful performance of his duties as receiver.

9    IT IS FURTHER ORDERED that the Receiver shall have the following powers and

10    responsibilities:

11    1.    To enter, gain access, and take possession of the premises of the Receivership

12    Defendants wherever their assets and property are located, including, without limitation, at the

13    following locations:  Laguna-Dana Urgent Care Center, 24060 Camino del Avion, Unit A, Dana

14    Point, CA; Cypress Urgent Care Center, 6876 Katella Ave., Cypress, CA; Your Neighborhood

15    Urgent Care, 18231 Irvine Blvd., No. 204, Tustin, CA; ("Business Premises"), and to seize,

16    manage, control and collect all of the Receivership Defendants' assets, including, but not limited

17    to, (a) the Collateral as defined in the Commercial Security Agreement attached as Exhibit 3 to

18    Plaintiff's Verified Complaint filed herein; (b) all inventory, equipment and accounts, including,

19    but not limited to, all health-care insurance receivables, chattel paper, instruments, all promissory

20    notes, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property,

21    money, other rights to payment and performance; (c) general intangibles including but not limited

22    to all software and all payment intangibles; (d) all fixtures; (e) all goodwill relating to the

23    foregoing property; (f) all records, data and embedded software relating to the foregoing property;

24    (g) all equipment, inventory and software to utilize, create, maintain and process any such records

25    and data on electronic media; (h) all products and proceeds of the foregoing, including, but not

26    limited to, all insurance payments; and (i) all interests which the Receivership Defendants have or

27    may have acquired in or to the Collateral, together with all income, revenue, profits, proceeds and

28    payments derived therefrom (collectively, all of the foregoing are referred to as the "Receivership

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

Property"). To the extent any Receivership Property is located in a location other than the
Business Premises, the Receivership Defendants shall notify the Receiver and Plaintiff of the
subject items and their location, and provide access to the location(s) or deliver possession of the
subject Receivership Property no later than ten (10) calendar days after the entry of this order.
The Receiver shall make books and records of the Receivership Defendants available or provide
copies of the same to the Receivership Defendants and/or their principals, employees, agents, and
professionals within ten (10) calendar days of the receipt of written request for such access.

2.    Subject to approval of the Court, the Receiver shall have the right to sell, lease,
transfer, collect and convey the Receivership Property.

3.    To take any and all steps necessary to receive, collect and review all mail
addressed to Receivership Defendants, including, but not limited to, mail addressed to each and
every one of their Business Premises and any post office boxes held in the name of Receivership
Defendants, and, at the Receiver's discretion, he is authorized to instruct the U.S. Postmaster to
re-route, hold and/or release said mail to the Receiver. Copies of mail reviewed by the Receiver
in the performance of his duties will promptly be made available for inspection by Receivership
Defendants upon request after review by the Receiver. Receiver shall not collect, open or review
any mail addressed solely to any individual or entity other than the Receivership Defendants. If
any correspondence appears to be confidential or privileged in nature, including, without
limitation, any communications from counsel for the Receivership Defendants, Receiver shall
immediately notify the Receivership Defendants of the receipt of such correspondence and shall
not open or review such correspondence (a) unless and until authorized or instructed to do so by
the Receivership Defendants or, (b) if no such authorization is received, five (5) court days have
passed since Receiver notified the Receivership Defendants of the receipt of such
correspondence. The Receivership Defendants shall have the right to review any potentially
confidential or privileged correspondence prior to Receiver's review of the same. The
Receivership Defendants shall have the right to withhold any confidential or privileged
correspondence or communication if the disclosure of the correspondence or communication to
Receiver would violate or render inapplicable any protection(s) for confidential or privileged

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES
BN 28757825v1                                3
ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER
Exhibit 3, Page 000123

communications or information under California or federal law.  Receiver agrees to maintain the confidentiality of and abide by all laws and regulations with respect to mail he receives, collects and reviews that deal with patient information.

4.    To demand, collect, and receive all monies, funds and payments arising from the Receivership Property.

5.    To take possession of all bank and deposit accounts of Receivership Defendants wherever located, and to take possession of any money on deposit in said accounts.

6.    To establish bank accounts at any bank the Receiver deems appropriate for the deposit of monies and funds collected and received in connection with his administration of the Receivership estate, provided that all funds on deposit are insured by an agency of the United States Government and the account(s) and bank(s) are disclosed to the Receivership Defendants and the court.

7.    The Receiver shall have the non-exclusive right to use in the course of the operations of the Receivership Defendants the Federal and State taxpayer identification and account numbers of the Receivership Defendants, including Receivership Defendants' property tax account numbers, NPI numbers and any other billing NPI numbers used by the Receivership Defendants and licensed physicians, whether employees or contractors, and computer network access passwords, keys and any other access controls, computer and software passwords, business licenses, Federal, State and any other licenses currently required to operate, in connection with the Receivership estate, as necessary to perform and/or carry-out the Receiver's duties.  The Receivership Defendants, and each of them, shall promptly provide to Receiver the foregoing information and any other information necessary for the operation of the Receivership Defendants or for Receiver to perform or carry-out the Receiver's duties.  Notwithstanding anything to the contrary, the obligation to provide information and/or access pursuant to this paragraph 7 shall not apply to the personal accounts of the officers, owners, principals, agents, employees, and/or independent contractors of the Receivership Defendants, or the personal or professional accounts of any professionals or advisors of the Receivership Defendants, including, without limitation,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28757825v1                                           4
ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER

Exhibit 3, Page 000124

1  any accounts for the attorneys representing the Receivership Defendants, or any of them, or their

2  respective law firms.

3      8.    To execute and prepare all documents and to perform all acts, either in the names

4  of the Receivership Defendants, or in the Receiver's own name, which are reasonably necessary

5  to preserving, protecting, managing, controlling, and/or liquidating the Receivership Property.

6      9.    To contact the Receivership Defendants' account debtors ("Account Debtors"),

7  and/or their billing departments, insurance companies, governmental agencies or contractors, in

8  order to advise the Account Debtors not to send or transmit further payments to the Receivership

9  Defendants and to instruct the Account Debtors to send or transmit any and all payments due

10 directly to the Receiver.

11     10.    To compromise debts and to incur risks and obligations reasonably necessary to

12 maintain or continue the businesses and enterprises of the Receivership Defendants.

13     11.    To employ servants, agents, employees, appraisers, guards, clerks, accountants,

14 liquidators, auctioneers, locksmiths, computer system experts, attorneys, and management

15 consultants necessary to assist the Receiver in administering the Receivership estate and to

16 protect the Receivership Property and to purchase any necessary materials, supplies and services

17 and to pay therefor at the usual rate and prices out of funds that shall come into his possession.

18 No expenses incurred by the Receiver pursuant to this paragraph shall be the personal obligation

19 of the Receiver but shall be the obligation of the Receivership estate.

20     12.    To procure insurance on the Receivership Property if, in his discretion, there is

21 insufficient insurance coverage thereon, provided the Receiver has funds available to do so.

22 Receiver shall make a determination regarding the adequacy of the insurance coverage and, if

23 deemed deficient, obtain additional coverage, if funds are available to do so, no later than thirty

24 (30) days after the entry of this order.  During said 30-day period, the Receiver shall not be

25 personally responsible for claims arising or for the procurement of insurance.

