BARRY A. SMITH (SBN: 48697)
  bsmith@buchalter.com
STEVEN M. SPECTOR (SBN: 51623)
  sspector@buchalter.com
ANTHONY J. NAPOLITANO (SBN: 227691)
  anapolitano@buchalter.com
BUCHALTER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891.0700
Facsimile: (213) 896.0400

Attorneys for Secured Creditor Opus Bank

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>HOAG URGENT CARE-TUSTIN, INC., et al.,<br><br>Debtors and Debtors in Possession. | Lead Case No. 8:17-bk-13077-TA<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos. 8:17-bk-13078-TA, 8:17-bk-13079-TA, 8:17-bk-13080-TA, 8:17-bk-13089-TA, 8:17-bk-13090-TA) |
| Affects:<br><br>☒   All Debtors<br><br>☐   Cypress Urgent Care, Inc., a California corporation, ONLY<br><br>☐   Hoag Urgent Care- Anaheim Hills, Inc., a California corporation, ONLY<br><br>☐   Hoag Urgent Care- Huntington Harbour, Inc., a California corporation, ONLY<br><br>☐   Hoag Urgent Care- Orange, Inc., a California corporation, ONLY<br><br>☐   Hoag Urgent Care- Tustin, Inc., a California corporation, ONLY<br><br>☐   Laguna-Dana Urgent Care, Inc., a California corporation, ONLY | **OPPOSITION OF OPUS BANK TO THE DEBTOR'S EMERGENCY MOTION FOR ORDER (1) AUTHORIZING THE INTERIM USE OF CASH COLLATERAL, (2) FINDING PREPETITION SECURED CREDITORS ADEQUATELY PROTECTED, AND (3) GRANTING RELATED RELIEF**<br><br>**Hearing:**<br>Date:   August 29, 2017<br>Time:  2:00 p.m.<br>Place:  United States Bankruptcy Court<br>        Courtroom 5B<br>        411 West Fourth Street<br>        Santa Ana, California 92701 |

1

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 29865728V1

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, ITS COUNSEL AND ALL PARTIES IN INTEREST:**

Opus Bank, senior secured creditor of Hoag Urgent Care – Tustin, Inc., and its affiliated debtors in the above-captioned, jointly administered, chapter 11 bankruptcy cases (collectively, the "Debtors"),[1] submits this Opposition (the "Opposition") to the Debtors' *Emergency Motion for Order (1) Authorizing the Interim Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (2) Finding Prepetition Secured Creditors Adequately Protected Pursuant to 11 U.S.C. §§ 361 and 363, and (3) Granting Related Relief* [Docket No. 12][2] (the "Motion") as follows.[3]

## I. INTRODUCTION

This Court's order of August 14, 2017 defines the substance of the upcoming hearing regarding the Debtors' continued use of cash collateral:

> the court's initial impression that this case is on something of a fast track anyway, depending on what post-petition revenue will support. Debtor's available time to get a highest and best deal is directly related to how performance is measured post-petition, and continuing losses will not be tolerated.

Docket No. 49, p. 2. Opus Bank believes that two things are readily apparent from the foregoing statement.

First, post-petition cash flow is the focus of the Court's next decision respecting the use of Opus Bank's cash collateral by the Debtors. With respect to this Opposition, Opus Bank asked the Receiver (as defined below) to prepare a full cash flow analysis for the relevant August through October 2017 operating period.[4] This cash flow analysis unequivocally demonstrates that Opus Bank is not adequately protected. Over this three-month period, the Debtors: (1) incur net

---

[1] The Debtors include Hoag Urgent Care – Tustin, Inc. (Case No. 8:17-bk-13077-TA), Hoag Urgent Care – Huntington Harbour, Inc. (Case No. 8:17-bk-13078-TA); Hoag Urgent Care – Orange, Inc. (Case No. 8:17-bk-13079-TA); Hoag Urgent Care – Anaheim Hills, Inc. (Case No. 8:17-bk-13079-TA); Cypress Urgent Care, Inc. (Case No. 8:17-bk-13089-TA); and Laguna Dana Urgent Care, Inc. (Case No. 8:17-bk-13090-TA).

