BARRY A. SMITH (SBN: 48697)
 bsmith@buchalter.com
STEVEN M. SPECTOR (SBN: 51623)
 sspector@buchalter.com
ANTHONY J. NAPOLITANO (SBN: 227691)
 anapolitano@buchalter.com
BUCHALTER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891.0700
Facsimile: (213) 896.0400

Attorneys for Secured Creditor Opus Bank

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Lead Case No. 8:17-bk-13077-TA |
| HOAG URGENT CARE-TUSTIN, INC., et al., | Chapter 11 |
| Debtors and Debtors in Possession. | (Jointly Administered with Case Nos. 8:17-bk-13078-TA, 8:17-bk-13079-TA, 8:17-bk-13080-TA, 8:17-bk-13089-TA, 8:17-bk-13090-TA) |

Affects:

☒  All Debtors

☐  Cypress Urgent Care, Inc., a California corporation, ONLY

☐  Hoag Urgent Care- Anaheim Hills, Inc., a California corporation, ONLY

☐  Hoag Urgent Care- Huntington Harbour, Inc., a California corporation, ONLY

☐  Hoag Urgent Care- Orange, Inc., a California corporation, ONLY

☐  Hoag Urgent Care- Tustin, Inc., a California corporation, ONLY

☐  Laguna-Dana Urgent Care, Inc., a California corporation, ONLY

**LIMITED OPPOSITION OF OPUS BANK TO THE DEBTORS' NOTICES OF SETTING INSIDER COMPENSATION OF DR. ROBERT C. AMSTER, FAYE AMSTER AND JENNIFER AMSTER**

Date:      TBD
Time:      TBD
Place:     United States Bankruptcy Court
           Courtroom 5B
           411 West Fourth Street
           Santa Ana, California 92701

1

**LIMITED OPPOSITION OF OPUS BANK TO THE DEBTORS' NOTICES OF SETTING INSIDER COMPENSATION OF DR. ROBERT C. AMSTER, FAYE AMSTER AND JENNIFER AMSTER**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 30237548V1

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE DEBTORS, THEIR COUNSEL AND ALL PARTIES IN INTEREST:**

Opus Bank, senior secured creditor of Hoag Urgent Care – Tustin, Inc., and its affiliated debtors in the above-captioned, jointly administered, chapter 11 bankruptcy cases (collectively, the "Debtors"),[1] submits this limited opposition (the "Opposition") to the Debtors' (1) *Notice of Setting / Increasing Insider Compensation of Dr. Robert C. Amster;* (2) *Notice of Setting / Increasing Insider Compensation of Dr. Faye Amster*; and (3) *Notice of Setting / Increasing Insider Compensation of Jennifer Amster* (collectively, the "Notices") as follows.

1.      The Notices of Dr. Amster, Faye Amster, and Jennifer Amster are attached hereto as Exhibits 1, 2 and 3, respectively, without the supporting employee wage statements that had been attached by the Debtors as exhibits to the Notices.  The Proof of Service indicating that the Debtors served the Notices on the U.S. Trustee and interested parties on August 10, 2017 is attached hereto as Exhibit 4.

2.      Local Bankruptcy Rule 2014-1(a) addresses the setting of compensation of insiders and requires that no compensation may be paid from the assets of the estate from the time of the filing of the petition until the confirmation of the plan unless the debtor serves its "Notice of Setting/Increasing Insider Compensation."  L. Bankr. R. 2014-1(a)(1).  The local rules further provide that if an objection is timely received within the 14 day period following the service of the Notice then the debtor may not pay such compensation and the debtor must set the matter for hearing.  L. Bankr. R. 2014-1(a)(3) and (a)(4).

3.      Similarly, the U.S. Trustee's guidelines provides that "[n]o compensation may be paid out to any insiders until 15 days after service of such notice, and no objection to the Notice of Setting / Increasing Compensation has been received or filed with the court."  *See Guidelines and Requirements for Chapter 11 Debtors in Possession (Central Division)*, Office of the United

---

[1]  The Debtors include Hoag Urgent Care – Tustin, Inc. (Case No. 8:17-bk-13077-TA), Hoag Urgent Care – Huntington Harbour, Inc. (Case No. 8:17-bk-13078-TA); Hoag Urgent Care – Orange, Inc. (Case No. 8:17-bk-13079-TA); Hoag Urgent Care – Anaheim Hills, Inc. (Case No. 8:17-bk-13079-TA); Cypress Urgent Care, Inc. (Case No. 8:17-bk-13089-TA); and Laguna Dana Urgent Care, Inc. (Case No. 8:17-bk-13090-TA).

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**LIMITED OPPOSITION OF OPUS BANK TO THE DEBTORS' NOTICES OF SETTING INSIDER
COMPENSATION OF DR. ROBERT C. AMSTER, FAYE AMSTER AND JENNIFER AMSTER**

BN 30237548V1

1    States Trustee (Region 16), p. 6 at Part IV.B.3. (rev. Oct. 1, 2014).  As the Debtors served the

2    Notices on August 10, 2017, this objection is timely and relevant.

3          4.       At the hearing on the Debtors' (1) emergency motion for use of cash collateral

4    [Docket No. 12][2] and (2) emergency motion for the payment of employee wages [Docket No. 13],

5    the Court stated the following with respect to the payment of compensation to insiders:

6            THE COURT: So we have an understanding that the wages are approved
            for an interim period.  We're going to talk about when the continued is.  But for
7            an interim period, but not to include insiders . . . .

8    August 4, 2017 Transcript, p. 5, ln. 9-15.  A copy of the 8/4 Transcript is attached hereto as

9    Exhibit 5.  The Court set this interim period as running from the August 2, 2017 petition date

10   through August 29, 2017 (the "Interim Period"), the date of the continued hearing on the motion

11   for use of cash collateral.  *See* Docket No. 27, p. 2, ln 17-21.  Consequently, Opus Bank objects

12   to the payment of any insider compensation for the Interim Period based on the discussions on the

13   record at the first-day hearing.

14          5.       Additionally, neither the emergency wage motion or the Debtors' *Declaration of*

15   *Jennifer Amster* [Docket No. 17] filed in support of that motion disclosed that Faye Amster was

16   an insider of the Debtors.  The Declaration only disclosed that Dr. Amster and Jennifer Amster

17   were statutory insiders.  *See* Docket No. 17, p. 8 at n.4 and n.5.  While Opus Bank does not

18   necessarily object to the payment of compensation to Faye Amster (except as previously noted),

19   Opus Bank does observe that the Debtors propose to pay Mrs. Amster approximately $35,606.88

20   on an annualized basis for only 15 hours of work per week "Retriev[ing] and sort[ing] mail for

21   different departments and assist[ing] with collecting checks, matching and deposits."  *See* Notice

22   of Setting Insider Compensation for Faye Amster, p. 1.  This salary equates to a full-time,

23   annualized salary of approximately $95,000 per year based on a 40-hour work-week and a 50-

24   week work-year.

25

26    ─────────────────

27    [2]  All docket references are to the docket for the lead bankruptcy case of Hoag Urgent Care – Tustin, Inc. (Case No.
     8:17-bk-13077-TA) unless otherwise noted.

28

**LIMITED OPPOSITION OF OPUS BANK TO THE DEBTORS' NOTICES OF SETTING INSIDER
COMPENSATION OF DR. ROBERT C. AMSTER, FAYE AMSTER AND JENNIFER AMSTER**

6.      In accordance with Local Bankruptcy Rule 2014-1(a) and the U.S. Trustee guidelines, Opus Bank hereby objects to the payment of insider compensation to Dr. Amster, Faye Amster and Jennifer Amster.  While the Local Bankruptcy Rules require that the Debtors not serve less than 21 days' notice of the date and time of the hearing on the objection, Opus Bank is amenable to having the matter heard on shortened time at the August 29, 2017 2:00 p.m. hearing on continued use of cash collateral.  At that hearing, the parties can address and the Court can decide whether there is adequate cash flow for the Debtors to pay insider compensation for the Interim Period and beyond.

DATED:  August 23, 2017                      BUCHALTER, a Professional Corporation


By:   */s/ Anthony J. Napolitano*

                            BARRY A. SMITH
                            STEVEN M. SPECTOR
                            ANTHONY J. NAPOLITANO

                            Attorneys for Secured Creditor Opus Bank

4

**LIMITED OPPOSITION OF OPUS BANK TO THE DEBTORS' NOTICES OF SETTING INSIDER COMPENSATION OF DR. ROBERT C. AMSTER, FAYE AMSTER AND JENNIFER AMSTER**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 30237548V1

# EXHIBIT 1

Exhibit 1, Page 000005

<table>
<tr><td colspan="2">

Attorney Name, Address,  Telephone and FAX

Ashley M. McDow (245114)
Michael T. Delaney (261714)
Fahim Farivar (252153)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:      310.820.8800
Facsimile:       310.820.8859
Email:            amcdow@bakerlaw.com
                      mdelaney@bakerlaw.com
                      ffarivar@bakerlaw.com

</td><td>File with U.S. TRUSTEE Only</td></tr>
</table>

|  |  |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**CENTRAL DISTRICT OF CALIFORNIA** |  |
| In re<br>HOAG URGENT CARE-TUSTIN, INC., et al.,<br><br>     Debtors and Debtors in Possession.<br><br>Affects:<br><br>■ All Debtors<br>☐ Cypress Urgent Care, Inc., a California corporation, ONLY<br>☐ Hoag Urgent Care – Anaheim Hills, Inc., a California corporation, ONLY<br>☐ Hoag Urgent Care – Huntington Harbour, Inc., a California corporation, ONLY<br>☐ Hoag Urgent Care – Orange, Inc., a California corporation, ONLY<br>☐ Hoag Urgent Care – Tustin, Inc., a California corporation, ONLY<br>☐ Laguna-Dana Urgent Care, Inc., a California corporation, ONLY | Chapter 11<br>Case No. 8:17-bk-13077-TA<br><br>(Jointly Administered with Case Nos.<br>8:17-bk-13078-TA; 8:17-bk-13079-TA;<br>8:17-bk-13080-TA; 8:17-bk-13089-TA;<br>8:17-bk-13090-TA) |
| **NOTICE OF SETTING/INCREASING INSIDER COMPENSATION**<br>**SUBMITTED ON AUGUST 9, 2017** |  |

| | |
|---|---|
| 1.  Name of Insider: | **Dr. Robert C. Amster** |
| 2.  Relationship to Debtors (i.e. owner, partner, officer, director, shareholder) | **President/ 100% shareholder/ director/ officer** |
| 3.  Date when relationship with Debtors commenced: | **February 9, 2008** |
| 4.  Position title: | **Primary physician and president, director, and officer of all the Debtors entities.** |
| 5.  Position Description: | **Primary physician for the Debtors, and in his capacity as the president of the Debtors, he operates and manages the Debtors.** |
| 6.  Assigned Duties: | **Practicing physician and emergency medicine specialist rotating between the Debtors' offices, and assists in managing and operating the Debtors.** |
| 7.  Date employed in current position: | **February 9, 2008** |
| 8.  If previously employed by Debtors within past two years in a different position, state position(s) and date(s). | **N/A** |
| 9.  Number of hours worked per week: | **40+** |

| | |
|---|---|
| 10.  Total amount of compensation and payment interval: | **~ $ 198,565.21 (annually)** |
| 11.  Breakdown of compensation (specify amount and payment interval. | **$ 4,326.50 (salary; bi-weekly)**<br>**$ 3,305.63 (management fee; bi-weekly)[1]** |
| Salary: | **$ 16,536.27 (monthly)** |
| Perquisites (total, detail below): | **$10.83** |
| Car Allowance: | **N/A** |
| Medical Insurance: | **$10.83 (dental; monthly)** |
| Life Insurance: | **N/A** |
| Business Expenses: | **N/A** |
| Other (Specify): | **N/A** |
| 12.  Identify the source of the funds to be used to pay compensations specified in No. 10: | **General operating funds.** |
| 13.  Date and amount of last increase in compensation: | **October 21,2016; <u>decrease</u> from $7,269 to $4,326 (salary; bi-weekly) and $8,885 to $5,289 (management fee; bi-weekly)—a total decrease of approximately $156,936 (annually)** |
| 14.  Identify any creditor who asserts a security interest (whether or not Debtor disputes the validity thereof) in the receipts generated by the operation of the Debtors' business and the amount of its claim: | **Opus Bank.** |
| 15.  Specify all compensation, perquisites, loans, benefits etc. received by insider from the Debtors during the twelve month period immediately preceding the filing of the Chapter 11 Petition (Attach W-2, 1099, Individual Payroll Cards and other related forms): | **~ $292,680.00[2]** |
| Compensation: | **~ $ 198,565.21 (annually)** |
| Loans: | **N/A** |
| Perquisites (Specify): | **~ $130.00 (annually)** |

---

1 The total bi-weekly management fee is $ 5,289.00.  This amount is allocated among all of the clinics managed by Radiant Physician Group (RPG).  Accordingly, the amount included here accounts for the pro rata amount allocated to the Debtors—namely, 5/8ths of the total management fee, or $3,305.63.  As used herein, "bi-weekly" refers to a two week period, not twice monthly.
2 The figure provided accounts for the compensation paid by the Debtors.  It does not include the portion of the salary/management fee attributable to non-debtor entities managed by RPG.