26     13.    To institute ancillary proceedings in this State or other States as is necessary to

27 obtain possession and control of the Receivership Property, and to participate in any court or

28 other proceedings involving Receivership Defendants.  The Receiver may engage the services of

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28757825v1

5

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER

Exhibit 3, Page 000125

1  counsel in accordance with California Rule of Court ("CRC") 3.1180.  The Receiver may pay for

2  such services from the funds of the Receivership estate.

3     14. In accordance with CRC 3.1181, the Receiver shall, within thirty (30) days of his

4  appointment, file in this action an inventory of all property of which he has taken possession

5  pursuant to this Order and any supplemental inventory which he subsequently obtains.  The

6  Receiver shall provide the parties with a copy of the inventory pursuant to CRC 3.1182.

7     15. In accordance with CRC 3.1182, the Receiver shall prepare interim statements

8  every thirty (30) days commencing with his appointment providing any and all information and

9  disclosures required under CRC 3.1182, including, without limitation, the Receiver's fees and

10  administrative costs and expenses incurred for the period in the operation and administration of

11  the Receivership estate.  Subject to the requirements and limitations of CRC 3.1183, the Receiver

12  may seek approval to pay from the Receivership estate funds, if any, the amount of said

13  statement, including fees and expenses due to the Receiver and Receiver's counsel, if any.

14  Notwithstanding any interim payment(s) on account of Receiver's fees and administrative

15  expenses, such fees and expenses shall be submitted to the Court for its final approval and

16  confirmation in accordance with CRC 3.1184.

17     16. The Receiver shall not be obligated to file on behalf of the Receivership

18  Defendants any federal or state income tax returns, schedules or other forms as required under

19  applicable law.  The Receiver shall make any and all documents in his possession, custody or

20  control available to the Receivership Defendants or their agents within ten (10) calendar days of

21  written request.

22     17. If reasonably necessary to maintain the operations of the Receivership Defendants

23  and subject to court approval, the Receiver may issue Receivership Certificates totaling no more

24  than $1,000,000 in increments of up to $10,000 bearing interest at no more than eight percent

25  (8%) per annum to any person or party that loans funds to the Receivership estate.  Before the

26  Receiver borrows from or issues Receivership Certificates to any party to this action, the Receiver

27  must provide written notice to all parties to this action of his intention to enter into such a

28  transaction, the terms of the transaction, and the terms of any similar transactions with individuals

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28757825v1    6

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER

Exhibit 3, Page 000126

1  or entities that are not parties to this action. All funds loaned to the Receiver pursuant to such

2  Receivership Certificate(s) shall be deemed to be a lien and charge of first priority on all assets of

3  the Receivership estate which shall be repaid prior to all other encumbrances and claims, other

4  than costs of administration of the receivership.

5      18.    In their sole and absolute discretion, the Receivership Defendants, and each of

6  them, may file a petition for relief under any chapter of title 11 of the United States Code

7  following the appointment of the Receiver or the term of this order. Nothing contained herein

8  shall be interpreted to hinder, limit, diminish, divest or transfer the rights of the Receivership

9  Defendants to file a petition for relief under any chapter of title 11 of the United States Code

10 following the appointment of the Receiver or the term of this order. If any of the Receivership

11 Defendants files a bankruptcy case during the receivership, Plaintiff shall give notice of the

12 bankruptcy case to the Court, to all parties, and to the Receiver by the close of the business day

13 after the day on which Plaintiff receives notice of the bankruptcy filing.

14     19.    If the Receiver receives notice that a bankruptcy has been filed by any or all of the

15 Receivership Defendants and/or that part of any bankruptcy estate includes property that is the

16 subject of this order, the Receiver shall have the following duties:

17          (a)    The Receiver shall immediately contact the party who obtained the

18 appointment of the Receiver and determine whether that party intends to move in the bankruptcy

19 court for an order for (1) relief from the automatic stay (11 U.S.C. § 362), and/or (2) relief from

20 the Receiver's obligation to turn over the property (11 U.S.C. § 543). If the party has no intention

21 to make such motions, the Receiver shall immediately turn over any and all property in his

22 possession, custody or control subject to this order to the appropriate entity (either to the trustee

23 in bankruptcy if one has been appointed or, if not, to the debtor in possession) and otherwise

24 comply with 11 United States Code section 543.b.

25          (b)    If the party who obtained the receivership intends to seek relief

26 immediately from the automatic stay and/or the Receiver's obligation to turn over the property,

27 the Receiver may remain in possession and preserve the property pending the ruling on those

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28757825v1                          7

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER
                                                    Exhibit 3, Page 000127

motions (11 U.S.C. § 543(a)). The Receiver's authority to preserve the property shall be limited to the following:

      (1)     The Receiver may continue to collect rents and other income;

      (2)     The Receiver may make only those disbursements necessary to preserve and protect the property;

      (3)     The Receiver shall not execute any new leases or other long-term contracts; and

      (4)     The Receiver shall do nothing that would effect a material change in the circumstances of the property.

      (c)     If no motion for relief from the automatic stay or to excuse turnover is filed within ten (10) court days after the Receiver's receipt of notice of the date of the bankruptcy filing, but in no event later than seven (7) court days from the date of the bankruptcy filing, the Receiver shall immediately turn over the property in his possession, custody or control subject to this order to the appropriate entity (either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession) and otherwise comply with 11 United States Code section 543.

      (d)     The Receiver may petition the Receivership Court to retain legal counsel to assist the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

      20.     The Receiver shall be authorized to apply to this Court for further orders instructing the Receiver from time to time, and on due notice.

## PRELIMINARY INJUNCTION

      21.     Effective upon entry of this order, the Receivership Defendants, their officers, members, directors, agents, servants, employees and all persons or entities acting under, or in concert with them or for them, are ordered to do the following and are restrained and enjoined from engaging in, or performing, directly or indirectly, any or all of the following acts:

BUCHALTER
A Professional Corporation
Los Angeles

BN 28757825v1

8

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER

Exhibit 3, Page 000128

1         (a)     Interfering, hindering or molesting in any way whatsoever the Receiver in

2 the performance of the Receiver's duties herein described and in the performance of any duties

3 incident thereto;

4         (b)     Failing or refusing to turnover to or provide the Receiver access to all

5 Business Premises in accordance with the provisions hereof;

6         (c)     Transferring any interest in the Receivership Property by sale, pledge,

7 grant of security interest, assignment, invoice or encumbering in any manner thereof;

8         (d)     Removing any Receivership Property from the Business Premises;

9         (e)     Transferring, concealing, destroying, defacing or altering any of

10 Receivership Defendants' books and records;

11         (f)     Diverting in any of the proceeds from Receivership Defendants' accounts

12 receivable, equipment and/or inventory;

13         (g)     Causing any mail addressed to the Receivership Defendants or payments

14 by Receivership Defendants' Account Debtors to be forwarded to any address other than the

15 Business Premises or any existing post office box or other mailing address in the name of the

16 Receivership Defendants, or otherwise interfering with or intercepting any mail intended for the

17 Receivership Defendants; and

18         (h)     Failing or refusing to immediately turn over to the Receiver the

19 Receivership Property and all monies, checks, funds or proceeds relating to the Receivership

20 Property, or failing to make available to the Receiver all books and records of the Receivership

21 Defendants relating to the Receivership Property.

22      IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of

23 the receivership ordered herein, the Receivership Defendants, and all customers, vendors,

24 principals, investors, collectors, stockholders, lessors, creditors and other persons seeking to