[2] All docket references are to the docket for the lead bankruptcy case of Hoag Urgent Care – Tustin, Inc. (Case No. 8:17-bk-13077-TA) unless otherwise noted.

[3] Opus Bank submits this Opposition in accordance with the timing requirements under Local Bankruptcy Rule 9013-1(f)(1) and (m)(4). Opus Bank reserves the right to further supplement this Opposition after the Debtors file their court-ordered, semi-monthly Monthly Operating Reports by no later than August 22, 2017.

[4] Opus Bank's cash flow analysis is the work product of David P. Stapleton, the state court appointed receiver (the "Receiver"), who, while serving as the receiver was provided with the financial detail of the Debtors to enable him to prepare and support the analysis and its conclusions.

2

operating losses totaling over $90,000, (2) burn through over $90,000 in cash, and (3) reduce Opus Bank's net accounts receivable balance (as disclosed in the Debtors own cash collateral Motion) by over $135,000, all of which, of course, materially erode Opus Bank's collateral without any replacement and without any compensation. This cash flow analysis, grounded in the Debtors' historical financial operating results rather than "pie in the sky" wishful projections, demonstrates that the continued operations of the Debtors' clinics is at the expense of Opus Bank's collateral.

Second, the Court's focus on the "highest and best deal" was based upon the Debtors' proclamation at the hearing on the "first-day" motions that there was a "white knight" about to make an offer to purchase all of the assets of the clinics. The Debtors disclosed on the record that they would be filing their application to employ an investment banker the following week to get the sale process going. To date, no application has been filed, nor has any term sheet or letter of intent been provided to Opus Bank. Continuing losses to Opus Bank's collateral cannot be tolerated while the Debtors wait with bated breath for their white knight to gallop into this case. While skeptical before, Opus Bank believes, given the blatant lack of progress, the Court's skepticism was well-warranted.

For these reasons, Opus Bank requests that the Court deny the Debtors' continued use of cash collateral or, since Opus Bank cannot be provided with meaningful customary adequate protection measures to compensate for prospective financial losses, the Court should deny further use of cash collateral.[5]

**II.    ARGUMENT**

    **A.    The Debtors' continuing losses post-petition demonstrate that Opus Bank is not adequate protected.**

Opus Bank provides to the Court, as set forth below, a full cash flow analysis for a 90-day period beginning in August and ending in October 2017. This analysis presents cumulative cash flow projections for all five operating clinics as well as individual projections for each clinic

---

[5] Moreover, the best result of this denial is a *sua sponte* dismissal of these cases. There is no bankruptcy purpose to be obtained by maintaining these cases under any chapter of the Bankruptcy Code.

3

based on this Court's admonition at the hearing on the "first-day" motions that the money-making clinics were not to financially support the money-losing clinics.

Equally as important, Opus Bank's analysis is based on the Debtors' historical financial performance as opposed to mere "wishful thinking." Indeed, Opus Bank believes it is critical to recognize both the historical basis of the analysis and the quite obvious trends which are demonstrated by that analysis.

First, there is a significant reduction in monthly patient visits, monthly billings and receivable aged balances from January 2017 through July 2017. For example, the average patient count for January through May 2017 was 6,323 patients per month. *See* Declaration of David P. Stapleton, Exh. 1 (Urgent Care Projected Collections Report). The monthly patient count for June 2017 was 5,794 and for July 2017 was 5,419. *Id.* This is approximately a 14% reduction in patients for July when compared with the five-month average. Second, monthly billings from all five clinics shrink from $1.898 million in January 2017 to $1.549 million in July, 2017—a shrinkage of about $350,000 per month—more than 20% of beginning billings. *Id.* This is consistent with the reduction in patient count. Similar trends appear in the aged accounts receivable balances. *Id.* In July 2017, the cumulative balance was $2.286 million down from $2.865 million in December 2016. *Id.* This shrinkage equates to about $580,000—more than 20% from the initial figure.