I declare under penalty of perjury that the answers contained in the foregoing notice are true and correct.

Dated: **August 9, 2017**

**Dr. Robert C. Amster, President of the Debtors**

Print Name and Title of Authorized Agent for Debtor(s)

Signature

---

Attach proof of service on Creditors Committee or the Twenty Largest Creditors if no committee has been formed, and to any secured creditors that claim an interest in cash collateral.

If this notice pertains to setting compensation, it must be filed and served fifteen days before any pay out of compensation, although compensation may be accrued during this period.

If this notice pertains to an increase in compensation, it must be filed and served thirty days before the date when the proposed increase takes effect.

---

Revised February 2002
611149598.1
611165453.1

INSIDER COMPENSATION (Page 3 of 3)

USTLA-12

Exhibit 1, Page 000008

# EXHIBIT 2

Attorney Name, Address, Telephone and Facsimile

Ashley M. McDow (245114)
Michael T. Delaney (261714)
Fahim Farivar (252153)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:    310.820.8800
Facsimile:    310.820.8859
Email:    amcdow@bakerlaw.com
        mdelaney@bakerlaw.com
        ffarivar@bakerlaw.com

File with U.S. TRUSTEE Only

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re

HOAG URGENT CARE-TUSTIN, INC., et al.,

                                    Debtors and Debtors in Possession.

Affects:

- ■    All Debtors
- □    Cypress Urgent Care, Inc., a California corporation, ONLY
- □    Hoag Urgent Care – Anaheim Hills, Inc., a California corporation, ONLY
- □    Hoag Urgent Care – Huntington Harbour, Inc., a California corporation, ONLY
- □    Hoag Urgent Care – Orange, Inc., a California corporation, ONLY
- □    Hoag Urgent Care – Tustin, Inc., a California corporation, ONLY
- □    Laguna-Dana Urgent Care, Inc., a California corporation, ONLY

Chapter 11
Case No. 8:17-bk-13077-TA

(Jointly Administered with Case Nos. 8:17-bk-13078-TA; 8:17-bk-13079-TA; 8:17-bk-13080-TA; 8:17-bk-13089-TA; 8:17-bk-13090-TA)

**NOTICE OF SETTING/INCREASING INSIDER COMPENSATION SUBMITTED ON AUGUST 9, 2017**

| | |
|---|---|
| 1.  Name of Insider: | **Faye Amster** |
| 2. Relationship to Debtors (i.e. owner, partner, officer, director, shareholder) | **The wife of Dr. Robert C. Amster, who is the president, 100% shareholder, director, and officer of the Debtors.** |
| 3.  Date when relationship with Debtors commenced: | **March 1, 2008** |
| 4.  Position title: | **Clerical Assistance** |
| 5.  Position Description: | **Retrieves and sorts mail for different departments and assists with collecting checks, matching and deposits.** |
| 6.  Assigned Duties: | **See # 5** |
| 7.  Date employed in current position: | **March 1, 2008** |
| 8.  If previously employed by Debtors within past two years in a different position, state position(s) and date(s). | **N/A** |
| 9.  Number of hours worked per week: | **~15** |
| 10.  Total amount of compensation and payment interval: | **~$35,606.88 (annually)** |

| | |
|---|---|
| 11. Breakdown of compensation (specify amount and payment interval. | $2,967.24 |
| Salary: | $311.54 (gross; bi-weekly)[1] |
| Perquisites (total, detail below): | $2292.24 (monthly average) |
| Car Allowance: | N/A |
| Medical Insurance: | $10.83 (dental; monthly) |
| Life Insurance: | $2,181.41 (monthly)[2] |
| Business Expenses: | $100.00 (monthly average) |
| Other (Specify): | |
| 12. Identify the source of the funds to be used to pay compensations specified in No. 10: | General operating funds. |
| 13. Date and amount of last increase in compensation: | November 27, 2015; decreased from $526.15 to $498.46 (bi-weekly) |
| 14. Identify any creditor who asserts a security interest (whether or not Debtor disputes the validity thereof) in the receipts generated by the operation of the Debtors' business and the amount of its claim: | Opus Bank. |
| 15. Specify all compensation, perquisites, loans, benefits etc. received by insider from the Debtors during the twelve month period immediately preceding the filing of the Chapter 11 Petition (Attach W-2, 1099, Individual Payroll Cards and other related forms): | ~ $41,290.00[3] |
| Compensation: | ~$35,606.88 (annually; includes perquisites) |
| Loans: | N/A |
| Perquisites (Specify): | $27,506.88 annually |

I declare under penalty of perjury that the answers contained in the foregoing Notice are true and correct.

Dated: **August 9, 2017**

**Dr. Robert C. Amster, President of the Debtors**

Print Name and Title of Authorized Agent for Debtor(s)

Signature

---

1 The total bi-weekly management fee is $498.46. This amount is allocated among all of the clinics managed by Radiant Physician Group (RPG). Accordingly, the amount included here accounts for the pro rata amount allocated to the Debtors—namely, 5/8ths of the total management fee, or $311.54. As used herein, "bi-weekly" refers to a two week period, not twice monthly.

2 Mrs. Amster is required to have a life insurance policy per the terms of the loan agreement with Opus Bank. As the loan serves solely business purposes, the clinics, via Radiant Physician Group, reimburse Mrs. Amster for the costs associated with the life insurance coverage.

3 The figure provided accounts for the compensation paid by the Debtors. It does not include the portion of the salary/management fee attributable to non-debtor entities managed by RPG.

Revised February 2002
611149804.1
611156365.4

INSIDER COMPENSATION (Page 2 of 3)          USTLA-12

Attach proof of service on Creditors Committee or the Twenty Largest Creditors if no committee has been formed, and to any secured creditors that claim an interest in cash collateral.

If this notice pertains to setting compensation, it must be filed and served fifteen days before any pay out of compensation, although compensation may be accrued during this period.

If this notice pertains to an increase in compensation, it must be filed and served thirty days before the date when the proposed increase takes effect.

# EXHIBIT 3

| Attorney Name, Address, Telephone and Facsimile | File with U.S. TRUSTEE Only |
|---|---|
| Ashley M. McDow (245114)<br>Michael T. Delaney (261714)<br>Fahim Farivar (252153)<br>**BAKER & HOSTETLER LLP**<br>11601 Wilshire Boulevard, Suite 1400<br>Los Angeles, CA  90025-0509<br>Telephone:    310.820.8800<br>Facsimile:    310.820.8859<br>Email:    amcdow@bakerlaw.com<br>    mdelaney@bakerlaw.com<br>    ffarivar@bakerlaw.com | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>HOAG URGENT CARE-TUSTIN, INC., et al.,<br><br><br>                            Debtors and Debtors in Possession.<br>Affects:<br><br>■    All Debtors<br>□    Cypress Urgent Care, Inc., a California corporation, ONLY<br>□    Hoag Urgent Care – Anaheim Hills, Inc., a California corporation, ONLY<br>□    Hoag Urgent Care – Huntington Harbour, Inc., a California corporation, ONLY<br>□    Hoag Urgent Care – Orange, Inc., a California corporation, ONLY<br>□    Hoag Urgent Care – Tustin, Inc., a California corporation, ONLY<br>□    Laguna-Dana Urgent Care, Inc., a California corporation, ONLY | Chapter 11<br>Case No. 8:17-bk-13077-TA<br><br>(Jointly Administered with Case Nos. 8:17-bk-13078-TA; 8:17-bk-13079-TA; 8:17-bk-13080-TA; 8:17-bk-13089-TA; 8:17-bk-13090-TA) |
| **NOTICE OF SETTING/INCREASING INSIDER COMPENSATION SUBMITTED ON AUGUST 9, 2017** | |

| 1.  Name of Insider: | **Jennifer Amster** |
|---|---|
| 2.  Relationship to Debtors (i.e. owner, partner, officer, director, shareholder) | **The daughter of Dr. Robert C. Amster, who is the president, 100% shareholder, director, and officer of the Debtors.** |
| 3.  Date when relationship with Debtors commenced: | **April 1, 2008** |
| 4.  Position title: | **Chief Executive Officer of Radiant Physician Group, the management company for the Debtors.** |
| 5.  Position Description: | **Serves as the Chief Executive Officer of Radiant Physician Group, the management company for the Debtors and oversees day-to-day operation of the Debtors.** |
| 6.  Assigned Duties: | **Managing the operations of the Debtors and their offices, hiring, firing, employee and vendor relationships; responsible for strategic planning, governance, operations, oversight and compliance of the Debtors.** |
| 7.  Date employed in current position: | **April 1, 2008** |
| 8.  If previously employed by Debtors within past two years in a different position, state position(s) and date(s). | **N/A** |

| | |
|---|---|
| 9. Number of hours worked per week: | **40+** |
| 10.  Total amount of compensation and payment interval: | **~ $137,129.90 (annually; includes perquisites)** |
| 11.  Breakdown of compensation (specify amount and payment interval. | **$11,427.49 (monthly; paid bi-weekly)** |
| Salary: | **$4,807.69 (gross; bi-weekly)[1]** |
| Perquisites (total, detail below): | **$1,010.83 (monthly average)** |
| Car Allowance: | **N/A** |
| Medical Insurance: | **$10.83 (dental; monthly); $400.00 (medical; monthly)** |
| Life Insurance: | **N/A** |
| Business Expenses: | **$600.00 (monthly average)** |
| Other (Specify): | |
| 12.  Identify the source of the funds to be used to pay compensations specified in No. 10: | **General operating funds** |
| 13.  Date and amount of last increase in compensation: | **May 12, 2017** |
| 14.  Identify any creditor who asserts a security interest (whether or not Debtor disputes the validity thereof) in the receipts generated by the operation of the Debtors' business and the amount of its claim: | **Opus Bank** |
| 15.  Specify all compensation, perquisites, loans, benefits etc. received by insider from the Debtors during the twelve month period immediately preceding the filing of the Chapter 11 Petition (Attach W-2, 1099, Individual Payroll Cards and other related forms): | **~ $169,560.00[2]** |
| Compensation: | **~ $137,129.90 (annually; includes perquisites)** |
| Loans: | **N/A** |
| Perquisites (Specify): | **~ $12,129.96 (annually)** |

1 The total bi-weekly management fee is $7,692.31.  This amount is allocated among all of the clinics managed by Radiant Physician Group (RPG).  Accordingly, the amount included here accounts for the pro rata amount allocated to the Debtors—namely, 5/8ths of the total management fee, or $4,807.69.  As used herein, "bi-weekly" refers to a two week period, not twice monthly.
2 The figure provided accounts for the compensation paid by the Debtors.  It does not include the portion of the salary/management fee attributable to non-debtor entities managed by RPG.

Case 8:17-bk-13077-TA   Doc 65   Filed 08/23/17   Entered 08/23/17 18:53:41   Desc
Main Document      Page 16 of 80

I declare under penalty of perjury that the answers contained in the foregoing Notice are true and correct.

Dated: **August 9, 2017**

**Dr. Robert C. Amster, President of the Debtors**

Print Name and Title of Authorized Agent for Debtor(s)          Signature

---

Attach proof of service on Creditors Committee or the Twenty Largest Creditors if no committee has been formed, and to any secured creditors that claim an interest in cash collateral.

If this notice pertains to setting compensation, it must be filed and served fifteen days before any pay out of compensation, although compensation may be accrued during this period.

If this notice pertains to an increase in compensation, it must be filed and served thirty days before the date when the proposed increase takes effect.