25 establish or enforce any claim, right or interest against or on behalf of the Receivership

26 Defendants or any assets or property of the Receivership Defendants be and are hereby stayed

27 from:

28

BUCHALTER
A Professional Corporation
Los Angeles

BN 28757825v1

9

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER

Exhibit 3, Page 000129

(a)    Commencing, prosecuting, continuing or enforcing any suit or proceeding against Receivership Defendants, or any of their subsidiaries or affiliates, except such actions may be filed to toll any applicable statute of limitations;

(b)    Commencing, prosecuting, continuing or entering into any suit or proceeding in the name or on behalf of Receivership Defendants, or any of their subsidiaries or affiliates;

(c)    Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, any property of the Receivership Defendants, or any of their subsidiaries or affiliates, or any property claimed by any of them or attempting to foreclose, forfeit, alter, or terminate any of the Receivership Defendants or any of their subsidiaries or affiliates interest in property, including, without limitation, the establishment, granting or perfection of any security interest, whether such acts are part of a judicial proceeding or otherwise;

(d)    Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the Receivership Defendants, or any of their subsidiaries or affiliates, or the Receiver appointed pursuant to this Order or any agent appointed by said Receiver; and

(e)    Doing any act or thing whatsoever to interfere with the Receiver taking control, possession or management of the Receivership Property, or to in any way interfere with the Receiver, or to harass or interfere with the duties of the Receiver, or to interfere in any manner with the exclusive jurisdiction of this Court over the property and assets of the Receivership Defendants, or their subsidiaries or affiliates. Provided, however, nothing in this paragraph shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Receivership Defendants, or their subsidiaries or affiliates.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 28757825v1

10

ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER

Exhibit 3, Page 000130

1      (f)      None of the foregoing provisions shall be interpreted in any way to hinder,

2  limit, diminish, divest or transfer the rights of the Receivership Defendants to file a petition for

3  relief under any chapter of title 11 of the United States Code following the appointment of the

4  Receiver or during the term of this order.

5      **THE COURT ORDERS** Plaintiff to immediately file a preliminary injunction bond

6  under Code of Civil Procedure section 529 in the amount of $1,000 and file a Plaintiff's

7  receivership bond under Code of Civil Procedure section 566(b) in the amount of $1,000.

8      **IT IS SO ORDERED.**

9

10  DATED: **5-25-17**                                                                                    _____

11                                                                          JUDGE OF THE SUPERIOR COURT

12                                                                          WALTER SCHWARM

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER APPOINTING RECEIVER AND ISSUANCE OF PRELIMINARY INJUNCTION
IN AID OF RECEIVER**

Exhibit 3, Page 000131

# EXHIBIT B

Exhibit 3, Page 000132

<u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement (this "**Agreement**") is entered into as of July 20, 2017 (the "**Effective Date**") by and among (i) David P. Stapleton  (the "**Receiver**"), in his capacity as court-appointed receiver in the actions styled *OPUS BANK v. HOAG URGENT CARE-TUSTIN, INC., et al. and OPUS BANK v. LAGUNA-DANA URGENT CARE, INC., et al.* (the "**Actions**"), currently pending in the Superior Court of California, County of Orange (the "**Court**") (ii) Newport Healthcare Center LLC, a Delaware limited liability company  ("**Newport**"); and (iii) Opus Bank ("**Bank**").  The Receiver, Newport and Bank are occasionally referred to herein singularly as a "**Party**" and collectively as the "**Parties**."

<h1 style="text-align:center">RECITALS</h1>

A.      The following recitals represent a summary of the contentions of the Parties. Many of these contentions are disputed and, therefore, are not to be deemed admissions in any respect:

1.      Certain medical and office equipment, furniture and inventory is located at (i) 5355 Warner Avenue, Suite 102, Huntington Beach, CA 92649; (ii) 2560 Bryan Avenue, Tustin, CA 92782; and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 (collectively, the "**Premises**") and other medical and office equipment, furniture and inventory has been moved from the Premises and placed in storage (collectively, the "**Equipment**").

2.      Each Premises is occupied under a separate sublease between Newport, as sublessor and Your Neighborhood Urgent Care, LLC ("**YNUC**"), as sublessee (collectively, the "**Leases**").  YNUC has subleased the Premises located at (i) 5355 Warner Avenue, Suite 102, Huntington Beach, CA 92649 to Hoag Urgent Care-Huntington Harbour, Inc. ("**HUCHH**"); (ii) 2560 Bryan Avenue, Tustin, CA 92782 to Hoag Urgent Care-Tustin, Inc. ("**HUCT**"); and (iii) 5630 Santa Ana Canyon Road, Anaheim, CA 92807 to Hoag Urgent Care-Anaheim Hills, Inc. ("**HUCAH**" and together with HUCT, HUCAH, HUCHH, and Hoag Urgent Care-Orange, Inc. ("**HUCO**"), the "**Affiliates**"), each for the operation of an urgent care facility (collectively, the "**Subleases**").

3.      In connection with the Leases and the Subleases, the following agreements were also entered into: (i) a Master Urgent Care Development Agreement (the "**UrgentCare Agreement**") by and among Robert C. Amster ("**Amster**"), YNUC, Newport and Hoag Memorial Hospital Presbyterian, a California nonprofit public benefit corporation ("**Hoag**"), as may be amended; (ii) Terms and Conditions of Trademark License (the "**Trademark License**") by and between Hoag, YNUC and each Affiliate, as may be amended; and (iii) Guaranty of Sublease Agreement (the "**Guaranty**") made by and among Amster and Robert Amster, M.D., Inc., a California medical professional corporation ("**Amster Corporation**") (jointly, the "**Guarantors**") and in favor of Newport for each Lease, as may be amended (collectively with the Leases and Subleases, the "**Newport/Hoag/YNUC Agreements**").

4.      Newport contends it owns certain of the Equipment and leased the same to YNUC pursuant to the Leases.

5.      Newport, as secured party, filed a Financing Statement (Form UCC-1) with the California Secretary of State on January 26, 2012. The debtor listed on the Newport UCC-1 was YNUC. Newport contends the purpose of filing the Newport UCC-1 was to establish that Newport's interest in the Equipment was perfected as against third parties in the event a

1

Exhibit 3, Page 000133

third party asserted that the Leases were not true leases under the Uniform Commercial Code. Newport's UCC-1 expired on January 26, 2017.

6.      Bank contends that YNUC and the Affiliates own the Equipment as a result of the Equipment being acquired by a sale transaction.

7.      Bank contends it has a first priority security interest in the Equipment by virtue of a credit transaction in which Bank provided financial accommodations to YNUC and/or the Affiliates and YNUC and/or the Affiliates granted to Bank a first priority security interest in the Equipment to secure payment of the financial accommodations.

8.      Bank, as secured party, filed with the California Secretary of State various Financing Statements (Form UCC-1) on September 30, 2013 and October 3, 2013 thereby perfecting its security interest in the Equipment, among other collateral. Bank contends its UCC-1 filings evidence a first priority lien upon the Equipment senior and superior to the interests of any third party to the Equipment.

9.      Newport contends that YNUC is in default under the terms of the Leases, which default is not curable, and that Newport has the right to, among other things, terminate the Leases and the Subleases. Bank contends that YNUC and the Affiliates are in default in their obligations to Bank which default entitles Bank to pursue its various rights and remedies against the Equipment.