The Receiver's report also demonstrates persistent and continuing losses since January 1, 2017 through July 31, 2017 (just two days prior to the Debtors' petition date).[6] It is unclear (other than "pie in the sky") how the Debtors, despite these diminishing patient counts and continuing losses, can project collections revenue of $714,553 for August 2017 and $700,445 for October 2017 when the Debtors averaged collections of $671,063 per month for January 2017 through July 2017.[7]

---

[6] These persistent and continuing losses do not even include the failure to make payments due to Opus Bank—a failure which began in August 2016. The point is: the Debtors have had a "free ride" on Opus Bank for one year. Opus Bank submits that this Court now clearly sees the facts and should reach the same inescapable conclusion reached by Opus Bank: the "free ride" is over.

[7] Notably missing from the Debtors' cash flow projection reports were any assumptions to establish a plausible basis for their underlying projections. The absence of their assumptions casts doubt as to the validity of their projections.

4

Additionally, cash-on-hand at inception of the Debtors' cases is $279,793. At the end of the three-month period, cash-on-hand shrinks to $189,128. Stapleton Decl, Exh. 1. A net loss of approximately $100,000. These, again, are cumulative numbers. Viewed individually, the risk of loss is worse. The October projections show one of the five clinics (*i.e.*, Huntington Harbour) in a negative cash position of ($16,685). *Id.* Moreover, three other clinics (*i.e.*, Anaheim Hills, Tustin and Laguna) show cash-on-hand at less than $50,000 and show cash flow losses for all three projected months. Clearly, the conclusion is (a) one clinic must close, and (b) for three clinics, it is just a matter of a short time (*i.e.*, how fast they run out of cash to cover losses) before they, too, must close.

The conclusion of Opus Bank's cash flow analysis is, to use the Court's language, "continuing losses" of about $90,000 for the postpetition period of August through October. When the loss is coupled with the shrinkage in the collateral base, continued operations of the clinics is at the sole expense of and risk to Opus Bank. Moreover, there is no cushion (*i.e.*, margin for error) beyond the Debtors' cash-on-hand which is likewise a shrinking asset during the period. There is no adequate protection being provided other than the misstated conclusion that Opus Bank will be no worse off at the end of the period. Conversely, as demonstrated, the Bank will be materially worse off.

### B. Opus Bank will continue to suffer material losses while the Debtors' optimistically wait for the arrival of their "white knight."

The Court will recall the optimism the Debtors shared at the initial hearing that: (1) a "white knight" was going to make an offer to purchase all of the assets of the clinics, (2) an application to employ an investment banker was going to be filed during the following week; and (3) a letter of intent or term sheet was imminent. Instead, this, too, was apparently nothing more than the proverbial "pie in the sky." No white knight has materialized. No application to employ an investment banker has been filed. No letter of intent has been provided. No term sheet has been provided. Worse yet, all informal requests for information have been met with <u>no response</u>.

This Court has keenly observed that the focus in this case is on obtaining the highest and best deal available. The simplest comparative analysis of secured debt versus value of the assets

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 29865728V1

Case 8:17-bk-13077-TA    Doc 51    Filed 08/15/17    Entered 08/15/17 17:50:19    Desc
                         Main Document    Page 6 of 8

demonstrates there is no equity available for the Debtors' equity holders. It cannot plausibly be argued that there is any benefit for the equity holder in these cases. Indeed, this conclusion is exacerbated when coupled with the significant and complicated legal issues respecting Newport Healthcare Center ("Newport"), an affiliate of Hoag Memorial Hospital Presbyterian ("Hoag Memorial"), a major player in these cases.

Newport/Hoag Memorial claims to own the equipment in the Hoag clinics. Newport/Hoag Memorial is the landlord of the four Hoag clinics and the leases are all in substantial default. Newport/Hoag Memorial licenses the use of the name "Hoag" and the licenses are in substantial default with a formidable (indeed, impossible) legal obstacle to assumption and assignment under *In re Catapult Entertainment, Inc.*, 165 F.3d 747 (9th Cir. 1999). Perhaps, the highest and best deal was the deal that the Receiver had orchestrated.[8]

The clear lack of progress in submitting the proverbial "white knight" and the insurmountable hurdles that the Debtors face in effectuating a sale transaction, which include over $100,000 in lease cure costs as well as the inability to assume and assign the trademark license, the filing of these cases was likely done only to gain the benefit of the automatic stay. It is certainly arguable that these cases were filed in bad faith without the intent or the ability to reorganize. The conclusion seems inescapable. To use the Court's terms: there is no "highest and best deal" available to the Debtors.