---

# EXHIBIT 4

Exhibit 4, Page 000017

Ashley M. McDow (245114)
Michael T. Delaney (261714)
Fahim Farivar (252153)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:    310.820.8800
Facsimile:    310.820.8859
Email:        amcdow@bakerlaw.com
              mdelaney@bakerlaw.com
              ffarivar@bakerlaw.com

Proposed Attorneys for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Lead Case No.: 8:17-bk-13077-TA |
| HOAG URGENT CARE-TUSTIN, INC., et al., | Chapter 11 |
| Debtors and Debtors in Possession. | (Jointly Administered with Case Nos. 8:17-bk-13078-TA; 8:17-bk-13079-TA; 8:17-bk-13080-TA; 8:17-bk-13089-TA; 8:17-bk-13090-TA) |
| Affects: | |
| ■  All Debtors | **PROOF OF SERVICE FOR NOTICES OF INSIDER COMPENSATION FOR DR. ROBERT C. AMSTER, JENNIFER AMSTER, AND FAYE AMSTER** |
| ☐  Cypress Urgent Care, Inc., a California corporation, ONLY | |
| ☐  Hoag Urgent Care – Anaheim Hills, Inc., a California corporation, ONLY | [NOT FOR FILING] |
| ☐  Hoag Urgent Care – Huntington Harbour, Inc., a California corporation, ONLY | |
| ☐  Hoag Urgent Care – Orange, Inc., a California corporation, ONLY | |
| ☐  Hoag Urgent Care – Tustin, Inc., a California corporation, ONLY | |
| ☐  Laguna-Dana Urgent Care, Inc., a California corporation, ONLY | |

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

611162881.1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, CA 90025-0509**

A true and correct copy of the foregoing document entitled (*specify*): **NOTICES OF INSIDER COMPENSATION FOR DR. ROBERT C. AMSTER, JENNIFER AMSTER, AND FAYE AMSTER** will be served or was served **(a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) August 10, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Michael Hauser
Office of the U.S. Trustee
411 W. Fourth St., Ste. 7160
Santa Ana, CA 92701

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 10, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>Via Email</u>:
Michael Hauser                               Marilyn Sorensen
Office of the U.S. Trustee                    Office of the U.S. Trustee
Michael.Hauser@usdoj.gov                     Marilyn.Sorensen@usdoj.gov

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 10, 2017 | Michael T. Delaney | /s/ Michael T. Delaney |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**SERVED BY UNITED STATES MAIL OR EMAIL (state method for each person or entity served):**

Your Neighborhood Urgent Care
c/o Dr. Robert C. Amster
RAmster@radiantphysician.us

Hall & Company
111 Pacifica, Ste. 300
Irvine, CA 92618

County of Orange
Attn: Treasurer-Tax Collector
625 North Ross St., Bldg, 11, G58
Santa Ana, CA 92701

Xerox Corporation
P.O. Box 650361
Dallas, TX 75265-0361

PSS World Medical, Inc.
P.O. Box 749499
Los Angeles, CA 90074-9499

City of Orange
Accounts Receivable
300 E. Chapman Ave.
P.O. Box 11024
Orange, CA 92856

Newport Healthcare Center, LLC
1800 Quail Street, Suite 100
Newport Beach, CA 92660

Integrity Healthcare Locums, LLC
P.O. Box 823424
Philadelphia, PA 19182-3424

Harris Medical Associates
1180 Satellite Blvd., Suite 200
Suwanee, GA 30024

Clockwise MD
Lightshed Healthcare Technologies
554 North Avenue NW Suite E
Atlanta, GA 30318

California Dept. of Public Health
Radiologic Health Branch
MS 7610
PO Box 997414
Sacramento, CA 95899

Hoag Urgent Care-Huntington Harbor
c/o Dr. Robert C. Amster
RAmster@radiantphysician.us

Access Medical Management
2325 W. Victory Blvd. Ste #1
Burbank, CA 91506

Provider Healthcare, LLC
4252 South Highland Drive,
Suite 104
Salt Lake City, UT 84124

Medline
finance@medline.com

ADT Security Services
4161 E La Palma Ave
Anaheim, CA 92807

UTC
c/o Dr. Robert C. Amster
RAmster@radiantphysician.us

Mission Recruiting, LLC
3020 Saturn Street, Ste. 201
Brea, CA 92821

Adams, Evens & Ross Inc.
For the Benefit of All Star #254
37460 Sixes Road, Suite 126
Canton, GA 30114

Whitaker Medical, LLC
File 50834
Los Angeles, CA 90074

Partners Urgent Care – UTC
c/o Dr. Robert C. Amster
RAmster@radiantphysician.us

AMN Healthcare
12400 High Bluff Drive
San Diego, CA 92130

Rhino Medical Services
P.O. Box 16253
Greenville, SC 29606-6000

Cox Communications
PO Box 53280
Phoenix, AZ 85052

All Medical Personnel, LLC
Attention: Ray Iturrioz
4000 Hollywood Blvd, Ste 600N
Hollywood, FL 33021

Radiant
c/o Dr. Robert C. Amster
PO Box 8979
Newport Beach, CA 92658

Hoag Urgent Care – Tustin, Inc.
RAmster@radiantphysician.us

Cypress Urgent Care
RAmster@radiantphysician.us

Hoag Urgent Care - Anaheim Hills
RAmster@radiantphysician.us

Joline Tilly
340 Ashton Drive
Laguna Beach, CA 92651

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Weatherby Healthcare
PO Box 972633
Dallas, TX 75397-2633

Continental Maintenance, Inc.
13318 Mapledale Street
Norwalk, CA 90650

Singer Lewak
10960 Wilshire Blvd. 7th Floor
Los Angeles, CA 90024

**Secured Creditors**

Opus Bank
c/o BARRY A. SMITH
c/o STEVEN M. SPECTOR
c/o ANTHONY J. NAPOLITANO
Buchalter, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457

U.S. Bancorp
CT Corporation System
818 W 7th St Ste 930
Los Angeles CA 90017

Orange County Recorder –
211 West Santa Ana Blvd.
Santa Ana, CA 92701

Cardinal Health
7000 Cardinal Place
Dublin, OH 43017

General Electric Capital
CorpCustomerCare@ge.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
611162881.1

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT 5

1                  UNITED STATES BANKRUPTCY COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                           --oOo--

4   In Re:                    ) Case No. 8:17-bk-13077-TA
                              )
5   HOAG URGENT CARE-TUSTIN,  ) Chapter 11
    INC.,                     )
6                             ) Santa Ana, California
            Debtor.           ) Friday, August 4, 2017
7   _____) 10:00 a.m.

8                             EMERGENCY MOTION FOR ORDER
                              (1) AUTHORIZING THE
9                             MAINTENANCE OF EXISTING BANK
                              ACCOUNTS AND
10                            (2) AUTHORIZING THE CONTINUED
                              USE OF CASH MANAGEMENT SYSTEM
11
12                            EMERGENCY MOTION FOR ORDER
                              (1) AUTHORIZING INTERIM USE OF
13                            CASH COLLATERAL PURSUANT TO 11
                              U.S.C. 363,
14                            (2) FINDING PREPETITION
                              SECURED CREDITORS ADEQUATELY
15                            PROTECTED PURSUANT TO 11
                              U.S.C. SECTION 361 AND 363,
16                            AND
                              (3) GRANTING RELATED RELIEF
17
                              EMERGENCY MOTION FOR ORDER
18                            AUTHORIZING
                              (1) THE PAYMENT OF PREPETITION
19                            WAGES,
                              (2) THE CONTINUATION OF
20                            EMPLOYEE PROGRAMS
                              POSTPETITION,
21                            (3) THE WITHHOLDING AND
                              PAYMENT OF PAYROLL RELATED
22                            TAXES, AND (4) THE PAYMENT OF
                              PREPETITION CLAIMS RELATING TO
23                            EMPLOYEE PROGRAMS

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE THEODOR ALBERT
2                UNITED STATES BANKRUPTCY JUDGE

3  APPEARANCES:

4  For the Debtor and              ASHLEY M. MCDOW, ESQ.
     Debtor-in-Possession:         MICHAEL T. DELANEY, ESQ.
5                                  Baker & Hostetler, LLP
                                   11601 Wilshire Boulevard
6                                  Suite 1400
                                   Los Angeles, California 90025
7                                  (310) 820-8800

8  For Opus Bank:                  ANTHONY J. NAPOLITANO, ESQ.
                                   BARRY A. SMITH, ESQ.
9                                  Buchalter, APC
                                   1000 Wilshire Boulevard
10                                 Suite 1500
                                   Los Angeles, California 90017
11                                 (213) 891-0700

12 For the Offices of the          MICHAEL J. HAUSER, ESQ.
     United States Trustee:        Offices of the United States
13                                    Trustee
                                   411 West 4th Street
14                                 Suite 7160
                                   Santa Ana, California 92701
15                                 (714) 338-3400

16 For the Receiver in the         JAKE DILORIO, ESQ.
     State Court actions:          515 South Flower Street
17                                 36th Floor
                                   Los Angeles, California 90071
18                                 (213) 235-0600

19 For Newport HealthCare          RANDYE B. SOREF, ESQ.
     Center and Hoag Memorial      Polsinelli, LLP
20     Hospital Presbyterian:      2049 Century Park East
                                   Suite 2900
21                                 Los Angeles, California 90067
                                   (310) 556-1801

22

23

24

25

*Briggs Reporting Company, Inc.*

Exhibit 5, Page 000024

iii

1  Court Recorder:              Sally Daniels
                                United States Bankruptcy Court
2                               411 West Fourth Street
                                Suite 2030
3                               Santa Ana, California 92701

4  Transcriber:                 Briggs Reporting Company, Inc.
                                4455 Morena Boulevard
5                               Suite 104
                                San Diego, California 92117
6                               (310) 410-4151

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

Exhibit 5, Page 000025

1

1    SANTA ANA, CALIFORNIA  FRIDAY, AUGUST 4, 2017  10:00 AM

2                              --oOo--

3        (Call to order of the Court.)

4            THE COURT:  We have this morning at, scheduled at

5    10:00 a.m., an emergency hearing in the matter of Hoag

6    Urgent Care-Tustin, Inc.  That's one of four cases, which I

7    have by order just entered, administratively consolidated.

8            The first motion is emergency motion for order

9    authorizing the use and maintenance of existing bank

10   accounts and continued use of the cash management system.

11           Number two is an emergency motion for order

12   authorizing interim use of cash collateral, for asking for a

13   finding of adequate protection.

14           And number three is emergency motion for order

15   authorizing payment of pre-petition wages, continuation of

16   employee programs post-petition, withholding of payroll

17   taxes, and payment of pre-petition claims related to

18   employee programs.

19           Appearances.

20       MS. MCDOW:  Good morning, your Honor.  Ashley

21   McDow, Baker and Hostetler, on behalf of the Debtors and

22   Debtors-in-possession in all three matters, your Honor.

23       MR. DELANEY:  Good morning, your Honor.  Michael

24   Delaney, also of Baker and Hostetler.

25       MR. NAPOLITANO:  Good morning, your Honor.

2

1   Anthony Napolitano of Buchalter, appearing on behalf of Opus

2   Bank on all matters for all Debtors.

3           MR. SMITH:  Good morning, your Honor.  Barry Smith

4   of Buchalter, also appearing on behalf of all Debtors.

5           MR. HAUSER:  Good morning, your Honor.  Michael

6   Hauser appearing for the U.S. Trustee.

7           MR. DILORIO:  Good morning, your Honor.  Jake

8   Dilorio, agent for David Stapleton, receiver in the state

9   court actions.

10          THE COURT:  Well, all right.  I have tried to --

11          MS. SOREF:  Your Honor --

12          THE COURT:  I'm sorry.  Is somebody on the

13  telephone?  Good ahead.

14          MS. SOREF:  Thank you.  It's Randye Soref of

15  Polsinelli.  I'm here on four of the matters, the Hoag

16  matters, Hoag Urgent Care matters for Newport HealthCare

17  Center, LLC, landlord and equipment lessor, and Hoag

18  Memorial Hospital Presbyterian, the licensor of the Hoag

19  name.  Thank you.

20          THE COURT:  Any other appearances?  All right.

21          I have tried to read all the documents before me.

22  As you can imagine, since some of them were filed only this

23  morning, I'm not really sure I have it all well in hand, but

24  I've got a general idea of what's going on.  As I can gather

25  from the papers, some points are really not contested that

3

1  much, others more so.

2        I would appear to me that we might make sense to

3  start with number three first, which is an emergency motion

4  for order authorizing payment of pre-petition wages.  I take

5  it that's not opposed, is that right?