10.     In the Actions, pursuant to the request of Bank, the Court has appointed Receiver, as receiver over the Equipment and the business and assets of YNUC and the Affiliates.

B.      Subject to the terms of this Agreement, the Parties desire to settle all claims among the Parties related to the matters set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, promises, terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Financial/Ownership Settlement Terms. Subject to the terms of this Agreement and upon approval by the Court of this Agreement and the transactions contemplated in this Agreement ("Court Approval"):

1.1.    The Receiver and Bank will not oppose Newport's claim that Newport owns the Equipment.

1.2.    The Receiver will transfer to Newport all telephone numbers related to the Premises (the "Telephone Numbers").

1.3.    The Receiver and Bank will not claim any ownership or security interest in the Equipment or in the patient records – both hard copies and computer records – of the patients of YNUC or the Affiliates maintained at or for the Premises ("Patient Records", and together with the Equipment and the Telephone Numbers, the "Settlement Property"). For the avoidance of any doubt, the Settlement Property includes Patient Records and Telephone Numbers of HUCO and the Settlement Property does not include any accounts receivable of

2

59499128.8

YNUC or the Affiliates arising on or prior to August 7, 2017 or the proceeds thereof (collectively, the "**Accounts Receivable**"). Newport will not claim any interest in the Accounts Receivable.

      1.4.    The Bank will not claim any security interest in the Settlement Property.

      1.5.    On the Closing Date (as defined below) the Receiver hereby assigns, transfers, conveys and delivers to (a) Newport, all right, title and interest in and to and possession of the Equipment and the Telephone Numbers, and (b) subject to the terms of Section 6 of this Agreement, Hoag (or such other entity designated by Hoag) all right, title and interest in and to and possession of the Patient Records, all of the foregoing free and clear of any right, title or interest of any other person or entity, including but not limited to YNUC, Amster, Amster Corporation or the Affiliates, as applicable that is reflected on the Closing UCC Search (defined hereinafter) ("**Free and Clear**").

      1.6.    On the Closing Date the Bank will deliver to Newport (i) UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property and (ii) UCC-3 statements reflecting an assignment of any security interest of the Bank in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration. If, prior to January 1, 2018, none of YNUC or the Affiliates (i) is or has been the subject of a petition under 11 U.S.C. or the commencement of a bankruptcy or similar proceeding which is not dismissed by January 1, 2018; (ii) is or has been the subject of an involuntary bankruptcy petition or other commencement of a bankruptcy, reorganization or similar proceeding which is not dismissed by January 1, 2018; (iii) is or has been subject to an order for relief under 11 U.S.C.; (iv) is subject to an assignment for the benefit of its creditors; (v) is or has been subject to the approval by a court of competent jurisdiction of a petition in any proceeding for its reorganization instituted under the provisions of any state or federal bankruptcy, insolvency, or similar laws; or (vi) other than as exists as of the date of this Agreement, is or has been subject to the appointment of a receiver of the whole or any substantial part of the properties of any of the same (collectively, a "**Bankruptcy Event**"), then Bank authorizes Newport to cause UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property to be filed with the any applicable Secretary of State or other applicable recording office. If, prior to January 1, 2018, any of YNUC or the Affiliates is or has been the subject of a Bankruptcy Event, then the Bank hereby confirms the assignment of the Bank's security interest in and to the Settlement Property to Newport, together with an assignment to Newport of a portion of the underlying obligation secured by such Settlement Property in an amount equal to the Settlement Consideration is effective and authorizes Newport to cause UCC-3 statements reflecting such assignment to be filed with the any applicable Secretary of State or other applicable recording office. Notwithstanding anything in this Agreement to the contrary, after the Closing Date, if the Receiver and Bank oppose Newport's claim that Newport owns the Settlement Property, then Bank hereby authorizes Newport to cause UCC-3 statements reflecting a release of any security interest of the Bank in and to the Settlement Property to be filed with the any applicable Secretary of State or other applicable recording office. If any Equipment is determined in any case or matter related to any Bankruptcy Event (i) not to the be the sole property of Hoag or (ii) to not be subject to the security interest of the Bank as assigned and described above, the Bank will promptly return to Newport the Settlement Consideration.

59499128.8

1.7.    The Receiver, Bank and Newport agree that this Agreement constitutes the full and final settlement of claims and contentions respecting ownership of and secured claims among the Parties with respect to the Settlement Property and the Accounts Receivable.

2.    The Newport/Hoag/YNUC Agreements. Subject to the terms of this Agreement, Court Approval and the transactions contemplated in this Agreement:

2.1.    On the following dates, the Receiver will pay or cause to be paid to Newport the following amounts on account of rent and other amounts owed under the Newport/Hoag/YNUC Agreements:

| Date | Amounts |
|---|---|
| Closing Date | $30,000 |
| September 1, 2017 | $5,000 |
| October 1, 2017 | $5,000 |
| December 1, 2017 | $5,000 |
| January 1, 2018 | $5,000 |
| February 1, 2018 | $5,000 |
| March 1, 2018 | $1,250 |

2.2.    On the Closing Date, without further payment, the obligations of Newport, Hoag or the Receiver under the Leases, the Subleases, the UrgentCare Agreement and the Trademark License are agreed among them to be terminated in their entirety and no are longer of any force or effect, and thereupon, possession of the Premises and any other rights, title and interests conveyed pursuant to the Leases, the Subleases, the UrgentCare Agreement and the Trademark License are agreed to be finally, completely and exclusively vested in Newport or Hoag (or such other entity designated by Hoag), as the case may be.

2.3.    From and after the Effective Date and at all reasonable times, upon reasonable notice, Newport and its agents, employees, consultants, inspectors, appraisers, engineers and contractors will have the right to enter upon and pass through the Premises during normal business hours to examine and inspect the Settlement Property, as well as conduct reasonable investigations and the like of the Premises and the Settlement Property as Newport deems necessary. Prior to the Closing Date, Newport shall conduct a walk-through inspection of the Premises and may conduct a walk-through inspection of the stored Equipment (the "**Inspection**") whereby Newport shall prior to the Closing Date approve or disapprove in writing of the state of the Premises or Settlement Property. The failure of Newport to provide its written disapproval as set forth herein within the time set forth herein shall be deemed Newport's approval of the state of the Premises and Settlement Property.

2.4.    On the Closing Date (i) the Receiver, YNUC, Amster, Amster Corporation and the Affiliates, as applicable, must vacate and surrender the Premises to Newport with all improvements, parts, and surfaces clean and free of debris, and in a condition and state of repair as approved by Newport as part of the Inspection; (ii) the Receiver, YNUC, and the Affiliates, as applicable, must remove any and all hazardous materials or substances brought onto the Premises by or for the Receiver, YNUC, Amster, Amster Corporation and the Affiliates, unless otherwise approved by Newport in connection with the Inspection; (iii) the Receiver must return all keys and

4

access cards to the Premises to which the Receiver has access to Newport (or provide the keys to new access locks); and (iv) the Receiver, YNUC and the Affiliates, as applicable, must surrender the Settlement Property (including delivering the stored Equipment to Newport at a mutually agreed location) to Newport or Hoag (or such other entity designated by Hoag), as the case may be, in a condition and state of repair as existed at the time of the Inspection, all of the foregoing Free and Clear.