### III. CONCLUSION

In conclusion, the answer to the issues before the Court is reasonably obvious and substantiated by this opposition. The Debtors have not produced a highest and best deal and

---

[8] The Court should also recall that one hour before the Receiver's state court hearing to obtain approval of the transaction resulting in the "sale" of the Hoag clinics, the four Hoag Urgent Care cases were filed. This deal resolved many things respecting the clinics of the Hoag Borrowers. It provided for Newport/Hoag Memorial to be the new operator of the clinics. It settled a dispute between Opus Bank and Newport over the equipment. It settled the financial issues respecting the clinics. It resulted in Opus Bank receiving payment of the appraised liquidation value of the equipment. It allowed the employees of the clinics to continue to be employed. It ended the receivership over the clinics (except for collecting receivables). Most importantly, it did not impact receivables. They were to be collected by the Receiver for the benefit of Opus Bank.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 29865728V1

1 losses and collateral erosion are continuing. The Court has signaled the conclusion: this cannot 2 be tolerated. Further use of cash collateral should be denied.[9]

3 DATED: August 15, 2017                         BUCHALTER, a Professional Corporation

5                                                By:   */s/ Anthony J. Napolitano*

6                                                      BARRY A. SMITH
                                                       STEVEN M. SPECTOR
7                                                      ANTHONY J. NAPOLITANO

8                                                Attorneys for Secured Creditor Opus Bank

---

[9] Moreover, the best result of this denial is a *sua sponte* dismissal of these cases. There is no bankruptcy purpose to be obtained by maintaining these cases under any chapter of the Bankruptcy Code.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 29865728V1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
BUCHALTER, 1000 Wilshire Blvd, Suite 1500, Los Angeles, CA 90017

A true and correct copy of the foregoing document entitled (*specify*): **OPPOSITION OF OPUS BANK TO THE DEBTOR'S EMERGENCY MOTION FOR ORDER (1) AUTHORIZING THE INTERIM USE OF CASH COLLATERAL, (2) FINDING PREPETITION SECURED CREDITORS ADEQUATELY PROTECTED, AND (3) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 15, 2017___, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
COUNSEL FOR HOAG URGENT CARE: Michael T Delaney    mdelaney@bakerlaw.com, sgaeta@bakerlaw.com
STAFF ATTY UST: Michael J Hauser    michael.hauser@usdoj.gov
COUNSEL HOAG URGENT CARE: Ashley M McDow    amcdow@bakerlaw.com,
mdelaney@bakerlaw.com;sgaeta@bakerlaw.com;rojeda@bakerlaw.com;ffarivar@bakerlaw.com
COUNSEL OPUS: Anthony J Napolitano    anapolitano@buchalter.com,
IFS_filing@buchalter.com;salarcon@buchalter.com
COUNSEL HOAG MEMORIAL: Randye B Soref    rsoref@polsinelli.com, acruickshank@polsinelli.com
COUNSEL FOR OPUS: Steven M Spector    sspector@buchalter.com,
IFS_efiling@buchalter.com;salarcon@buchalter.com
OFFICE UST: United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) August 15, 2017___, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

*Debtor*
**Hoag Urgent Care-Tustin, Inc.**
PO Box 8979
Newport Beach, CA 92658

David Stapleton, as receiver
515 South Flower Street, 36th Floor
Los Angeles, CA  90071

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 15, 2017___, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
Via Overnight Mail:
Hon. Theodor C. Albert
U.S. Bankruptcy Court
411 W. Fourth Street, Suite 5085
Santa Ana, CA 92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 15, 2017 | Sandra I. Alarcon | /s/ Sandra I. Alarcon |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**