6        MR. NAPOLITANO:  No, your Honor.  The -- we

7  understand that there are wages due today, payroll on

8  Friday, and they occur on alternating Fridays for different

9  labor groups.  And the bank does not oppose us of its

10  collateral to pay the employees, provided that they amounts

11  being paid to the employees are consistent with prior

12  practices, prior periods.

13        THE COURT:  Mention was made of a operating

14  budget.  Are the wages a line item in that budget?

15        MS. MCDOW:  They are, your Honor.

16        THE COURT:  All right.  So it's presumed that if I

17  authorize payment of a budget for some period of time, the

18  wages are consistent with that budget, and the wages are not

19  different than has been the case for the preceding weeks, is

20  that right?

21        MS. MCDOW:  Correct, your Honor.  We do not intent

22  to make any extraordinary expenditures at the time of this

23  payroll.

24        THE COURT:  All right.  So chipping away at this

25  one flake at a time, maybe we can say that cash collateral

4

1 can be used for payment of wages on an emergency basis

2 pending further hearing.

3            MR. NAPOLITANO:  Is there intent to also pay

4 insiders under the emergency employee motion, or is that

5 being deferred to insider comp?

6            MR. HAUSER:  So, your Honor, that issue was

7 addressed in docket item 17 that was filed a little bit

8 later than the original document.

9            MR. NAPOLITANO:  Okay.

10            MR. HAUSER:  And there's a specific provision at

11 page eight of eight of that document, which drops a

12 footnote, number four and five, that addresses the payments

13 to Robert Amster, who's a doctor, who's the 100-percent

14 owner of all these entities.  And then his daughter,

15 Jennifer Amster, who works for a copy called, "RPG," which

16 is the management company that operates these entities.

17            And so, pursuant to the declaration of Jennifer

18 Amster, at page eight of eight, there's a representation

19 that the Debtors will comply with LBR 2014-1, and file a

20 notice of insider compensation before any -- such

21 compensation is paid.

22            So based upon that representation -- and I'm aware

23 of any other insiders, unless you are?  I don't know

24 anything about his sister.

25            MR. NAPOLITANO:  Yeah.  Is there --

5

1          MR. HAUSER:  Does it address --

2          MR. NAPOLITANO:  Jennifer Amster's sister --

3          MS. MCDOW:  No longer works there.

4          MR. NAPOLITANO:  "No longer works there."  Okay.

5          MR. DELANEY:  Your Honor, yeah.  I know she's no

6   longer there as a of last week.

7          THE COURT:  All right.

8          MR. NAPOLITANO:  Okay.

9          THE COURT:  So we have an understanding that the

10  wages are approved for an interim period.  We're going to

11  talk about when the continued is.  But for an interim

12  period, but not to include insiders, and unless and until

13  the U.S. Trustee has a chance to weigh in, because an

14  application under the local rules has been filed.  Is that a

15  correct statement?

16         MR. HAUSER:  Yeah.  It's more than just the U.S.

17  Trustee.  So then the notice of insider compensation would

18  be served upon the 20 largest secured creditors, interested

19  parties.  There's a 14-day drop-dead date.  So hopefully --

20         THE COURT:  All as suggested by the local rules?

21         MR. HAUSER:  It's the local rules in conjunction

22  with the U.S. Trustee form.

23         THE COURT:  All right.

24         MR. HAUSER:  So, in any event -- and, hopefully,

25  we can all work together and come to some arrangement on

6

1 that.

2          THE COURT:  So we'll flake off the first part of

3 this motion this morning by saying, pre-petition wages will

4 be approved as the moving papers suggest.  And it's further

5 amplified on the record.

6          The next one is continuation of employee programs,

7 post-petition withholding of payroll taxes, and payment of

8 pre-petition claims.  Are those points opposed?

9          MR. NAPOLITANO:  No, your Honor.

10          THE COURT:  All right.  So then we can have the

11 same understanding, that those will be granted -- they are

12 granted, but subject to review at a continued hearing, which

13 we will set in a little while.

14          All right.  So then -- well, moving backwards,

15 we'll take up number two, which is the emergency motion for

16 order authorizing the interim use of cash collateral,

17 finding pre-petition creditors adequately protected, and

18 granting related relief.

19          I take it this is opposed?

20          MR. HAUSER:  No, it's not, your Honor.  I

21 discussed this with Mr. Delaney.  Maybe Mr. Napolitano

22 opposes it.  But, basically, the purpose of DIP accounts is

23 to make sure that, for one, that you have -- you're not

24 subject to the FDIC cap of $250,000.  So no matter how much

25 money you have in a debtor-in-possession account, there's

7

1 unlimited insurance.

2          In the motion, it's indicated that the Debtor --

3          THE COURT:  This is number one we're talking about

4 now, or number two?

5          MR. HAUSER:  I thought you were talking about the

6 cash management system.

7          THE COURT:  No.

8          MR. HAUSER:  Okay.  I thought we got rid of the

9 easy ones first.

10          THE COURT:  We'll take it up.  It's probably all

11 of a single now anyway.

12          MR. HAUSER:  Okay.

13          THE COURT:  We'll take up one and two, which would

14 then include maintenance of existing bank accounts and

15 continued of cash management.

16          I read the papers, and again, it was rather

17 hurried, because if you include exhibits, there was over 500

18 pages.  There was no way I can absorb that that fast.

19          But I gather that the bank doesn't feel that it's

20 adequately protected, and, in fact, these entities are

21 losing money.  Is that a fair capsulization?

22          MR. NAPOLITANO:  that's a fair characterization,

23 your Honor.  In fact, the budget that was submitted by the

24 Debtor proves that point.  We have a diminishing collateral

25 package, and we have an increasing bank balance over the 90-

8

1  day period that the Debtor's proposed.

2          The Debtor provides no offer of adequate

3  protection.  Collateral is being cannibalized to use Debtor

4  operations, Debtor funds, during this period, and the bank's

5  debt is accruing.

6          THE COURT:  So broadly stated, the bank's view is

7  at this minute in time, is that the longer this case goes

8  on, the worse it gets?

9          MR. NAPOLITANO:  That's correct, your Honor.  And

10 there are some omissions from the budget as -- in discussing

11 these issues with Mr. Hauser this morning, there's no line

12 item for quarterly U.S. Trustee fees, there's no provision

13 for a patient care ombudsman.  Potentially, if a committee's

14 appointed, the budget does not currently reflect that.

15         So we have a budget which demonstrates that these

16 entities are going to be burning through receivables,

17 consuming the bank's collateral, and the bank's debt is

18 continuing to accrue.

19         THE COURT:  Let me ask you the question that I'm

20 sure Ms. McDow would raise.  I'll save her the effort.  All

21 of that may be true, however, if there's a value here at

22 all, it's an operating concern.

23         Presumably, I'm going to hear some story about how

24 there's discussions underway to try to sell this to some

25 white knight, and that can only happen if you in fact have

9

1  people showing up for work and running a business.  I mean,

2  is that -- am I saying anything that comes as a surprise to

3  anyone?

4          MR. NAPOLITANO:  If the Court's insinuating that

5  liquidation value is less than going-concern value, then,

6  yes, that's --

7          THE COURT:  No, no, my --

8          MR. NAPOLITANO:  -- certainly a true statement.

9          THE COURT:  Yes.  If we stopped everything today,

10 fired everybody, and they closed until further notice.  A

11 sign goes up.  These things are intrinsically worth less.

12 Is that a true statement?

13         MR. NAPOLITANO:  Well, your Honor, one point I

14 think Mr. Smith's going to make, is about this white knight

15 sale.

16         MR. SMITH:  We have a white knight, your Honor.

17         THE COURT:  Okay.

18         MR. SMITH:  On Wednesday the Hoag, the Newport

19 group, this is, Randye Soref represents, we have a signed

20 agreement.  I can present a copy to the Court.  A signed

21 agreement by Hoag.  Hoag is the -- the Newport Hoag is the

22 landlord.

23         They were taking over the -- of the four Hoag, one

24 is closed down.  So out of the three of them, they were

25 taking back their leases.  They were hiring all the

10

1  employees.  They paying the bank what we appraised to be the

2  liquidated value of the equipment, $116,000.  And on August

3  7th, there will be a changeover, a transition.  As a matter

4  of fact, the Hoag people had already met the employees of

5  Doctor Amster's group.  And so that was done.  It was

6  complete.

7         I was appearing before Judge Di Cesare at 1:30 on

8  Wednesday to get the court approval for the receiver to go

9  through this, and the court approval of the contract.

10        I got a phone call with Mr. Reimers, who's Ms.

11 Soref's partner, advising me he just learned of the

12 bankruptcy.  They've been in -- Ms. McDow and their firm

13 have been advised of this contract going on.  We've been

14 negotiating it for almost three months now.  And they have

15 copies of everything that was going on, and so on and so

16 forth.

17        So this -- this was a done deal, almost, until the

18 bankruptcy was filed.

19        THE COURT:  Presumably, equity, this doctor who

20 owns everything, doesn't like it because my guess is,

21 there's nothing in it for him.  Am I wrong?

22        MR. SMITH:  Well, there was something in it for

23 him.  One, he would be relieved of liability under our

24 guarantee.  We have a lawsuit, a state court lawsuit, and he

25 would be relieved of liability to the -- under the lease.

11

1         And, also, we were in discussions with them with

2 respect to the two profitable entities, Laguna and Cypress.

3 We had received financial documents from Ms. Amster that her

4 father wanted to assume that debt, and she was also going to

5 come in and she would prove to be credit worthy, he would

6 have been able to take over the profitable, the two

7 profitable ones, because we had --

8         THE COURT:  Which are not debtors, is that

9 correct?

10        MR. NAPOLITANO:  No, they are.

11        THE COURT:  They are debtor -- when did that

12 happen?  This thing started with four.  Are there now more

13 than four entities?

14        MR. NAPOLITANO:  There are six, your Honor.

15        MR. SMITH:  There are --

16        MS. MCDOW:  Six.

17        MR. SMITH:  -- there are six, however -- there are

18 six that have been -- filed bankruptcy.  Orange, Hoag Orange

19 has been closed.  It was closed down by Doctor Amster a

20 long, long time ago, just for -- because it was not

21 successful at all.  So there are three Hoag, and then there

22 is Laguna and Cypress.

23        Laguna and Cypress are two different urgent care

24 centers.  They are both profitable.  They're about $10,000 a

25 week -- is that a fair statement?

12

1          MR. NAPOLITANO:  As of about four months --

2          MR. SMITH:  In the black.  And the Hoag are

3   running at about $7,000 a week in the negative.

4          So the Hoag's are very valuable.  We -- in fact,

5   we've been contacted by other individuals, including the

6   Hoag Hospital, to even have an interest in it.  So that's a

7   -- those are viable companies that we --

8          MR. NAPOLITANO:  And Cypress Laguna.

9          MR. SMITH:  Yeah.  And Cypress Laguna.  But the

10  other Hoags, they're dead.  There's -- they're never -- we

11  allowed -- I've been involved in this case for over a year.

12  We didn't file our action until a while ago because we were

13  giving the Amsters an opportunity to try to rework the three

14  Hoag facilities.  They couldn't do it.  They were -- it just

15  was not profitable at all, and it kept them losing money.

16         We finally -- and we received zero.  The bank has

17  received no money since last August of 2016.  So we put a

18  receiver in.  And we figured, we got to close this down, and

19  we've got to find somebody to come in.  We found that white

20  knight.

21         THE COURT:  But, presumably, somebody doesn't like

22  the deal, and so they want more time to either juggle in a

23  better deal or something else, hence they filed an action to

24  stop the receiver's --

25         MR. SMITH:  Candidly --

13

1        THE COURT:  -- consummation of his settlement

2  agreement, is that right?

3        MR. SMITH:  -- candidly, your Honor, we have no

4  idea why they filed.  We think this was a great deal for

5  Doctor Amster.  Because the Hoags are never going to be

6  profitable.  It's never, it's not going to happen.  They

7  couldn't make it happen.  Before they had a consultant,

8  before the had filed, we met with them.  We gave them six,

9  eight months to try to get it together before we finally had

10 to file suit.

11        So, we don't understand that.  As a matter of

12 fact, we had asked that question.  We were shocked that they

13 filed, because this was a good deal for everybody.  And,

14 again, we have a signed contract in place.

15        THE COURT:  Is there a 542 motion then being

16 prepared?

17        MR. HAUSER:  543.

18        MR. NAPOLITANO:  543, your Honor.

19        THE COURT:  "543."  Excuse me.

20        MR. NAPOLITANO:  We're in the process of

21 evaluating that.  And if we do, it will be early next week.