2.5.    If, on the Closing Date (i) the Premises and all improvements, parts, and surfaces are not in a condition and state of repair existed at the time of Inspection; (ii) all hazardous materials or substances brought onto the Premises by or for the Receiver, YNUC, Amster, Amster Corporation and the Affiliates have not been removed, unless otherwise approved by Newport in connection with the Inspection; (iii) all keys and access cards to the Premises have not been returned to Newport or keys to new access locks provided to Newport; and (iv) the Settlement Property is not surrendered to Newport or Hoag (or such other entity designated by Hoag), as the case may be, in a condition and state of repair as existed at the time of the Inspection, all of the foregoing Free and Clear, then Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. Newport acknowledges its interest in the Settlement Property is "as-is, where-is and how-is".

2.6.    UCC Search. Prior to Closing the Receiver will deliver to Newport at the Receiver's sole cost and expense one or more UCC searches (collectively, the "**Closing UCC Search**") respecting YNUC and the Affiliates. All references herein to "Free and Clear" shall mean the elimination of liens on or attached to the Settlement Property of YNUC or the Affiliates that are set forth on the Closing UCC Search.

3.    Payment of Settlement Consideration. Upon the Closing Date, Newport will deposit $116,000 in good funds (the "**Settlement Consideration**") with the Receiver and Receiver must pay the Settlement Consideration so received to Bank.

4.    Closing.

4.1.    Provided that all of the conditions of this Agreement have been satisfied prior to or on the Closing Date, the closing of this transaction will take place (the "**Closing**"), not later August 7, 2017 (the "**Closing Date**").

4.2.    The following constitute obligations of the Parties identified below and conditions precedent to Newport's obligation to deposit the Settlement Consideration with the Receiver on or before the Closing Date:

4.2.1.    Court Approval.

4.2.2.    The Receiver must have (i) made the assignments, transfers, conveyances and deliveries required pursuant to Section 1.4 of this Agreement; (ii) assigned transferred, conveyed and delivered to Hoag (or such other entity designated by Hoag) all right, title and interest in and to and possession of the Patient Records; (iii) strictly complied with all of the terms of the Newport/Hoag/YNUC Agreements; provided however, payment under the UrgentCare Agreement, the Trademark License, the Leases and the Subleases will be limited as provided in Section 2.1 of this Agreement; (iv) caused to have occurred all of the requirements of Section 2.4 of this Agreement; and (v) complied with all other terms and conditions of this Agreement applicable to him.

59499128.8

4.2.3.  Bank must have complied with Section 1.5 and all other terms and conditions of this Agreement applicable to it.

4.2.4.  All representations and warranties of the Parties made in this Agreement must be true and correct in all material respects as of the Effective Date and the Closing Date.

4.3.    In the event that one or more of the above conditions is not satisfied on or before the Closing Date, then (i) Newport can waive satisfaction of such condition(s) in writing, and the Closing will proceed, or (ii) Newport may terminate this Agreement upon written notice to the Receiver and the Bank and this Agreement and the rights and obligations of Parties under this Agreement will terminate except as and to the extent otherwise expressly provided in this Agreement.

5.    <u>Releases</u>.

5.1.  Definitions:

5.1.1.  **"Damages and/or Claims"** means any and all manner of, any actions, causes of action, suits, claims, counterclaims, demands, costs, debts, dues, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, acknowledgments, extents, executions, liens, remedies, liabilities judgments, defenses, assertions, allegations, rights of setoff, sums of money owed, proceedings, doings, omissions, loss of services, attorneys' fees and expenses, and all expenses and compensation related in any way to all known or unknown injuries or damages resulting, now or later, from this Agreement, whether fixed or contingent, asserted or unasserted, known or unknown, at law or in equity, in contract or tort, unsecured, secured, priority, administrative, or otherwise, suspected or unsuspected, accrued or unaccrued, patent or latent, liquidated or unliquidated, pending or threatened, and all resulting damages, including but not limited to actual damages, compensatory damages, consequential damages, statutory damages, punitive and exemplary damages, pre-judgment and post-judgment interest, attorneys' fees and costs of court, and all other damages, which the releasing Party has, ever had, or may have now or hereafter, against the released Party for, upon, or by reason of any matter, cause or thing whatsoever.

5.1.2.  **"Released Damages and/or Claims"** means any Damages and/or Claims, arising from or out of the matters which are the subject of this Agreement; provided however, Released Damages and/or Claims exclude the released Party's obligations under this Agreement.

5.2.    Upon Closing, Bank knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases Newport and Hoag and their respective officers, directors, employees, contractors, attorneys, successors and permitted assigns (the **"Newport Parties"**), of and from, and remises and waives any Released Damages and/or Claims. Bank knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties in connection with any Damages and/or Claims.

5.3.    Upon Closing, Newport knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases Bank and the Receiver and their respective officers, directors, employees, contractors, attorneys, successors and permitted assigns

6

(the "**Bank/Receiver Parties**"), of and from, and remises and waives any Released Damages and/or Claims. Newport knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Bank/Receiver Parties in connection with any Damages and/or Claims.

5.4.    Upon Closing, the Receiver for himself and his agents, successors and assigns, and any other person or entity acting for or on behalf of the same (each, a "**Releasing Party**," and collectively, "**Releasing Parties**") knowingly, voluntarily, unconditionally, irrevocably, and expressly forever discharges and releases the Newport Parties and the Bank/Receiver Parties of and from, and remises and waives any Released Damages and/or Claims. The Releasing Parties knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties or the Bank/Receiver Parties in connection with any Damages and/or Claims. Each Releasing Party knowingly, voluntarily and expressly waives and relinquishes all rights and benefits and agrees not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, directly or indirectly, with or against any Newport Parties or the Bank/Receiver Parties in connection with any Damages and/or Claims.

5.5.    Each Party acknowledges that, subsequent to the execution of this Agreement, it may discover Damages and/or Claims which are unknown or unanticipated as of the Effective Date, including unknown or unanticipated Damages and/or Claims that arose from, or are based upon or relate to, matters for which such Party's release is given under this Section, and that, if known on the Effective Date, may have materially affected such Party's decision to execute this Agreement. Each Party acknowledges that it is assuming the risk of such unknown or unanticipated Damages and/or Claims, and agrees that this Agreement applies thereto. Each Party expressly waives the benefits of any applicable statutory provision prohibiting, conditioning or restricting the release of unknown or future claims or any Damages and/or Claims being released pursuant to this Agreement. It is the intention of the Parties that all of the foregoing releases in this Section will be effective with respect to all Released Damages and/or Claims, and other matters, past and present, known and unknown, suspected and unsuspected. Each Party agrees, represents, and warrants that such Party realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Damages and/or Claims which are presently unknown, unanticipated, and unsuspected; and each Party further agrees, represents and warrants that the waivers and releases in this Agreement have been negotiated and agreed upon in light of that realization and that such Party nevertheless hereby intends to release and discharge the express beneficiary of the applicable release of and from any and all Released Damages and/or Claims. In furtherance of this intention, each Party knowingly and voluntarily expressly waives and relinquishes all rights and benefits afforded by Section 1542 of the Civil Code of the State of California and any other similar provision of applicable law, and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 of the Civil Code of the State of California states as follows:

7

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_____
Bank Initials

_____
Receiver Initials

_____
Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records.  On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.  Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request (**"Transition Assistance"**).  If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access.  For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

59499128.8

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_A J_

Bank Initials

_____

Receiver Initials

_____

Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records.  On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.  Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**").  If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

59499128.8

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

_____

Bank Initials

_____

Receiver Initials

Newport Initials

Each Party acknowledges that the foregoing acknowledgments, releases, and waivers, including without limitation the waiver of the provisions of Section 1542 of the Civil Code of the State of California, were expressly bargained for. The terms of this Section will survive the termination or expiration of this Agreement.