22        THE COURT:  All right.  Ms. McDow, or whomever

23 wants to speak for Debtor.

24        MR. HAUSER:  I just thought it would be useful,

25 your Honor, if they took out one of the dockets, and so I

14

1 can just kind of go over the profit and loss/closed

2 situation.  If you grab --

3          THE COURT:  We're going to get to that.  Let's

4 circle back to that.

5          MR. HAUSER:  I know, but do --

6          THE COURT:  First I want to find out the big

7 picture, where the devil is this thing going?  And then

8 we're going to get down into the weeds and we're going to

9 deal with the fact that some of them are losers and some of

10 the are winners.  And how long this case is going to go and

11 on what basis.

12          So, Ms. McDow, you've heard the picture.  The

13 picture is, this is a last-minute stall on a deal set up by

14 the receiver.  Most of your units are not profitable.  There

15 are a couple that are profitable.

16          And I'm going to guess that the argument is going

17 to be made loudly, that it is incorrect for the two

18 profitable ones to continue to be drained away for an

19 extended period of time subsidizing the losers, while your

20 guy tries to cut a better deal.

21          Now, what part of that is wrong?

22          MS. MCDOW:  I think you're correct that that is

23 going to be the argument that's made, your Honor.  And I

24 will tell you that based on our cash flows, and we did, we

25 had prepared part of what we've been doing for the past

15

1  couple of months, is, in addition to trying to reach a deal

2  that worked for everyone, that we thought was in the best

3  interest of all of the creditors of what we'll call "the

4  Hoag clinics," as well as equity, you know, is also dual

5  track, trying to understand what the financial situation

6  really is and what the prospects are for reorganization.

7          And we've, again, we've had prepared and we've

8  attached for the Court pretty detailed financial

9  projections, and we believe they are profitable.  They're

10 not hugely profitable right now.  There is definitely more

11 money in two of the clinics.  And we believe -- two-fold,

12 again, this is not going to come as a surprise.  Your Honor

13 has already stated, so I feel a little silly repeating it.

14         We do have someone who we think is definitely a

15 better buyer.  We're going to employ an investment banker

16 early next week because --

17         THE COURT:  You're going to employ an--

18         MS. MCDOW:  Yes.

19         THE COURT:  And you're just now starting a search?

20         MS. MCDOW:  Seek authority to employ, I should

21 say.  Seek authority from your Honor to employ.  I

22 apologize.

23         THE COURT:  Okay.  I'm not worried about the

24 professional employment.  I'm more worried about where we

25 are in a process, because the image that is appearing to me

16

1  is something that's hanging by a thread.  And so if you have

2  in mind that we're going to engage somebody to go out and do

3  a world-wide search, and take seven months to do it, forget

4  about it.

5          Now, you were about to say?

6          MS. MCDOW:  Your Honor, it is not that.  We have

7  had someone in place doing just that for quite some time.

8  We do believe we have found someone certainly that proposes

9  a significantly better deal than one that was encapsulated

10 in the Hoag clinic deal.  The only person who benefited

11 from that, quite frankly, was the landlord and the secured

12 creditor.

13         We believe that this, this offer is a

14 significantly better deal.  The number is much higher.  We

15 haven't yet, you know, figured out exactly how the structure

16 would be, but they are interested in all of the clinics,

17 which is something that we've struggled with.  Not everybody

18 has been interested in what I think your Honor said is the

19 loser clinics, but the ones that are viewed as less

20 profitable.

21         This person has indicated an interest in

22 purchasing all of them and helping run them and keeping to

23 employ the employees.  Suffice it to say, that the -- there

24 are other issues that I don't think are appropriate to hash

25 out with the settlement agreement that we've been going back

17

1  and forth with for months.  And it got to a point where it

2  was just, it was just not advantageous for either the now-

3  Debtors, and when we say the now-Debtors, we mean the

4  employees, the creditors of the Debtor, and quite frankly,

5  the public who these clinics serve.

6         So that was the reason for filing.  And we are

7  going to endeavor very quickly to either get this buyer in

8  as a stocking horse, or to get them in somehow presented to

9  the Court.  We think they are real.  I know that's a story

10 that, you know, you hear a lot with debtors.

11        THE COURT:  How long should the Court let any of

12 these units -- and by the way, I added to your order, the

13 administrative consolidation order, I added my own language,

14 which I think makes explicit what was otherwise implicit.

15 And that is, there is no sharing of expenses across entity

16 lines.

17        You said something about there can be a

18 consolidated reporting.  I don't care if there's a

19 consolidated reporting on a summarized basis, but there has

20 to be separate accounting for the individual estates.

21 Whether it's part of your report or not, we can debate about

22 that.

23        But here's what we cannot do.  We cannot have a

24 situation where you're able to file a piece of paper on a

25 consolidated basis saying, great news, we made five bucks

18

1  last week.  But what really happened is, we lost money in

2  four locations and made a lot of money in two locations.

3  That is not going to fly.  So there has be a reporting which

4  shows in scrupulous detail how each of the units are doing.

5          MS. MCDOW:  We understand, your Honor.  We're

6  prepared to do that.

7          THE COURT:  All right.

8          MS. MCDOW:  We don't intend to consolidate in that

9  sense.

10         THE COURT:  So that, I tried to make that -- and

11 that will also go to the issue of fees.  The practical

12 implication of that from the lawyers, is that you're going

13 to have to, when you record your time, express one of two

14 things.  Either that what you are doing is genuinely

15 divisible amongst all the units, or it has application to

16 one of the units.  Because at the end, the fees will be

17 borned by the entities, to the extent that they benefitted.

18         We are not, again, we're not going to allow the

19 winners to subsidize the losers, whether they be fees or

20 anything else. Okay?

21         So, I say that now because I remember not too long

22 being in practice, and it's very much more helpful if you

23 write it down now, when you're entering your time, as

24 opposed to trying to figure out six months from now what you

25 did and for whom.  Okay?

19

1          MS. MCDOW:  Understood, your Honor.

2          THE COURT:  Very good.  And you were saying?

3          MS. MCDOW:  Again, your Honor, we are going to act

4 quickly here.  You're not going to find that any of these

5 Debtors lag.  Again, the urgency was, again, for lack of a

6 better word, this agreement was being forced down our

7 throats, in the sense that it was being brought for an ex-

8 parte hearing.

9          We tried in good faith to get to a place where we

10 thought it benefitted other creditors or anyone else, other

11 than the secured creditor.  And the landlord, we didn't get

12 there, unfortunately, but it's not going to change how we

13 act and what we do.

14          We've been trying to find a buyer, someone

15 interested in taking these clinics.  We did propose both

16 that Doctor Amster assume the loan.  It actually -- again,

17 not to delve too much into those conversations, but that

18 wasn't as well received as counsel for the bank suggested.

19 It was not that we said he'd assumed it, and they said, yay,

20 and it went on that way.

21          It was -- it's been three months of a lot of

22 negotiations on a lot of levels.  And, again, we are

23 prepared to move very fast, your Honor.  You're not going to

24 find us lagging here for a number of reasons.  The Amsters

25 do not want to be in this position.

20

1        So, you will find that our, again, our proverbial

2   white knight, will be likely in front of your Honor, on one

3   respect or another, very soon.  We will be employing

4   professionals to make sure that, again, we find the highest,

5   best.  If that's, you know, if that is the person we bring

6   to purchase these, that we will have somebody who's looking

7   for overbidders.

8        We're going to look for the best way out of this,

9   and the best result for all of the creditors, your Honor.

10  And, hopefully, of course, do we do this for equity?  Of

11  course we hope we come out with a win-win situation for all.

12  But certainly we want to avoid having a win situation for

13  only the bank and only the landlord, your honor.  So, we

14  will move quickly, your Honor.

15        THE COURT:  All right.  Let me tell you where my

16  tentative places, and then you each can address that

17  tentative solution with your specific suggestions,

18  criticisms, oppositions.

19        It's very clear to me that there's some reason, at

20  least initially, to be in Chapter 11.  I'm not going to

21  prejudge your rule -- Section 543 motion, but what I am

22  going to say is, the way this is shaping up, it looks like

23  what Debtor is trying to do here is to get a very brief

24  period of time to offer an alternative deal.

25        Now, when you say a very brief period of time, I

*Briggs Reporting Company, Inc.*

21

1  do mean very brief.  By that I mean, no entity in Chapter

2  11, whether administratively consolidated or otherwise, can

3  be allowed to continue digging a deeper hole, while you talk

4  and ponder and suggest and negotiate, and you sink and sink

5  and sink and sink.  That is not going to happen.

6           So you can regard your horizon as very close in

7  time.  The question is, how close?  Is it a matter of a

8  week, is it a month, is it a couple three months?  I don't

9  know.

10          I lot of that's going to depend on how bad the

11 bleeding is.  If the bleeding is very bad, you're going to

12 find, I think, either that that 543 motion gets granted, or

13 that I put some kind of very stark deadlines on it, and

14 you're either going to be to produce or die.  It's that

15 simple.  I will not let you burn up the value here in some

16 shoot-the-moon effort on behalf of Amster or anyone else.

17          So, that's my general view.  And what that

18 translates to in detail is, I give you temporary authority

19 to use the cash collateral on all the other things that

20 you've described in your motion, pending a further hearing.

21 And we can discuss whether that's a week from now or two

22 weeks from now, but probably not longer than that.

23          Now that's my tentative on this so far.  But I am

24 listening to what you can constructively suggest otherwise,

25 or where I may have missed something, but that's, I think,

22

1  the sort of the obvious approach to where we are here.

2  Okay?

3          Now, who wants to speak first?

4          MS. MCDOW:  Your Honor, I'll just speak before I

5  sit down, since I'm already here.

6          I think, obviously, we would appreciate as much

7  time as possible.  One of the logistical challenges for us

8  is that the receiver is actually in possession currently.

9  So, the longer the receiver is in possession of our stuff,

10 and our books and records, the more difficult it's going to

11 be for us to present something to you for a motion for

12 approval of final cash collateral.  So --

13         THE COURT:  Why?

14         MS. MCDOW:  Again, because the financials we have

15 are based on, you know, a couple of months ago and the

16 information we've been receiving.  But I imagine if we're

17 going to have a contested motion for approval of cash

18 collateral, we're going to want more current cash balances,

19 final approvals.

20         THE COURT:  Well, I mean, it shouldn't come as a

21 surprise to anyone that anybody who stands in the way of

22 where the obvious direction of this case is going, is not

23 going to be well received.

24         So I would think that the receiver would go

25 forward from this hearing, knowing that -- he may not like

23

1  it, but he's got a duty to share what he's got in realtime

2  with the Debtors, so that we can constructively look at

3  whether there is an alternative.

4          And he should want to do that, because the sooner

5  we get to the conclusion that there is no better

6  alternative, the sooner he's confirmed and is able to

7  consummate his deal.  So, there is no room in this case for

8  obfuscation and delay on documents and reporting.

9          Next point.

10          MS. MCDOW:  And, your Honor, I don't -- I was just

11  going to say for the benefit of Mr. Stapleton, he -- I was

12  not meaning to suggest at all that he would do that.  I

13  think it's more of a practical turning over.  I know he's on

14  the East Coast, so.

15          THE COURT:  Well, redouble the efforts.

16          MS. MCDOW:  Understood, your Honor.

17          THE COURT:  You're not going to have a lot of

18  time.  You see, that's the thing.  As your deadline

19  approaches, you're going to come screaming in her and

20  saying, we really, really, really have a great deal here,

21  but I can't verify the number because this guy went home or

22  went fishing for a week.  That is not going to be allowed to

23  happen.

24          MS. MCDOW:  I understand, your Honor.

25          THE COURT:  All right?

24

1        MS. MCDOW:  Thank you.

2        MR. SMITH:  And, your Honor, I'm pleased you

3  understand the issues.  So --

4        THE COURT:  This is not a new case.  I've seen

5  this case 50 times.

6        MR. SMITH:  I'm sure you have.

7        THE COURT:  Yeah.

8        MR. SMITH:  So allow me just to say one thing with

9  respect to the time deadline.  Again, I've been on this case

10  since the very beginning.  And what Ms. McDow said is a

11  total surprise to me, because we have been in constant

12  communication in negotiations with them.

13        Obviously, the bank would like to receive as much

14  money as they can for the $3.2 million that they're owed.

15  So if someone would approach us with a better offer, we

16  would have discussed that, we would have looked to that, and

17  so on and so forth.