6.    HIPAA Obligations and Patient Records. On the Closing Date, the Receiver must assign, transfer, convey and deliver to Hoag (or such other entity designated by Hoag), and Hoag (or such other entity designated by Hoag) will assume, custodial responsibility for and the responsibility thereafter to maintain all Patient Records on the Closing Date, subject to the rights of individual patients to such records. In its capacity as custodian of the Patient Records, Hoag (or such other entity designated by Hoag to receive the Patient Records) will comply with all applicable laws applicable to the handling, maintenance and storage of the Patient Records, including HIPAA.

7.    Cooperation Regarding Transition and Employees. It is understood and agreed by the Parties that the Receiver's, Bank's, YNUC's and the Affiliates' cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement. Therefore, subject to the terms and conditions of this Agreement, the Receiver, Bank, YNUC and the Affiliates must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition of the Settlement Property to Newport, including answering questions, facilitating the employment of those of YNUC and/or Affiliate employees which Newport or its affiliate chooses to employ, and such other actions as Newport or its affiliate may reasonably request ("**Transition Assistance**"). If, on the Closing Date adequate Transition Assistance has not been provided, Newport may terminate this Agreement and, such termination will be Newport's sole and exclusive remedy under this Agreement as to the Bank and the Receiver. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties, as applicable, must take all such necessary action as may reasonably be requested by the other Party.

8.    Receiver/Bank Access. For a period of one year following the Closing Date, and to the extent not prohibited by applicable law, Newport will permit the Receiver, Bank and their respective agents, access, at reasonable times during normal business hours and on reasonable

8

59499128.8

notice, to accounts receivable records and such other records of Newport as Receiver and Bank may reasonably need for purposes related to the transaction contemplated by this Agreement or for compliance with applicable law.

9.    Excluded Liabilities.  This Agreement pertains only to the property rights and obligations expressly set forth herein.  It is expressly understood and agreed that Newport will not assume, pay, or in any way be liable or responsible for any debts, liabilities, or obligations of the Receiver, Bank, YNUC, Amster, Amster Corporation or the Affiliates, or, for debts, liabilities or obligations arising prior to the Closing Date or the date on which Newport or an affiliate assumes responsibility for operation of the Premises or the Settlement Property, whichever is later (the "**Excluded Liabilities**").

10.    Indemnities.

10.1.    Subject to the terms and conditions set forth in this Agreement, Bank must indemnify, hold harmless, and defend the Newport Parties from and against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees (collectively, "**Losses**"), that arise out of or result from, in whole or in part, (i) any material misrepresentation or breach of any representation or warranty of Bank, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of Bank contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) the Excluded Liabilities attributable to the Bank; and (iv) enforcement of the indemnification obligations of Bank under this Agreement.

10.2.    Subject to the terms and conditions set forth in this Agreement, the Receiver must indemnify, hold harmless, and defend the Newport Parties from and against any and all Losses that arise out of or result from, in whole or in part, (i) any material misrepresentation or breach of any representation or warranty of the Receiver, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of the Receiver contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) the Excluded Liabilities attributable to the Receiver; and (iv) enforcement of the indemnification obligations of the Receiver under this Agreement.

10.3.    Subject to the terms and conditions set forth in this Agreement, Newport must indemnify and defend Bank and any Releasing Party from and against any and all Losses, that arise out of or result directly from (i) any material misrepresentation or breach of any representation or warranty of the Newport, contained in this Agreement; (ii) any material breach or default in respect of any covenant, agreement, or obligation of the Newport contained in this Agreement or any other agreement, instrument, or document contemplated by this Agreement; (iii) any obligations of Newport related to the Settlement Property which first arise after the Closing Date; and (iv) enforcement of the indemnification obligations of the Newport under this Agreement..

10.4.    Notwithstanding anything to the contrary in this Agreement, no indemnifying Party is obligated to indemnify, hold harmless or defend any indemnified Party against any claim (whether direct or indirect) if such claim or corresponding Losses arise out of or result from any the indemnified Party's: (i) gross negligence or more culpable act or omission (including recklessness or willful misconduct); or (ii) bad faith failure to comply with any of its

59499128.8

obligations set forth in this Agreement.

10.5.    Any indemnified Party must give the indemnifying Party a prompt written notice (a "**Claim Notice**") of any Losses or discovery of facts on which any indemnified Party intends to base a request for indemnification. Any indemnified Party's failure to provide a Claim Notice to indemnifying Party does not relieve the any indemnifying Party of any liability. Indemnifying Party duty to defend applies immediately but in no event will indemnifying Party be liable for any Losses that result directly or indirectly from a delay in providing a Claim Notice.

10.6.    An indemnified Party may assume control of the defense, appeal or settlement of any claim that is reasonably likely to give rise to an indemnification claim (a "**Indemnified Claim**"), at indemnified Party's sole cost and expense, by sending written notice of the assumption to the indemnifying Party on or before 30 days after receipt of a Claim Notice through reputable independent counsel of its own choosing.

10.7.    Notwithstanding anything to the contrary in this Section, an indemnified Party may defend an Indemnified Claim with counsel of its own choosing and without an indemnifying Party's participation if: (i) the Indemnified Claim is one for which the indemnified Party properly gave a Claim Notice under this Section and indemnifying Party fails to assume the defense or refuses to defend the Indemnified Claim under this Section; (ii) the Indemnified Claim seeks only an injunction or other equitable relief against such indemnified Party; or (iii) such indemnified Party reasonably believes (a) that there are one or more legal or equitable defenses available to it that are materially different from or in addition to those available to indemnifying Party; (b) counsel for indemnifying Party could not adequately represent the interest of such indemnified Party because such interest could be in conflict with those of indemnifying Party; or (c) such action or proceeding involves, or could have a material effect on, any material matter beyond the scope of the indemnification or defense obligations of indemnifying Party in this Section. If an indemnified Party assumes control of the defense under this Section, the applicable indemnifying Party must (i) unless otherwise provided above, reimburse such indemnified Party promptly and periodically for the reasonable costs properly incurred in defending against the Indemnified Claim (including reasonable attorneys' fees and expenses); and (ii) remain responsible to such indemnified Party for any Losses indemnified under this Section. Indemnifying Party must give prompt written notice to indemnified Party of any proposed settlement of an Indemnified Claim.    Indemnifying Party may not, without indemnified Party's prior written consent, which indemnified Party may not unreasonably withhold, condition or delay, settle or compromise any Indemnified Claim or consent to the entry of any judgment regarding any Indemnified Claim unless such settlement, compromise or consent: (i) includes an unconditional release of such indemnified Party from all liability arising out of such claim; (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of such indemnified Party; and (iii) does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business of such indemnified Party. An indemnified Party may not settle or compromise any claim or consent to the entry of any judgment regarding which it is seeking indemnification under this Section without the prior written consent of indemnifying Party, which indemnifying Party may not unreasonably withhold, condition or delay, unless: (i) the Indemnified Claim is one for which indemnified Party properly gave indemnifying Party a Claim Notice, and indemnifying Party fails to assume

10

Exhibit 3, Page 000144

the defense or refuses to defend the Indemnified Claim under this Section; or (ii) such settlement, compromise or consent (a) includes an unconditional release of indemnifying Party from all liability arising out of such claim; (b) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of indemnifying Party; and (c) does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business of indemnifying Party.