18        Again, they were involved in our negotiations with

19  Hoag.  They were supposed to be part of the deal, and they

20  were not part of the deal, because they non-responsive and

21  everything else.  But this new person that Ms. McDow says

22  she's been working with for a couple months, I mean, again,

23  I've -- this is the first I've ever heard of any of this.

24  No one has said, let's look at a better deal.

25        The only deal in town was Hoag, and they were

*Briggs Reporting Company, Inc.*

Exhibit 5, Page 000049

25

 1  about to go ahead and file unlawful detainer actions and

 2  throw them out.  And all the other problems that come under

 3  this --

 4         THE COURT:  So you're very surprised and shocked.

 5  Okay.

 6         MR. SMITH:  That's a --

 7         THE COURT:  People's imagination get fired at the

 8  sound of a cocking gun.  So --

 9         MR. SMITH:  With that, it's just the --

10         THE COURT:  Let me -- answer this for me.

11         MR. SMITH:  How much time are you going to give

12  them?

13         THE COURT:  I was not able to discern from your

14  papers, because I read them so hurriedly, are these all

15  cross-collateralized and/or cross-guaranteed?  I couldn't

16  quite tell from that?  Are they --

17         MR. SMITH:  No.  They are --

18         THE COURT:  No, they're not?

19         MR. SMITH:  -- they are five separate obligations.

20  They're in two different lawsuits.  The only common, the

21  only thing in common is Doctor Amster, Robert Amster

22  personally is a guarantor on all of them.  All the others

23  are five different entities.  And there's no cross-

24  collateral.

25         THE COURT:  All right.  Thank you.

26

1        Mr. Napolitano.

2        MR. NAPOLITANO:  Just to correct one thing that

3   Mr. Smith said.  So, there's really two collateral packages,

4   three loans.  You have the four Hoag entities, Hoag Urgent,

5   Tustin, Orange County, Orange, Huntington Harbor, and

6   Anaheim Hills, and those are on one loan, with one

7   collateral package securing that loan.

8        You have two loans on the other side with respect

9   to Laguna, Laguna-Dana, Cypress, and then a non-debtor

10  entity.  And that's a separate collateral package securing

11  those two loans.  So -- and that's really the divide here.

12       The Hoag, the four Hoag entities, and one of them

13  has shut down and removed all of its equipment from that

14  location, those have been the perennial losers.  The

15  Cypress/Laguna-Dana entities have been the profitable, more

16  profitable entities.

17       So our biggest concern with respect to how this

18  proceeding is going to unfold, is with cannibalizing the

19  good entities to save the bad entities.  And I think we made

20  that clear in our objection to the joint -- the motion for

21  joint administration.

22       And I would like to address one aspect of that at

23  some point.  We do have a concern with having fees being

24  used to subsidize these entities.

25       THE COURT:  I tried through my last-minute

27

1 addition to make very clear, the way I see this kind of case

2 going, is there are some things which are indisputably borne

3 by each entity, and I suppose the only way to divide those

4 services are on a percentage basis.

5        If there are six entities, then it's however --

6 what is six into 100?  Whatever that percentage is.  But

7 those items which are clearly single-entity services need to

8 be identified as such.  I will not be pleased if at the end

9 when I'm reviewing fees, everything is a straight

10 percentage.

11        MR. NAPOLITANO:  Right.

12        THE COURT:  So that's as good as I can do for you

13 on that point.  I'm going to require every estate to justify

14 its own existence and its administrative burden separately.

15        MR. NAPOLITANO:  Thank you, your Honor.  I

16 appreciate that.  And just to point it to one aspect of the

17 order in the lead case, docket number six, 3(e), it says:

18            "Unless otherwise ordered by the

19            Court, the Debtor shall be jointly and

20            severally liable for all of the jointly

21            administrated estates' allowed

22            professional fees and expenses."

23        That provision in the order seems to be a

24 conflict --

25        THE COURT:  Yes, it was very wide, and I tried to

28

1  tighten it up by adding the language I did.  So the

2  "otherwise ordered" may be the operative language.

3         MR. NAPOLITANO:  Okay.  So, is the Court today

4  otherwise ordering, or do we need to do an amended order?

5         THE COURT:  No.  What I'm telling everybody is

6  what I expect.  I don't know, because I didn't know this

7  case from a hole in the ground --

8         MR. NAPOLITANO:  Sure.

9         THE COURT:  -- 24 hours ago.  So I don't know what

10 the details are going to unfold.  What I am going to

11 require, it's a very simply concept, every entity has to

12 justify its own existence and the burden of administrative

13 costs separately.  We are not going to allow the winners to

14 subsidize the losers.  It's not going to happen.  Because I

15 presume they have different debt structures, don't they?

16        MR. NAPOLITANO:  They do.

17        THE COURT:  Hence, we do not have a substantive

18 consolidation.  So I'm not going to allow a backdoor,

19 substantive consolidation that way.  So if that was your

20 concern, it's well taken, and I am trying to head that off.

21        Had I had more time with this, I probably would

22 have taken out the initial version of it, "as otherwise

23 ordered."  But I'm just putting everybody on notice, that

24 the "otherwise ordered" may be the operative language.

25        MR. NAPOLITANO:  And, certainly, we could address

29

1 this with the employment application --

2          THE COURT:  Sure.

3          MR. NAPOLITANO:  -- and the order approving

4 employment.

5          THE COURT:  And most specifically, and I'm trying

6 to be friendly to a former lawyer to a current lawyer, write

7 your time down now.  Don't come in and say, well, I sort of

8 think that I did this for everybody, but I don't remember.

9 Do it contemporaneously and then you'll find it much easier

10 come fee app time.

11          MR. NAPOLITANO:  Okay.  Thank you, your Honor.

12          Now, with respect to cash collateral, and we'll

13 talk at some point what that interim basis is.  Certainly a

14 60-day interim -- or 90-day interim basis -- or 60 -- they

15 provide a 90-day budget.  They're looking for 60-day interim

16 basis.  That flies in the face of what Rule 4001 allows for.

17 So we could talk about timing at a different point.

18          What I really want to be concerned with is seeing

19 this on a more -- for a bank to be able to get more

20 reporting from them on a more consistent basis.  And

21 certainly the receiver will help them enable to do that.

22          THE COURT:  By the way, talk to me a little bit

23 about management going forward.  We have a receiver in

24 place.  I suppose one result is, he simply gives over the

25 keys and walks away.  Or we have a 543 motion where he

*Briggs Reporting Company, Inc.*

30

1 maintains control, or we have a hybrid of some kind.

2        Does a hybrid make sense to you, only from the

3 prospect that it sounds to me like this is a sale case.

4 There's either a sale or there isn't in a pretty quick

5 period of time.  Does it make sense to have a hybrid

6 approach to management?

7        MR. NAPOLITANO:  Well, we'd have to discuss that

8 with the receiver and the bank.  But, certainly, if it helps

9 facilitate the flow of information, if it helps in terms of

10 whatever diligence a buyer is going to help, need and want

11 in this, then certainly it would make sense in that regard.

12 But I'd like to defer until I talk to the receiver himself,

13 and to the bank.

14        THE COURT:  All right.  Well, I guess I can table

15 that until the next hearing, or to your 543 motion,

16 whichever first occurs.  But the image is starting to come

17 pretty clear in my focus.  This is a sale case.  It's not an

18 earn-out case in all likelihood.  And you're either going to

19 have a sale or you're not in pretty soon and pretty fast

20 order.

21        Reporting is key because there's already a very

22 heavy intimation that some of these things are bleeding.

23 And they will not be allowed to be bleed long term.  They

24 will either be shut down or sold or something, but we can't

25 have blood all over the floor every week, right?

*Briggs Reporting Company, Inc.*

1          So with that in mind, everybody should realize

2     this case has got a very short shelf life.  So I'm just

3     throwing out the idea of a hybrid, cooperative effort

4     between the receiver and the Debtor's management, to help

5     facilitate what should be a sale in the best interest of

6     everyone.

7               MR. NAPOLITANO:  Certainly.  And certainly if this

8     progresses where these cases typically progress, and there

9     would be a cash collateral stipulation, maybe we can build

10    that in to that concept, if warranted.

11              THE COURT:  It's music to my hears.  What else can

12    I help with?

13              MR. NAPOLITANO:  Like your Honor said, reporting

14    is key.  So, the expectation for reporting would be not to

15    have it on a monthly basis.  Ideally, it would be weekly.

16              THE COURT:  How about --

17              MR. NAPOLITANO:  Probably, consistently two

18    weekly --

19              THE COURT:  You know, I'm not going to do it

20    formally, but I, what I would like to see, and I'm sure

21    there's some animosity here, but I'd like to have everybody

22    overlook that and simply say, why don't you have a realtime

23    sharing?  Because that's what we kind of need here, don't

24    we?  If we're losing money, I don't even think the Debtor

25    wants to continue doing that, do they?  I shouldn't think

32

1 so.

2          So, there should be an instantaneous exchange of

3 money, a formal report for the world to read.  We can talk

4 about what's a decent balance, because that's sometimes

5 somewhat expensive.  But I think there should be robust

6 exchange of data on a realtime basis.

7          MR. NAPOLITANO:  And so in terms of timing, where

8 does that leave us, your Honor?

9          THE COURT:  Well, you know, again, are we talking

10 informally or talking formally?

11          MR. NAPOLITANO:  Well, I think --

12          THE COURT:  Formal reports?  Mr. Hauser, is the

13 U.S. Trustee equipped to deal with MOR's on less than a

14 monthly basis?

15          MR. HAUSER:  It's not a matter of equipped.  The

16 Local Bankruptcy Rule 2015-1 requires that they be filed

17 monthly with the Court.  So --

18          THE COURT:  This case may not last a month.

19          MR. HAUSER:  Okay.  Well, the Court could modify

20 it.  That's a local rule, and have them file it semi-

21 monthly.  That's not going to give us heartburn.  As long as

22 it captures the full month.  So for August, there could be a

23 report for the period ending August 15th.  They could not

24 file that the same day.  We typically have a 15-day lag

25 time.

33

1          So for the period of August 2nd, which is when

2     this case was filed, through, let's say, August 15th, you

3     could have that report due by August 22nd.  And then from

4     the period of August 16th through the end of the month,

5     that's August 31st, that would be due on September 7th.

6          So, instead of having the typical 15-day period in

7     which to file the report, we'd have two -- a bi-weekly

8     report -- or bi-monthly, I should say, and then it would be

9     -- but it'd have to be filed no later than seven days.

10    Otherwise we're not really achieving the realtime

11    information that you've seeking.

12         THE COURT:  Does that work for you, Mr.

13    Napolitano?  Basically what I'm doing is, I'm doubling up

14    the reporting and making the lag period less.

15         MR. NAPOLITANO:  For the monthly operating

16    reports?  That works in some regards.  Typically, you know,

17    as a secured creditor, we like to see variants, budgets,

18    line item by line item.  And you don't really get that

19    visibility in a monthly operating report.

20         The financials that they put together -- I believe

21    it was Mr. Kurtz that handled that for you guys?

22         MS. MCDOW:  The representatives at Foreston

23    Partners (phonetic), I think Mr. Kurtz, Mr. Weiss.

24         MR. NAPOLITANO:  Yeah.  They have a built-in

25    template.  They have a built-in, you know, schematic here

*Briggs Reporting Company, Inc.*

34

1 for being able to clearly identify on a line-item basis

2 expenses.  Rather than do it on a monthly, or preference

3 would be to either do it weekly or bi-weekly, actual versus

4 budget, show the variants, show the percentage difference,

5 and do it on that basis.

6          THE COURT:  Ms. McDow, can you address what is

7 feasible for your side?  I know that it's burdensome, but

8 the way you have to look at this, is you have to look at

9 reporting of realtime data is your oxygen.

10          To the extent that you can report and show that

11 you're not losing money, you may have some more time.  To

12 the extent that you can't, you don't.  So approached that

13 way, how do you feel that it can be done feasibly?

14          MS. MCDOW:  Your Honor, I think the issue -- and

15 Mrs. Amster is actually present in court, so I would defer

16 to her.

17          I think the issue is that we have eliminated a

18 number of staff.  And so it's going to be just a difficulty.

19 Ms. Amster manages all six of the clinics.  And it's just, I

20 think, going to be an administerial issue.

21          I think we would be happy to share certain

22 financials with the bank.  It's not a unwillingness to

23 disclose.  It's certainly for bi-monthly MOR's.  The MOR's

24 are cumbersome and our -- Ms. Amster will be the one who

25 prepares them.