      10.8.    The obligations under this Section will survive the Closing or any earlier termination of this Agreement.

      11.    Representations.

      11.1.    Each Party represents and warrants as follows: (a) such Party has the legal power, right and authority to enter into this Agreement; (b) the person executing this Agreement on behalf of such Party has the legal power, right and actual authority to bind such Party to the terms and conditions of this Agreement, and no other persons are required to execute this Agreement on behalf of such Party; (c) except as otherwise expressly set forth in this Agreement, no representations, warranties, or promises of any kind have been made, directly or indirectly, to induce such Party to execute this Agreement; (d) such Party has not assigned, transferred or otherwise alienated its interests in or claims related to those certain loans to YNUC and the Affiliates, the Newport/Hoag/YNUC Agreements, the Settlement Property or the Premises to any other entity; (e) such Party has read and fully understands the terms of this Agreement and has had the full opportunity to consult with legal counsel of its own choosing as to the effect and meaning of this Agreement; (f) to the best knowledge of such Party, there are no delinquent taxes or assessments affecting the Settlement Property; (g) assuming due authorization, execution and delivery of this Agreement by the other Parties to this Agreement, this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as such enforcement may be limited by bankruptcy, fraudulent transfer, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights in general and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law); (h) the execution and delivery of this Agreement by such Party and such Party's performance and compliance with the terms of this Agreement will not violate any law or regulation or any administrative decree or order to which it is subject or constitute a default under, or result in the breach of, any material contract, agreement or other instrument to which such Party is a party or which may be applicable to such Party or any of its assets, that in any such case would materially and adversely affect such Party's performance under this Agreement; (i) such Party has not received written notice that any Party has filed or had filed against it any petitions seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency.

      11.2.    Bank further represents and warrants as follows: (a) Bank is the sole owner and holder of the Loan, the security interest in the Settlement Property and all related Loan documents, files, accounts, servicing and other related rights (collectively, the "**Loan Rights**"); (b) Bank has not previously conveyed any right, title or interest in the Loan Rights; (c) Bank's interest in the Loan Rights is free and clear of any participation interests; and (d) Bank had good title to, and was the sole owner and holder of, the Loan, free and clear of any and all liens, charges, encumbrances or any other ownership interests on, in or to the Loan.

59499128.8

12.    Cooperation and Prorations regarding Telephone Numbers; Utilities; Data Services. It is understood and agreed by the Parties that the Receiver's and Bank's cooperation and assistance is necessary to successfully facilitate the transition of the Settlement Property to Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) and for Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) to realize the full value and potential of this Agreement.    Therefore, subject to the terms and conditions of this Agreement, the Receiver and Bank must cooperate with Newport and Hoag (or such other entity designated by Hoag to receive the Patient Records) in the transition to Newport of the Telephone Numbers, any utilities related to the Premises and any data services related to the Premises.    All telephone service, utilities related to the Premises and data services related to the Premises, will be prorated based upon estimates using the most recent actual invoices.    The Receiver will receive a credit for the amount of deposits, if any, with companies that are transferable and that are assigned to Newport at the Closing, if any. In the case of non-transferable deposits, Newport will be responsible for making any security deposits required by such companies. At least one business day prior to the Closing, the Parties must agree upon all prorations to be made.    In the event that any prorations or computations made under this Section require final adjustment, then the Parties must make the appropriate adjustments promptly when accurate information becomes available and any Party may be entitled to an adjustment to correct the same; provided that all adjustments pursuant to this Section must be made no later than 90 days following the Closing Date, after which there shall be no further adjustments.    Any corrected adjustment or proration will be paid in cash to the Party entitled thereto. The terms of this Section will survive the Closing.

13.    Attorneys' Fees.    If it is necessary for any Party to employ an attorney to enforce or defend its rights under this Agreement, the non-prevailing Party will reimburse the prevailing Party for its reasonable attorneys' fees and costs of suit.

14.    Notices.    Any approval, disapproval, demand, document or other notice which any Party may desire to give to any other Party must be in writing and will be delivered by hand delivery, by overnight courier, by electronic mail, or by U.S. certified or registered mail (postage prepaid) and will be deemed received when receipted for at the addressee's place of business (in the case of hand delivery), on the date of delivery confirmed by the overnight courier service (in the case of overnight courier delivery), when the sending Party receives an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment in the case of electronic mail), and three days after being posted with the U.S. mail (in the case of certified or registered mail delivery).    All such notices must be delivered to the addresses (or at any other address as a Party may later designate in writing) set forth below:

| | |
|---|---|
| To Receiver: | 515 So. Flower St., 36th Floor,<br>Los Angeles, CA 90071<br>Attention: David Stapleton<br>Email: david@stapletoninc.com |
| To Bank: | 1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017-2457<br>Attention: Barry Smith<br>Email: bsmith@buchalter.com |

12

Exhibit 3, Page 000146

To Newport:                     One Hoag Drive, P.O. Box 6100,
                                Newport Beach, CA 92658-6100
                                Attention: Sandy Smith, Senior Vice
                                President Real Estate, Facilities,
                                Construction and Operations
                                Email: Sandy.Smith@hoag.org

With copy to (which             St. Joseph Health System
will not constitute             3345 Michelson Drive, Suite 100,
notice)                         Irvine, California  92612
                                Attention: Tara Cowell, Esq.

                                2049 Century Park East, Suite 2900
                                Los Angeles, CA 90067
                                Attention: Tim Reimers, Esq.
                                Email: TReimers@Polsinelli.com

15.     _Governing Law_.  The applicable laws of the State of California will govern the validity, enforcement, and interpretation of this Agreement.

16.     _Integration; Modification; Waiver_.  This Agreement constitutes the complete and final expression of the agreement of the Parties relating set forth in this Agreement and supersedes all previous contracts, agreements and understandings of the Parties, either oral or written, relating to the Premises or the Settlement Property (including, without limitation, any letter or letters of intent).  This Agreement cannot be modified, or any of the terms of this Agreement waived, except by an instrument in writing executed by the Party against whom enforcement of the modification or waiver is sought.  No delay on the part of any Party in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege under this Agreement, nor any single or partial exercise of any right, power or privilege under this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege under this Agreement.  The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights or remedies which any Party may otherwise have at law or in equity.

17.     _Counterpart Execution_.  This Agreement may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (_i.e._, "pdf" or "tif") format will be effective as delivery of a manually executed counterpart of this Agreement.

18.     _Headings; Constructions_.  The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matters to be construed in interpreting this Agreement.  Words of any gender used in this Agreement will be held and construed to include any other gender, and words in the singular number will be held to include the plural, and vice versa, unless the context requires otherwise.  The provisions of this Agreement will not be construed in favor of or against any Party, but will be construed as if

59499128.8

Exhibit 3, Page 000147

all Parties prepared this Agreement.

19.    _Time of the Essence_.    Time is of the essence for this Agreement and of the obligations of the Parties in this agreement, it being acknowledged and agreed by and between the Parties that any delay in effecting a Closing pursuant to this Agreement may result in loss or damage to the Party in full compliance with its obligations under this Agreement.