*Briggs Reporting Company, Inc.*

35

1          And I can speak with her, what, you know,

2   documents she has available that she'd be willing to share

3   with -- again, kind of on an informal basis.  And if they

4   think that we're not complying with that, you know, perhaps

5   we can have a report to the Court, a status report.

6          But to have us do bi-monthly MOR's I think is

7   going to be an administrative burden.

8          THE COURT:  How about bi-monthly?  That's twice a

9   month.  I know there's always a confusion with, bi means two

10  months or twice a month.  Twice a month, let's use that.  We

11  will have MOR's along the usual lines.  Try to have them on

12  file within seven days, as opposed to 15 days.

13         Now I know that's an accelerated timetable, but I

14  think it's necessary in this case.  Because, again, I want

15  to express to you, realtime, reliable data is your oxygen.

16  To the extent it's there and it's not bad, you have more

17  time.  To the extent that it isn't, you don't.

18         We are not going to give the benefit of the doubt,

19  trust us.  In a month we'll have a report on there and it

20  will show black at the bottom instead of red.  No.

21         So you have the burden, so to speak, of convincing

22  me on a weekly basis that this thing is floating.  Okay?

23  So, do that.

24         MS. MCDOW:  And we --

25         THE COURT:  Now, that's not to say you shouldn't

*Briggs Reporting Company, Inc.*

Exhibit 5, Page 000060

36

1 try to take some of the discomfort out of the bank's

2 position by giving them realtime data.  Obviously, your life

3 is a lot easier, to the extent that they're not running in

4 here on emergency motions to cut you off at the knees.  And

5 I, frankly, don't want to necessarily see you all that

6 often.  Not that I don't appreciate you company, it's just

7 that I think it ends up being expensive.

8            Mr. Hauser.

9            MR. HAUSER:  Just one point, your Honor.

10 Typically, when we have monthly MOR's, we have monthly bank

11 statements.  And unless they're doing on-line banking, I

12 don't know how they're going to have the backup bank

13 statements to support the information.

14            THE COURT:  Doesn't everybody have on-line banking

15 now?

16            MR. HAUSER:  I don't know, your Honor.  I just, I

17 don't -- I just wanted raise that, because we --

18            THE COURT:  I should think all they got to do is

19 that I do.  Type in, give my password, up comes my accounts.

20 They show me within an hour what check is out for clearance.

21            MR. HAUSER:  Okay.

22            THE COURT:  That's what I'm talking about.  Share

23 that date realtime, so that -- really what you want to do

24 is, you want to take the pin out from underneath what the

25 bank is sitting on right now, so that they are indulgent

37

1 enough to give you some breathing room.  And you do that by

2 flooding them with data that is dependable in realtime.

3      MS. MCDOW:  Your Honor, Ms. Amster has given me

4 the thumbs up that she can do what you just outlined --

5      THE COURT:  I see that lady back there.  She looks

6 like a can-do person to me.

7      MS. MCDOW:  Yeah.

8      THE COURT:  I welcome your presence, ma'am.

9      What else?

10      MS. MCDOW:  So that will be fine.

11      MR. HAUSER:  There's a couple line items that I

12 think Mr. Napolitano referenced that needed to be included

13 in the budgets.

14      There's a statutory requirement under Section 333

15 of the Code that when you have a healthcare business, which

16 these are as defined under 101.7 of the Code, that the U.S.

17 Trustee, at the Court's direction, appoints a patient care

18 ombudsman.

19      And I've already discussed the budget amounts with

20 Mr. Napolitano.  So I just would ask that that be included

21 in the revised budget.

22      There also needs to be just a line item for U.S.

23 Trustee quarterly fees.  In this particular budget we're

24 looking at for August, September, October, it would not be

25 due -- it would be due no later than October 31st.  So for

38

1  the month of October, they would just need to insert the

2  number.

3          There's a chart that we sent over to the Debtor's

4  counsel, and basically it's a sliding scale.  The more you

5  disburse, the higher the fee.  My estimation, it's going to

6  run around 1,625 to 2,000 per quarter per Debtor.  So that

7  needs to be built in to each budget.

8          THE COURT:  It is what it is.  You've got to pay

9  Uncle Sam, right?

10         MR. HAUSER:  So, I just wanted to raise those two

11  line items.  I'll confer with Ms. McDow about a stipulation

12  to submit to the Court for the appointment of an PCO and --

13         THE COURT:  Well, there's going to be an ombudsman

14  because I think the statute requires it.  So --

15         MR. HAUSER:  Right.  No, but what we typically do

16  is, I send a stipulation to Debtor's counsel, where we agree

17  that the Court will issue an order directing our office to

18  then in turn appointment a PCO.

19         I then basically tell them, I'm going to find

20  someone who -- and I've already spoken to a number of them,

21  and we're going to have the budget-level person whose, by

22  the way, I think probably the best person to handle this,

23  because she has 30 years' experience in dealing with these

24  types of facilities.

25         THE COURT:  Great.

39

1          MR. HAUSER:  So we're getting Rolls Royce service

2  for, you know --

3          THE COURT:  So you're going to give me a

4  stipulated order?

5          MR. HAUSER:  I hope so.  I hope I -- I'll send it

6  over to Ms. McDow, and --

7          THE COURT:  Don't make me have a hearing on that,

8  folks.  There's going to be an ombudsman.  Mr. Hauser has

9  somebody in mind who's good and knowledgeable and apparently

10  not that expensive.

11          MR. HAUSER:  So, anyway --

12          THE COURT:  Save us the cost of having five

13  lawyers down here.

14          MR. HAUSER:  Right.  I think Ms. McDow's probably

15  looking at Section 333.  And there's -- the Debtor can file

16  a motion to excuse the appointment of an ombudsman, but this

17  is not the case to excuse it.  The type of case you usually

18  file a 333 motion to excuse, is when you're basically

19  saying, your Honor, we don't really have any need for

20  monitoring patient quality care.

21          Well, these are urgent care facilities.  And while

22  they don't provide, quote-unquote, "emergency services,"

23  people come in there and they're sick and they're treated,

24  and they're given medication.  And --

25          THE COURT:  No, I agree.

*Briggs Reporting Company, Inc.*

40

1          MR. HAUSER:  -- unless the Court is telling them

2 to bring the motion --

3          THE COURT:  The societal purpose that Congress had

4 in mind is certainly fitted to this case.  So we need to

5 have an ombudsman.

6          MR. HAUSER:  I mean, I already talked to someone

7 who is the least expensive person you get assigned.  By the

8 way, has probably the most direct experience in dealing with

9 urgent care, has dealt with emergency facilities, for 30

10 years.  So --

11          THE COURT:  Nice.  Good.  We're all luckier than

12 that.

13          MR. HAUSER:  All right.

14          THE COURT:  So, what else?

15          MS. MCDOW:  Your Honor, just a -- I just want to

16 make sure I understand the MOR, the MOR requirements, so

17 that we don't find ourselves here on something silly.

18          We, in our minds, we're going to file a single

19 MOR, but account for each different entity within the MOR.

20 Is that acceptable?  Attach bank accounts for each of them,

21 rather than --

22          THE COURT:  Yeah.

23          MS. MCDOW:  Okay.

24          THE COURT:  Whether it's one piece of paper or six

25 pieces of paper, it doesn't matter.  What is very important

41

1  is that it's separately broken out.  Because the whole point

2  of this is, we need to identify who's bleeding and at what

3  rate.  That's the whole point.

4            MS. MCDOW:  Okay.  And then --

5            THE COURT:  So if you put it on a single piece of

6  paper in a consolidated case, I think that's fine.

7            MS. MCDOW:  Okay.

8            MR. HAUSER:  Just for academic regularity, your

9  Honor, is there going to be a separate P and L statement for

10 each entity?

11           THE COURT:  Well, that's what I understood her to

12 say.

13           MR. HAUSER:  Okay.  I just wanted to make sure we

14 are on the same page here.

15           MR. NAPOLITANO:  And I believe the MOR's require

16 balance sheets.  Will they be separate balance sheets for

17 each entity?

18           MS. MCDOW:  The accounting is going to be separate

19 for every entity.  I just didn't want to have to do six

20 different filings, if I can avoid it.  So -- okay.

21           THE COURT:  No.  You can do one filing broken down

22 into --

23           MS. MCDOW:  That's fine.

24           THE COURT:  -- six paragraphs.

25           MR. NAPOLITANO:  As part of that MOR for the

42

1 financial statement section of it, can we also include the

2 variants, the actual-to-budget variants for that particular

3 period?

4          MS. MCDOW:  We'll include everything that the MOR

5 requires.  We'll work with them.

6          THE COURT:  Well --

7          MS. MCDOW:  If there's something additional that

8 you'd -- I just don't know how easy that --

9          THE COURT:  The right answer is, I will do

10 everything to make you comfortable.

11          MS. MCDOW:  Yes.  I will do everything in my power

12 to make your comfortable that we are capable of doing.

13          THE COURT:  All right.  Good.  What else?

14          MS. MCDOW:  And then, again, as far as timing, so

15 will that be that the first one is due the 22nd -- the 21st?

16 I just want to make sure we get --

17          MR. HAUSER:  So if this case started on August

18 2nd, we'll call 8-15 as the -- shoot for 8-22.  And then for

19 the 8-16 through 8-31 period, we'd shoot for 9-7.  And then

20 just keep it going.  So then --

21          THE CLERK:  Your Honor, I'm not able to pick up

22 Mr. Hauser.

23          THE COURT:  Mr. Hauser, we're having a hard time

24 with the tape.

25          MR. HAUSER:  Okay.  So, the case started on August

43

1  2nd.  So for the reporting period of August 2nd through

2  August 15th, we would shoot for getting those filed on

3  August 22nd.  Then for the reporting period of August 16th

4  through August 31st, we would shoot for 9-7.  And then for

5  September 1 through September 15th, we'd shoot for 9-22.

6  And then for September 16th through September 30th, we'd

7  shoot for October 7th.

8          THE COURT:  I think that sounds correct.  How far

9  we actually go, however, is a conversation we're about to

10 have.

11         MR. HAUSER:  Well, yeah.  I mean, this could

12 change at the next hearing.  So, I mean --

13         THE COURT:  Sure.  My inclination is to grant the

14 authority for the pre-petition bank account stuff as

15 requested.

16         Regarding use of cash collateral, my inclination

17 is to grant it for a limited period, subject to further

18 hearing.

19         MR. NAPOLITANO:  Your Honor, the question is, how

20 long?  With respect to the -- because we didn't really talk

21 about the bank account transition motion.  We're fine with

22 that.  So I make it clear for record, the security that our

23 security interest will continue on --

24         THE COURT:  Yes.  Absolutely.

25         MR. NAPOLITANO:  -- into the DIP accounts.  Thank

44

1  you.

2          THE COURT:  Yeah.  And as I understood the

3  insurance operating account, basically what you'd have is,

4  you have existing accounts to which insurance companies make

5  on-line deposits.  And that's, they need to have that open.

6          And I take it the U.S. Trustee does not oppose?

7          MR. HAUSER:  We don't oppose, your Honor.  And the

8  only thing we'd ask -- and I'd spoke to Mr. Delaney about

9  this.  Is that to the extent their cash accumulates, they'd

10 sweep it as frequently as possible into the DIP accounts.

11          THE COURT:  Well, I would think, I would think

12 you'd want to sweep it daily.

13          MR. HAUSER:  Again, as frequently as possible.  I

14 mean --

15          THE COURT:  Is daily okay?

16          MR. HAUSER:  I don't know if that's feasible for

17 them, your Honor.  I don't know what their sweep procedures

18 are.  But --

19          THE COURT:  The idea is when an insurance company

20 check gets deposited, you sweep it for the operating account

21 as fast as possible.  But be careful -- and I'm speaking as

22 much to the gal at the back of the room right now.

23          Be sure that the money ends up in the right

24 accounts, okay, because accounting is so critical in this

25 case.  Because the bank is already very exercised about the

45

1  right money going in the right place.  Okay?

2          What else?  The question now I guess is, for how

3  long do we go out until we have our next hearing?

4          MR. NAPOLITANO:  One last point on the line item

5  in the budget, your Honor.

6          THE COURT:  Yes?

7          MR. NAPOLITANO:  They have management fees going

8  to RPG Group, the management entity.  That is an affiliated

9  entity.  I believe Doctor Amster is the sole owner of that

10 entity.  And that's the entity that employs Mrs. Amster.