20.    _Invalid Provisions_.    If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, will be held invalid or unenforceable, such provision will be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision will not be affected thereby.

21.    _Binding Effect_.    This Agreement will be binding upon and inure to the benefit of Parties (and Hoag as an express third party beneficiary of this Agreement), and their respective heirs, administrators, representatives, successors and permitted assigns.

22.    _Further Acts_.    In addition to the acts recited in this Agreement to be performed by any Party, such Party agrees to perform or cause to be performed at the Closing or after the Closing any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

*[Signatures on following page.]*

14

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

BANK:

Opus Bank

By: _____

Name: _____

Its: _____

S-1

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: SANFORD SMITH

Its: CEO

BANK:

Opus Bank

By: _____

Name: _____

Its: _____

S-1

Exhibit 3, Page 000150

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

THE RECEIVER:

_____

David P. Stapleton, in his capacity as
court-appointed receiver in the Actions

NEWPORT:

Newport Healthcare Center LLC,
a Delaware limited liability company

By: _____

Name: _____

Its: _____

BANK:

Opus Bank

By: _____

Name: _____Andrew Javis_____

Its: _____FVP_____

S-1

Exhibit 3, Page 000151

# DECLARATION

Exhibit 3, Page 000152

1

**DECLARATION OF STEVEN M. SPECTOR**

2

I, Steven M. Spector, hereby declare as follows:

3

1.     I am an attorney duly licensed to practice law in the State of California.  I am a

4

shareholder of the law firm Buchalter, A Professional Corporation ("Buchalter"), counsel for the

5

Plaintiff Opus Bank in the above-captioned action.

6

2.     I am one of the attorneys at Buchalter with responsibility for handling Buchalter's

7

representation of the Plaintiff in the above-captioned action.

8

3.     This declaration is submitted in connection with Receiver's Ex Parte Application

9

for Approval of Settlement Agreement ("Application") as to YNUC.

10

4.     This declaration pertains only to Notice respecting the Application pursuant to

11

California Rules of Court ("CRC") 3.1200-3.1207.  My firm represents the Plaintiff in this action.

12

We have worked with Mr. Stapleton to assist him respecting the Application.  Thus, we have

13

notice of the Application and, of course, approve the Application and the relief sought thereby.

14

While no formal appearance by YNUC has been made, I have had substantial contact with two

15

different lawyers representing YNUC.  These lawyers are as follows:

16

17

18

19

     Ashley McDow, Esq.              Garrick Hollander, Esq.
     Baker & Hostetler                Winthrop Couchot
     11601 Wilshire Blvd., Suite 1400     660 Newport Center Drive, Suite 400
     Los Angeles, CA  90025          Newport Beach, CA  92660
     Tel: 310-442-8846                Tel: 949-720-4100
     Email: amcdow@bakerlaw.com       Email: ghollander@wcghlaw.com

20

In addition, the lawyer for Newport/Hoag, with whom I have also had substantial contact,

21

is as follows:

22

23

24

25

26

     Timothy Reimers, Esq.
     Polsinelli
     2045 Century Park East
     Suite 2900
     Los Angeles, CA  90067
     Tel: 310-203-5316
     Email: treimers@polsinelli.com

27

Mr. Reimers has approved the Application and relief sought thereby.

28

5.     Consistent with CRC 3.1204, on July 3̲1̲ , 2017, I emailed the Application to Ms.

10

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

1    McDow, Mr. Hollander and Mr. Reimers. A true copy of my email transmission is attached as

2    **Exhibit "A."** The email transaction was reported without error. The email advises each recipient

3    that the Application would be presented to the Court on August 2, 2017 at 1:30 p.m. in Dept.

4    C-16 located at 700 Civic Center Drive West, Santa Ana, CA 92701 (before Judge James J.

5    DiCesare). A copy of the Application was attached to the email as was a copy of the [Proposed]

6    Order filed concurrently. As of the execution of this declaration, it is not known whether YNUC

7    will oppose the Application.

8       I declare under penalty of perjury of the laws of the State of California that the foregoing

9    is true and correct and that this declaration is executed on July 31, 2017, at Los Angeles,

10    California.

11

12                     STEVEN M. SPECTOR

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

**EX PARTE APPLICATION FOR APPROVAL OF SETTLEMENT AGREEMENT**

59502089.4
59798300.2

# EXHIBIT A

# Buchalter

## MEMORANDUM

**VIA E-MAIL**

| | |
|---|---|
| **To:** | Ashley McDow |
| | Garrick Hollander |
| | Timothy Reimers |
| **From:** | Steven M. Spector |
| **Date:** | July 31, 2017 |
| **Re:** | Opus Bank v. Hoag (the "Hoag Action") |
| | Case No. 30-2017-00911945-CU-BC-CJC |
| | Opus Bank v. Laguna (the "Laguna Action") |
| | Case No. 30-2017-00912132-CU-BC-CJC |

Dear Ashley, Garrick and Tim:

David Stapleton, ("Receiver"), the court-appointed receiver in both the Hoag Action and the Laguna Action, has determined to file an ex parte application (the "Applications") and (Proposed) Order (the "Orders") in both actions.  Copies of the Applications and Orders are attached.

The Receiver will be presenting the Applications to the Court on Wednesday, August 2, 2017 at 1:30 p.m.  The department is C-16 (Judge James J. DiCesare) and the court is located at 700 Civic Center Drive West, Santa Ana, CA.

Please advise the Receiver (david@stapletoninc.com) and the undersigned whether you intend to appear at the hearing and whether you oppose the Applications.

SMS

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
BUCHALTER, 1000 Wilshire Blvd, Suite 1500, Los Angeles, CA 90017

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF DAVID P. STAPLETON IN SUPPORT OF OPUS BANK'S MOTION FOR ORDER (I) PARTIALLY EXCUSING RECEIVER'S COMPLIANCE WITH 11 U.S.C. § 543(A) AND (B); AND (II) GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 11, 2017    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

COUNSEL FOR HOAG URGENT CARE: Michael T Delaney    mdelaney@bakerlaw.com, sgaeta@bakerlaw.com
STAFF ATTY UST: Michael J Hauser    michael.hauser@usdoj.gov
COUNSEL HOAG URGENT CARE: Ashley M McDow    amcdow@bakerlaw.com,
mdelaney@bakerlaw.com;sgaeta@bakerlaw.com;rojeda@bakerlaw.com;ffarivar@bakerlaw.com
COUNSEL OPUS: Anthony J Napolitano    anapolitano@buchalter.com,
IFS_filing@buchalter.com;salarcon@buchalter.com
COUNSEL HOAG MEMORIAL: Randye B Soref    rsoref@polsinelli.com, acruickshank@polsinelli.com
COUNSEL FOR OPUS: Steven M Spector    sspector@buchalter.com,
IFS_efiling@buchalter.com;salarcon@buchalter.com
OFFICE UST: United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) August 11, 2017    , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Debtor**
**Hoag Urgent Care-Tustin, Inc.**
PO Box 8979
Newport Beach, CA 92658

David Stapleton, as receiver
515 South Flower Street, 36th Floor
Los Angeles, CA 90071

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 11, 2017    , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Via Messenger:
Hon. Theodor C. Albert
U.S. Bankruptcy Court
411 W. Fourth Street, Suite 5085
Santa Ana, CA 92701

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 11, 2017 | Sandra I. Alarcon | /s/ Sandra I. Alarcon |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**