11         So, to the extent -- our concern is whether or not

12 cash is secreting this estate to improperly or get around

13 the insider --

14         THE COURT:  Well, I take it --

15         MR. NAPOLITANO:  -- insider comp issue.

16         THE COURT:  -- I take it that the obvious answer

17 to that is, the bookkeeper or accountant -- I don't mean to

18 denigrate whichever you are, you're most valuable.  Her

19 salary and expenses get paid.  The owner of the company

20 shouldn't be taking any money out of this thing.  That would

21 be my understanding of the obvious solution.  Am I wrong in

22 that?

23         MS. MCDOW:  Your Honor, how we've done it and how

24 we presented it in the wage motion is actually that the

25 doctor and Mrs. Amster -- Ms. Amster, who is his daughter,

46

1 and who is the operator of all of the clinics and the

2 management company, they are provided for in the wage motion

3 because Mr. Amster, the doctor, provides the medical

4 services for the clinics.  But until we have the notice of

5 insider comp approved they will not be paid.  So that is how

6 we've had it set up.  They will be paid for their salary.

7          And there is a portion of this, it's all detailed

8 -- again, I apologize.  That one was done late last night.

9 And their management fee, but not until -- if and when the

10 insider comp is approved for the two of them.  But it does

11 other non-insider expenses as well, which are detailed and

12 which we ask specific approval for.

13          THE COURT:  Okay.  Well, every dollar is precious

14 here.  So I'm sure what you're going to want to do is

15 dedicate monies to keeping the operation flow, and not for

16 dividends to shareholders, right?

17          MS. MCDOW:  I don't think we've made a dividend to

18 shareholders in five years.

19          THE COURT:  Okay.  I think that's most of Mr.

20 Napolitano's concern.

21          MS. MCDOW:  Understood, your Honor.

22          MR. HAUSER:  Your Honor, along these lines and for

23 the Court's thinking about timing, and when it wanted --

24 when it wants to have its next hearing.  So, we've solicited

25 potential committee members.  We're -- drop-dead date is the

47

1  14th of August, so we think we'll form it that night or the

2  15th.  Okay.

3          One of the things we hope the committee would do

4  would look at that management fee, and it could be perfectly

5  reasonable or it could be a little bit on the high side.

6  And then come back to the Court and say, based upon industry

7  standards, we think it's high.

8          That way you're not taking maybe the bank's

9  position, which might be overly aggressive in trying to

10 reduce it, but you're dealing with people who are in the

11 industry, and just make think -- can present evidence to the

12 Court that it's either high, or if it's fine, it's fine.

13         But -- so I just want to give an idea though, as

14 to when the committee would be formed.  Probably,

15 realistically, they'd have counsel by the 15th or 16th of

16 August.

17         THE COURT:  All right.  So now the question is,

18 when is our continued hearing?  It should probably be on the

19 near side, so we will have a first read on how we're doing

20 post-petition.

21         Anybody have a suggestion?

22         MS. MCDOW:  Your Honor, perhaps it makes sense to

23 do it a week -- or a couple of days after the first MOR is

24 due, August 22nd.

25         THE COURT:  So that would be like the last week of

48

1 August --

2          MS. MCDOW:  Correct, your Honor.

3          THE COURT:  -- is that right?

4          MS. MCDOW:  That way we'd have --

5          THE COURT:  Is that what you're saying?

6          MS. MCDOW:  Correct, your Honor.  That way we'd

7 have -- of course we would love much more, but I think that

8 will give us a chance to put our first financials forward.

9          THE COURT:  Well, yeah.  I think what the Debtor's

10 goal here is, to earn credibility.  To the extent you have

11 credibility, you have more time.  To the extent that you

12 don't, you don't.

13          Mr. Napolitano, what do you say?

14          MR. NAPOLITANO:  Visibility is certainly a good

15 thing in a case like this, especially early on.  And I think

16 that makes sense.  It probably doesn't make sense to come

17 back here next week and just talk about individual line

18 items on the budget.  I don't think that's a good use of

19 anyone's time.

20          I think the Court's admonition that the Debtor,

21 you know, really should be focusing on critical expenditures

22 during this short period, and really getting that white

23 knight to mount the horse and get in here.

24          THE COURT:  Yeah.

25          MR. NAPOLITANO:  You know, so, having that time to

49

1 do that, and have that first MOR report filed and for all

2 parties to be able to review, I think sometime during the

3 week of the 21st would be an ideal time.  Perhaps that

4 Friday, the 25th.

5          THE COURT:  Well, I don't always have Fridays

6 available, but I could set it Monday the 28th.  How about

7 that?

8          MS. SOREF:  Your Honor, it's Randye Soref.  I'm

9 traveling the 28th through 30th.  So either the 25th or the

10 31st would work best for me.

11          THE COURT:  Well, I'm sorry, Ms. Soref, but I'm

12 not sure on the 25th, and my vacation plans trump yours.

13 Sorry.

14          MS. SOREF:  Well, I'm terribly -- but I

15 understand, your Honor.  That's fine.  We'll --

16          MR. NAPOLITANO:  The -- Mr. Hauser just advised

17 that the 341 for each Debtor is August 29th, so --

18          THE COURT:  Is that -- that's a logical day then,

19 right?

20          MR. NAPOLITANO:  To have --

21          THE COURT:  To have your -- if he's going to have

22 a 341(a) in the morning, maybe you have it in the afternoon

23 here?

24          MR. HAUSER:  Yeah.  We're going to stack those, so

25 they're all going to be set at 10:00 o'clock.  I know enough

50

1 about this company that I can guarantee we're not going to

2 go past lunch.

3          THE COURT:  Okay.

4          MR. HAUSER:  And if people want to come back, we

5 can come back, but you can set a hearing in the afternoon,

6 your Honor.

7          THE COURT:  Well, I -- under the theory that each

8 of these hearings probably costs in aggregate 5,000 bucks,

9 I'm thinking that if we can combine one days' appearances on

10 the 29th, that would be a win for everybody.  Am I correct

11 in that?

12          MR. NAPOLITANO:  That would be.

13          MS. MCDOW:  Correct.  Yes.

14          MR. HAUSER:  Yeah.  I mean, your Honor, we can do

15 it another way where you have your hearing at 10:00, and we

16 just delay the 341.  And put up a sign and say, everyone's

17 up in Judge Albert's courtroom.  And when we're done, we'll

18 start the meeting.  So --

19          THE COURT:  If you want to do it that way, I'll

20 accommodate.

21          MS. MCDOW:  That's fine.

22          THE COURT:  What do you want to do?

23          MR. NAPOLITANO:  Or we could even get an earlier

24 start, 9:00, and that way we could afford more time for

25 them.

51

1          MR. HAUSER:  That makes sense.  Yeah.  Let's --

2          THE COURT:  Let's start at 9:00 for the hearing or

3 for the 341?

4          MR. HAUSER:  No, no.  The hearing -- the 341's

5 already noticed at 10:00.  So let's start at 9:00 with the

6 hearing, if that's acceptable to the Court.

7          THE COURT:  You're going to make me run down here

8 and miss my breakfast, is that what you're saying?

9          MR. HAUSER:  Okay.  Well, let's do the afternoon

10 then.

11          THE COURT:  That's what I like to hear.

12          MR. NAPOLITANO:  I think Mr. Smith was offering to

13 bring donuts.

14          THE COURT:  Yeah.  Well, I can't eat donuts

15 either, so.  But a nice thought, I must say.

16          Let's do it the afternoon of the 29th.

17          I'm sorry, Mr. Soref.  Do you have somebody who

18 can pinch hit for you?

19          MS. SOREF:  Yes, your Honor.  I'm on an airplane

20 -- I'm traveling on business but I'm on an airplane, so,

21 we'll have somebody else attend.

22          THE COURT:  All right.  Then let's do that.  Can

23 we say 2:00 o'clock on the 29th?

24          MR. NAPOLITANO:  That would work, your Honor.

25          THE COURT:  Is that good?

52

1          MS. MCDOW:  That works for us, your Honor.  I

2 apologize.  Yes.

3          THE COURT:  And how about you, Mr. Hauser?

4          MR. HAUSER:  Well, yes, your Honor.  As I said,

5 your Honor, we'll be conducting the 341's in the morning.

6 I'll available that afternoon.  And so that will be fine.

7          THE COURT:  All right.  Then this matter is

8 continued to August 29th at 2:00 o'clock.

9          The motion is granted on that interim basis,

10 subject to further review at that time.

11          The Movant is to submit an order.  I trust Ms.

12 McDow, that you'll consult with your colleagues, so that

13 there's no question about the lodged order?

14          MS. MCDOW:  I will, your Honor.  We will circulate

15 it.

16          MR. NAPOLITANO:  For this interim period, can we

17 have a new order that all of our liens continue in the --

18          THE COURT:  Absolutely.

19          MR. NAPOLITANO:  -- Debtor's assets --

20          THE COURT:  That's the --

21          MR. NAPOLITANO:  -- post-petition?

22          THE COURT:  -- offer of adequate protection.  I

23 think I'm -- given what I understand about this case, that's

24 the only logical way to go.

25          MS. MCDOW:  Correct, your Honor.  Any and all

53

1  liens.

2          MR. NAPOLITANO:  And perhaps we can work on a

3  consensual order --

4          MS. MCDOW:  Of course.

5          MR. NAPOLITANO:  -- for this interim period.

6          THE COURT:  Okay.  And we're going to want to look

7  very carefully at those initial reports.  And by the way, if

8  I were the Debtor here, I would be sharing data realtime.

9  And I wouldn't even wait for the written version.  Give the

10  written version because it's required, but share the data

11  earlier.  Because to the extent the bank can relax a little

12  bit, you have more time, right?

13          MR. NAPOLITANO:  Correct, your Honor.

14          THE COURT:  That's right.

15          Okay.  What else can we do today?  Number one and

16  number two, I think I -- I've already said that I'm going to

17  grant number one, which talks mostly about the pre-petition

18  and management system issue.  So that's granted.  Movant

19  will submit an order on that, too.

20          All right.  I thank you all.  Good luck with this

21  case.

22          MS. MCDOW:  Thank you, your Honor.

23          MR. DELANEY:  Thank you, your Honor.

24          THE COURT:  All right.

25          MR. NAPOLITANO:  Thank you, your Honor.

54

1        THE COURT:  All right.  We're off the record.

2    (Proceedings concluded.)

3

4       I certify that the foregoing is a correct

5 transcript from the electronic sound recording of the

6 proceedings in the above-entitled matter.

7 /s/ Holly Martens_____   8-17-17_____
Transcriber                        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
BUCHALTER, 1000 Wilshire Blvd, Suite 1500, Los Angeles, CA 90017

A true and correct copy of the foregoing document entitled (*specify*): **LIMITED OPPOSITION OF OPUS BANK TO THE DEBTORS' NOTICES OF SETTING INSIDER COMPENSATION OF DR. ROBERT C. AMSTER, FAYE AMSTER AND JENNIFER AMSTER** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 23, 2017____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

COUNSEL FOR HOAG URGENT CARE: Michael T Delaney      mdelaney@bakerlaw.com, sgaeta@bakerlaw.com
STAFF ATTY UST: Michael J Hauser    michael.hauser@usdoj.gov
COUNSEL HOAG URGENT CARE: Ashley M McDow      amcdow@bakerlaw.com,
mdelaney@bakerlaw.com;sgaeta@bakerlaw.com;rojeda@bakerlaw.com;ffarivar@bakerlaw.com
COUNSEL OPUS: Anthony J Napolitano      anapolitano@buchalter.com, IFS_filing@buchalter.com;salarcon@buchalter.com
INTERESTED PARTY:  Mary H Rose      mrose@buchalter.com, salarcon@buchalter.com
COUNSEL HOAG MEMORIAL: Randye B Soref    rsoref@polsinelli.com, acruickshank@polsinelli.com
COUNSEL FOR OPUS: Steven M Spector      sspector@buchalter.com, IFS_efiling@buchalter.com;salarcon@buchalter.com
OFFICE UST: United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) August 23, 2017____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor
Hoag Urgent Care-Tustin, Inc.
PO Box 8979
Newport Beach, CA 92658

Hon. Theodor C. Albert
U.S. Bankruptcy Court
411 W. Fourth Street, Suite 5085
Santa Ana, CA 92701

David Stapleton, as receiver
515 South Flower Street, 36th Floor
Los Angeles, CA  90071

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 23, 2017____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 23, 2017 | Sandra I. Alarcon | /s/ Sandra I. Alarcon |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.