BARRY A. SMITH (SBN: 48697)
  bsmith@buchalter.com
STEVEN M. SPECTOR (SBN: 51623)
  sspector@buchalter.com
ANTHONY J. NAPOLITANO (SBN: 227691)
  anapolitano@buchalter.com
BUCHALTER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone:  (213) 891.0700
Facsimile:  (213) 896.0400

Attorneys for Secured Creditor Opus Bank

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>HOAG URGENT CARE-TUSTIN, INC., et al.,<br><br>           Debtors and Debtors in Possession. | Lead Case No. 8:17-bk-13077-TA<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos. 8:17-bk-13078-TA, 8:17-bk-13079-TA, 8:17-bk-13080-TA, 8:17-bk-13089-TA, 8:17-bk-13090-TA) |
| Affects:<br><br>☒    All Debtors<br><br>☐    Cypress Urgent Care, Inc., a California corporation, ONLY<br><br>☐    Hoag Urgent Care- Anaheim Hills, Inc., a California corporation, ONLY<br><br>☐    Hoag Urgent Care- Huntington Harbour, Inc., a California corporation, ONLY<br><br>☐    Hoag Urgent Care- Orange, Inc., a California corporation, ONLY<br><br>☐    Hoag Urgent Care- Tustin, Inc., a California corporation, ONLY<br><br>☐    Laguna-Dana Urgent Care, Inc., a California corporation, ONLY | **SUPPLEMENTAL OPPOSITION OF OPUS BANK TO THE DEBTOR'S EMERGENCY MOTION FOR ORDER (1) AUTHORIZING THE INTERIM USE OF CASH COLLATERAL, (2) FINDING PREPETITION SECURED CREDITORS ADEQUATELY PROTECTED, AND (3) GRANTING RELATED RELIEF**<br><br>**Hearing:**<br>Date:      August 29, 2017<br>Time:     2:00 p.m.<br>Place:     United States Bankruptcy Court<br>             Courtroom 5B<br>             411 West Fourth Street<br>             Santa Ana, California 92701 |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ...................................................................................................................... 3

    A. The Debtors have produced no "White Knight" as they promised nor do they intend to produce a White Knight for quite some time assuming they can find one. ................................................................................................................................ 3

    B. The Debtors have not provided any meaningful or credible reporting to ascertain whether continued use of cash collateral should be permitted. ............... 5

    C. Opus Bank has a valid, perfected security interest in the Debtors' accounts receivable. ........................................................................................................... 6

III. CONCLUSION ................................................................................................................ 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bank of America N.T & S.A. v. United States*,
 1979 U.S. Dist. LEXIS 10058, at *4 (C.D. Cal. 1979) .................................................. 10

*DFS Secured Healthcare v. Caregivers Great Lakes*,
 384 F.3d 338 (7th Cir. 2004) ........................................................................................ 10

*In re American Care*,
 69 B.R. 66 (Bankr. N.D. Ill. 1986) ................................................................................ 10

*In re East Boston Neighborhood*,
 242 B.R. 562 (Bankr. D. Mass. 1999) ........................................................................... 10

*In re Machinery, Inc.*,
 342 B.R. 790 (Bankr. E.D. Mo. 2006) ............................................................................ 8

*In re Missionary Baptist Foundation of America, Inc.*,
 796 F. 2d 752 (5th Cir. 1986) .................................................................................. 9, 10

**Statutes**

42 U.S.C. § 1395g(c) ............................................................................................................ 9

42 U.S.C. § 1395u(b)(6) ....................................................................................................... 9

42 U.S.C. § 1396a(a)(32) ................................................................................................ 9, 10

CAL. COM CODE § 9314 ....................................................................................................... 9

CAL. COM CODE § 9315(a)(1) .............................................................................................. 9

CAL. COM CODE § 9315(a)(2) .............................................................................................. 9

CAL. COMM. CODE § 9315 ................................................................................................... 7

CAL. COMM. CODE § 9315(c) ............................................................................................... 7

CAL. COMM. CODE § 9332 ........................................................................................... 7, 8, 9

UCC § 9-332 ........................................................................................................................ 8

**Other Authorities**

LBR 9013-1(g)(4) ................................................................................................................ 7

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE DEBTORS, THEIR COUNSEL AND ALL PARTIES IN INTEREST:**

Opus Bank, senior secured creditor of Hoag Urgent Care – Tustin, Inc., and its affiliated debtors in the above-captioned, jointly administered, chapter 11 bankruptcy cases (collectively, the "Debtors"),[1] submits this Supplemental Opposition (the "Supplemental Opposition") to the Debtors' *Emergency Motion for Order (1) Authorizing the Interim Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (2) Finding Prepetition Secured Creditors Adequately Protected Pursuant to 11 U.S.C. §§ 361 and 363, and (3) Granting Related Relief* [Docket No. 12][2] (the "Motion") as follows.[3]

## I. INTRODUCTION

At the August 4th hearing on the Debtors' "first-day" motions, which included the cash collateral Motion, this Court made three key observations about the substance of the Debtors' bankruptcy cases and how these cases should proceed. First, the Court observed that "this is a sale case [and] [t]here's either a sale or there isn't in a pretty quick period of time."[4] Second, the Court warned that "reporting is key," due to the allegations of losses among the clinics, and that "realtime, reliable data is your oxygen" indicating, of course, that credible and timely reporting may provide the Debtors with more time in chapter 11. Transcript, p. 30, ln. 21-22 and p. 34, ln. 7-9. Finally, the Court admonished that the Debtor's "goal here is, to earn credibility. To the extent you have credibility, you have more time. To the extent that you don't, you don't." Transcript, p. 48, ln. 9-12.

---

[1] The Debtors include Hoag Urgent Care – Tustin, Inc. (Case No. 8:17-bk-13077-TA), Hoag Urgent Care – Huntington Harbour, Inc. (Case No. 8:17-bk-13078-TA); Hoag Urgent Care – Orange, Inc. (Case No. 8:17-bk-13079-TA); Hoag Urgent Care – Anaheim Hills, Inc. (Case No. 8:17-bk-13079-TA); Cypress Urgent Care, Inc. (Case No. 8:17-bk-13089-TA); and Laguna Dana Urgent Care, Inc. (Case No. 8:17-bk-13090-TA).

[2] All docket references are to the docket for the lead bankruptcy case of Hoag Urgent Care – Tustin, Inc. (Case No. 8:17-bk-13077-TA) unless otherwise noted.

[3] On August 15, 2017, Opus Bank filed its initial Opposition [Docket No. 51] to the Motion in order to comply with the timing requirements under Local Bankruptcy Rule 9013-1(f)(1) and (m)(4). In that Opposition, Opus Bank reserved the right to further supplement its Opposition after (i) the Debtors were required to file their court-ordered, semi-monthly Monthly Operating Reports on August 22, 2017, which were actually filed on August 23, 2017; and (ii) the Debtors were required to file their schedules and statements of financial affairs on August 16, 2017, which the Debtors subsequently obtained an extension to August 25, 2017. Having reviewed now these critical informational reports, Opus Bank submits this Supplemental Opposition with respect to the upcoming cash collateral hearing.

[4] *See* August 4, 2017 Transcript (the "Transcript"), p. 30, ln. 2-5, a copy of which is attached to the concurrently filed Declaration of Anthony J. Napolitano (the "Napolitano Decl.") as Exhibit 1.

1    Over the next twenty-four days, it is clear that the Debtors have done nothing to further
2 the Court's observations and recommendations.  The Debtors have yet to file their application to
3 employ their investment banker despite promising the Court that they would do so by early in the
4 week of August 7th.  The Debtors have yet to disclose to the Court or Opus Bank any information
5 on their proverbial "white knight" despite having assured the Court that the Debtors' will be
6 moving forward quickly with the sale process.  Finally, after receiving a proposed stipulation for
7 use of cash collateral from counsel for Opus Bank on August 10th, the Debtors have provided no
8 comments whatsoever other than sending counsel a picture of a plate of schnitzel.

9    With respect to financial reporting, clearly a critical component of the Court's comments,
10 the Debtors have submitted (with their Monthly Operating Report) a profit and loss statement on
11 what appears to be a hybrid accrual/cash accounting basis, which makes it impossible to ascertain
12 the true financial performance of the Debtors and whether each clinic is operating profitably.
13 Moreover, there are several omissions from that report that cast further doubt on its reliability.
14 For example, the Debtors do not disclose whether their revenue numbers are based at 100% of
15 collections or whether such collections will be closer to their historical average of 65%.  Finally,
16 it is puzzling why the Debtors chose to submit a comprehensive cash collateral budget report
17 prepared by their prepetition financial advisor in connection with their Motion, but then chose not
18 to provide any update to that report to show an "actual to budget" variance as is commonly done
19 in operating company chapter 11 cases.[5]

20    Additionally, in their reply to Opus Bank's Opposition, the Debtors ignored the substance
21 of the Receiver's report submitted in connection with the Opposition by raising two red herrings.
22 The Debtors first claim that Opus Bank does not have a perfected security interest in the Debtors'
23 receivables, which is based on the Debtors' erroneous reading of federal and state health care and
24 secured transactions law.  The Debtors then claim that Receiver's report does not disclose the
25 methodology that the Receiver used in preparing such report and, therefore, the Debtors need
26 more time to analyze the report in comparison to their own report.  To the contrary, the Debtors
27 overlooked the fact that the Receiver provided detailed assumptions and notes regarding the

---

[5] Unless, of course, the submission of such a comparative report would disclose results unfavorable to the Debtors.

preparation of his report whereas neither the Debtors' financial advisor (with respect to the Debtors' cash collateral budget) nor Jennifer Amster (with respect to the Monthly Operating Report's financial statements) provided <u>any</u> such assumptions or notes for their respective reports.

Finally, at the first-day hearing, the Court admonished the Debtors that "I will not let you burn up the value here in some shoot-the-moon effort on behalf of Amster or anyone else." Transcript, p. 21, ln. 15-16. The Court further warned the Debtors that "[t]his case may not last a month." Transcript, p. 32, ln. 18. As the Debtors approach the one-month mark, it now appears that the Debtors were less than candid with the Court since it is clear that the Debtors do not intend to bring about a quick sale of their assets or provide credible and competent reports so that interested parties can fully analyze the Debtors' actual financial position. The Debtors' have not lived up to promises and assurances made at the first-day hearing by failing to negotiate in good faith regarding a proposed cash collateral and receiver oversight stipulation and by engaging in unnecessary and burdensome discovery for inconsequential and irrelevant issues.[6]

For these reasons, Opus Bank requests that the Court deny the Debtors' continued use of cash collateral.

## II. ARGUMENT

### A. The Debtors have produced no "White Knight" as they promised nor do they intend to produce a White Knight for quite some time assuming they can find one.

Despite assuring the Court and interested parties that the Debtors had obtained a "better buyer" for the Debtors' assets, the Debtors have disclosed nothing and done nothing over the past month that they promised to do to bring about what this Court admonished should be a quick sale. At the hearing on the first-day motions, counsel for the Debtors represented to this Court that

---

[6] Opus Bank filed a motion to excuse the Receiver from turnover under section 543 of the Bankruptcy Code. This Motion acknowledged that the Receiver had already turned over all managerial control over the Debtors, but simply wanted to stay on in an oversight capacity to monitor the Debtors financial performance as the Court suggested. In response, the Debtors have launched discovery against Opus Bank, the Receiver, Opus Bank's counsel, Buchalter, Newport, Hoag Memorial, and Newport/Hoag's counsel, Polsinelli, seeking all communications and documents related to the proposed state-court receivership sale, the receiver, the Debtors and their bankruptcy cases. Not only is this discovery burdensome, it is completely irrelevant to the turnover motion and the Debtors' admonition by this Court to bring about a quick sale of its assets. To the extent not resolved on August 29th, Opus Bank suspects that the Court will be drawn into this discovery row through future motions to compel.

"[w]e do have someone who we think is definitely a better buyer. We're going to employ an investment banker early next week . . . ." Transcript, p. 15, ln. 14-16. One would surmise that such a statement made at a hearing on August 4th would mean that the forthcoming application to employ the investment banker would have been filed by no later than August 9th (*i.e.*, the following Wednesday). That did not occur. Indeed, since skepticism is clearly warranted, one should assume these statements were intentionally misleading in order to convince the Court to give the Debtors more time.

Additionally, the Debtors represented in their Statement of Major Issues and Timetable Report submitted to the U.S. Trustee on August 11, 2017, in connection with the Debtors' 7-Day Package, that the Debtors would be filing their motions to employ their bankruptcy counsel, a financial advisor and an investment banker within "2-5 days." *See* Napolitano Decl., Exhibit 2. That report was submitted on August 11th, which means that, even under a generous "5 business day" calculation, those employment applications should have been filed by no later than August 18th. It is now August 28th and the Debtors have yet to file any application or motion respecting the employment of their "investment banker" or a motion to approve the sale of the Debtors' assets.

Further, the Debtors' counsel at that hearing spoke in the present tense as if the Debtors had an offer in hand to purchase their assets. "We believe that this, this offer is a significantly better deal. The number is much higher. We haven't yet, you know, figured out exactly how the structure would be, but they are interested in all of the clinics, which is something that we've struggled with . . . ." Transcript, p. 16, ln. 13-17. Following the first-day hearing, Opus Bank requested multiple times specific details regarding this "white knight." An offer letter, a letter of intent, a term sheet—something. To date, Opus Bank has received absolutely nothing.

Most troublingly, the Debtors disclosed in their 7-Day Package that they submitted to the U.S. Trustee that their proposed sale process will take up to <u>5-6 months</u>. *See* Statement of Major Issues and Timetable Report, p. 3, attached as Exhibit 2 to the Napolitano Decl. This blatantly conflicts with what Debtors' counsel told to the Court at the hearing on the first-day motions: (1) "we are going to endeavor very quickly to either get his buyer in as a stocking (sic) horse,"

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

4

BN 30426110V3

Transcript, p. 17, ln. 6-8; (2) "we are going to act quickly here. You're not going to find that any of these Debtors lag," Transcript, p. 19, ln. 3-5; and (3) "our proverbial white knight, will likely be in front of your Honor, on one respect or another, very soon." Transcript, p. 20, ln. 1-3. The Debtors cannot comply with the Court's admonition that the Debtors are "going to have a sale . . . in pretty soon and pretty fast order." Transcript, p. 30, ln. 18-20. What seems clear is that the Debtors have no "white knight" and do not intend to adhere to the Court's quick sale guideline. Coupled with the cash collateral/replacement lien failures described hereinafter, the Debtors did not earn "credibility."

**B.    The Debtors have not provided any meaningful or credible reporting to ascertain whether continued use of cash collateral should be permitted.**

The Monthly Operating Report for the period from the August 2, 2017 petition date for each of the Debtors (the "Petition Date") through August 15, 2017 was supposed to be the first glimpse of the Debtors' post-petition financial performance so that all interested parties could ascertain the viability of the Debtors' operating results. This report was due on August 22nd. The Debtors filed this report on August 23rd, but omitted the profit and loss statement. The Debtors then filed an "errata" later that evening including the omitted profit and loss statements. A review of the Debtors' financial statements submitted with the Monthly Operating Report reveals several things.

First, the Debtors fail to include any notes or disclosures with respect to the financial statements (*i.e.*, the balance sheet and income statement). Consistent with generally accepted accounting principles, "[t]he primary purpose of notes to financial statements is to supplement or further explain the information on the face of financial statements by providing financial information relevant to existing and potential investors, lenders, and other creditors for making decisions about providing resources to the entity." FASB Exposure Draft, *Conceptual Framework for Financial Reporting, Chapter 8: Notes to Financial Statements* (Mar. 14, 2014). Without any such disclosures, it is impossible to obtain a true sense of the revenue and expenses of the Debtors.

For example, a cursory review of the Debtors' consolidated profit and loss statement reveals that the Debtors have impermissibly included a "hybrid" accrual basis and cash basis for reporting. The Debtors account for income with an "Accrual for Collections %" line item which appears to be on an <u>accrual</u> basis, which, in turn, also tends to <u>overstate income</u>, but then accounts for their expenses presumably on a <u>cash</u> basis, which can be manipulated by stretching payables to <u>understate expenses</u>. Additionally, the Debtors' primary income line item (Accrual for Collection %) does not indicate whether this is the Debtors' gross revenue or net revenue. As set forth in the Receiver's reports submitted with Opus Bank's Opposition, the Debtors have averaged a 65% collectability percentage.[7] Does this income statement reflect that reality or are the Debtors using "pie-in-the-sky" numbers to overstate their operating performance?

To further illustrate this point, the Debtors show Net Operating Income of $147,000 for the August 3, 2017 through August 15, 2017 period. How can that be? The Debtors showed net operating cash flows of $73,647 for the entire month of August 2017 in Mr. Kurtz's cash flow projections that were submitted in support of the Debtors' cash collateral Motion. Granted that this is a comparison of a <u>cash</u> model to a <u>hybrid accrual-cash</u> model, and a comparison of a partial month to a full month. But this just underscores the importance of getting these Debtors to provide consistent and comparable forms of reporting so that interested parties can fully evaluate the Debtors' financial performance. Otherwise, it may be several months before interested parties can sift through the Debtors' financial alchemy to ascertain the true state of affairs. At which point, it may be too late.

**C.    Opus Bank has a valid, perfected security interest in the Debtors' accounts receivable.**

The Debtors incorrectly contend that Opus Bank has failed to meet its burden under section 363(p) of the Bankruptcy Code to establish that it holds a valid, perfected security interest in the Debtors' accounts receivable to secure payment of obligations owing to it. To the contrary, Opus Bank submitted, in connection with its *Notice of Non-Consent to Use of Cash Collateral By the Debtor and Preliminary Opposition to Debtor's Forthcoming Motion for Use of Cash*

---

[7] That is, from gross (or 100%) billings, Debtors collect 65% of what is billed on a historic basis.

*Collateral* [Docket No. 16], copies of all of the applicable loan documents establishing the grant of the security interest by the Debtors to Opus Bank and the perfection of that security interest. The loan documents demonstrate that there can be no dispute that the Debtors granted Opus Bank a security interest in their accounts receivable and the proceeds of accounts receivable.

> **1.    The Debtors wrongly claim that Opus Bank lost its security interest in the proceeds of the accounts receivable by virtue of the transferee provisions of Section 9332 of the California Commercial Code.**

In what appears to be desperation, the Debtors raise for the first time in their reply brief an argument "requiring" this Court to find that Opus Bank has lost its security interest in proceeds of the Debtors' receivables.[8] To support this argument, the Debtors state that the receivables are first deposited into an account at Opus Bank (the "Opus Account"). Then, the Debtors state that the funds in the Opus Account are swept into the Debtors' accounts at Pacific Enterprise Bank (the "Pacific Account"). At this point, the Debtors' arguments become confusing and misleading.

The Debtors acknowledge, as they should, that Opus Bank has a security interest in the proceeds of the Opus Account and the Pacific Account by virtue of section 9315 of the California Commercial Code. Reply, p. 7, ln. 23-25. Section 9315(c) provides that "[a] security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." CAL. COMM. CODE § 9315(c). Yet, the Debtors have concocted an argument based on Section 9332 of the California Commercial Code that Opus Bank loses its security interest when the proceeds are swept into the Pacific Account. Section 9332 and its official comments demonstrate why this is not so. Section 9332 provides that:

> (a)    A transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of a secured party.
>
> (b)    A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of a secured party.

---

[8] In addition to being incorrect, the Debtors impermissibly raised this argument for the first time in their reply brief in violation of Local Bankruptcy Rule 9013-1(g)(4). Opus Bank requests that the Court strike this argument from the Debtors' reply brief and not consider it at the hearing on August 29th. To the extent that the Court does consider this argument, as set forth in this brief, Opus Bank maintains that the Debtors' argument is legally incorrect.

CAL. COMM. CODE § 9332. Official Comment No. 2 to Section 9332 makes clear that the debtor itself is not a transferee. Specifically, that comment states: "**The term "transferee" is not defined; however, the debtor itself is not a transferee**." CAL. COMM. CODE § 9332, cmt. 2 (emphasis added). As if that was not clear enough, the comment further provides that "Thus this section does not cover the case in which a debtor withdraws money (currency) from its deposit account or the case in which a bank debits an encumbered account and credits another account it maintains for the debtor." *Id.* § 9332, cmt. 2.

Simply moving the funds from one of the Debtors' accounts (*i.e.*, the Opus Account) to another of the Debtors' accounts (the Pacific Account) does not magically transform the Debtors into transferees within the meaning of Section 9332 of the California Commercial Code. To the contrary, the comments to that section expressly prohibit such an interpretation. Moreover, the Debtors' reliance on *In re Machinery, Inc.*, 342 B.R. 790 (Bankr. E.D. Mo. 2006) is similarly misplaced. That case involved a dispute between a senior and a junior secured creditor regarding the proceeds from the sale of collateral and whether the third-party junior secured creditor constituted a transferee within the meaning of Missouri's version of UCC § 9-332 and took those proceeds free of the senior creditor's security interest. *Id.* at 793-96.

Unlike *Machinery*, this case does not involve a third-party transferee. The Debtors are simply moving funds from one of their own accounts into another. One held at Opus Bank and the other held at Pacific Enterprise Bank. Consistent with Section 9315(a), at all times a party who has a security interest in the proceeds of its collateral continues to hold that security interest in such proceeds. The only thing that has changed is the depositary institution. This is, surely, not the third-party transfer of funds contemplated by Section 9332 of the California Commercial Code.

> **2. The Debtors wrongly claim that Opus Bank lost its security interest in the proceeds of the accounts receivable by virtue of the Medicare / Medicaid "anti-assignment" provisions.**

Next, the Debtors seem to make an additional (albeit equally as confusing) argument dealing with Medicare and Medicaid receivables. The Debtors assert that Opus Bank needs a

control agreement under Section 9314 of the California Commercial Code to perfect its security interest in those provisions. This argument overlooks the provisions of Section 9315(a)(1) referenced above pertaining to proceeds. The security interest in receivables continues in proceeds. This is reinforced by Section 9315(a)(2) which specifically deals with proceeds. There is no requirement for a control agreement. The security interest and its perfection are fully enforceable without it.

The Debtors further contend that Opus Bank could not obtain a control agreement over the accounts in any event. They cite to the anti-assignment provisions of the Social Security Act and its implementing regulations. The applicable statutes simply states that Medicare and Medicaid payments owing to a provider cannot be made "to any other person under an assignment or power of attorney." 42 U.S.C. §§ 1395g(c), 1395u(b)(6), 1396a(a)(32). The threshold issue is whether the grant of a security interest in Medicare and Medicaid accounts violates the anti-assignment provisions. This question was definitively settled in favor of secured creditors by the Fifth Circuit's decision in *In re Missionary Baptist Foundation of America, Inc.*, 796 F. 2d 752 (5th Cir. 1986).

In *Missionary Baptist*, a group of nursing homes in Texas granted a security interest to their lender in all accounts, including Medicaid accounts. *Id.* at 754-55. In the ensuing chapter 11 case, the trustee brought an adversary proceeding against the bank to invalidate the security interests on the ground that the grant of the security interest violated the Medicaid anti-assignment provisions under both federal and state law. *Id.* at 755-56. The Fifth Circuit looked at the legislative history of the anti-assignment statutes, which "reveal[ed] that its purpose was to prevent 'factoring' agencies from purchasing medicare and medicaid accounts receivable at a discount and then serving as the collection agency for the accounts." *Id.* at 757 n.6. Finding that there was nothing in the loan agreements to suggest a violation of 42 U.S.C. § 1396a(a)(32), the Fifth Circuit affirm the decision of the district court and held that the bank took a valid security interest in the Debtor's accounts receivable. *Id.* at 759.

Subsequent court decisions have uniformly held that, based on the legislative history, Medicare and Medicaid accounts can serve as collateral for secured loans without violating the

anti-assignment provisions under state or federal law.  *See In re East Boston Neighborhood*, 242 B.R. 562, 573 (Bankr. D. Mass. 1999); and *In re American Care*, 69 B.R. 66 (Bankr. N.D. Ill. 1986).  Indeed, the premise in favor of a secured lender was even recently extended to a factor.  *See, e.g., DFS Secured Healthcare v. Caregivers Great Lakes*, 384 F.3d 338 (7th Cir. 2004).

Similarly, California's anti-assignment statute, like the federal Medicare / Medicaid statutes, does not prohibit the granting of security interests in Medi-Cal accounts.  *See, e.g.*, *Bank of America N.T & S.A. v. United States*, 1979 U.S. Dist. LEXIS 10058, at *4 (C.D. Cal. 1979) (holding that California's anti-assignment statute "was never intended to, nor did it diminish, alter, or negate the underlying property rights of the Bank as a third-party assignee [for security] of the accounts receivable.") (bracketed text in original).  In short, the financing of Medicare, Medicaid and Medi-Cal receivables is commonplace and perfectly legal with the secured party retaining a security interest in the proceeds of those receivables.

Finally, to the extent that this is a post-petition issue, this Court has already granted a replacement lien in the post-petition accounts receivables and their proceeds and the Debtors' counsel has already acquiesced to this these post-petition liens:

> MR. NAPOLITANO:  For this interim period, can we have a new order that all of our liens continue in the --
>
> THE COURT:  Absolutely.
>
> MR. NAPOLITANO:  -- Debtor's assets --
>
> THE COURT:  That's the --
>
> MR. NAPOLITANO:  -- post-petition?
>
> THE COURT:  -- offer of adequate protection.  I think I'm -- given what I understand about this case, that's the only logical way to go.
>
> **MS. MCDOW:  Correct, your Honor.  Any and all liens.**

*See* Transcript, p. 52, ln. 16 to p. 53, ln. 1 (emphasis added); *see also* Transcript, p. 43, ln. 19-25.  Surely, the Debtors are not saying the Court can't do this.  Opus Bank suspects the Court will clarify any ambiguity respecting this issue at the upcoming hearing.

### III.   CONCLUSION

Based on the foregoing, it is clear that (i) the Debtors do not have a "white knight" or any interest in pursuing an expeditious sale of the Debtors' assets; (ii) the Debtors have no interest in working cooperatively with Opus Bank or the Receiver during the administration of the bankruptcy cases, and (iii) the Debtors have not provided any meaningful or competent reporting to permit Opus Bank to effectively monitor its collateral.  For these reasons, Opus Bank requests that the Court deny the Debtors' request for continued use of cash collateral and dismiss the bankruptcy cases *sua sponte*.

DATED:  August 28, 2017                BUCHALTER, a Professional Corporation


By:   */s/ Anthony J. Napolitano*

BARRY A. SMITH
STEVEN M. SPECTOR
ANTHONY J. NAPOLITANO

Attorneys for Secured Creditor Opus Bank

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
BUCHALTER, 1000 Wilshire Blvd, Suite 1500, Los Angeles, CA 90017

A true and correct copy of the foregoing document entitled (*specify*): **SUPPLEMENTAL OPPOSITION OF OPUS BANK TO THE DEBTOR'S EMERGENCY MOTION FOR ORDER (1) AUTHORIZING THE INTERIM USE OF CASH COLLATERAL, (2) FINDING PREPETITION SECURED CREDITORS ADEQUATELY PROTECTED, AND (3) GRANTING RELATED RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 28, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

COUNSEL FOR HOAG URGENT CARE: Michael T Delaney    mdelaney@bakerlaw.com, sgaeta@bakerlaw.com
STAFF ATTY UST: Michael J Hauser    michael.hauser@usdoj.gov
COUNSEL HOAG URGENT CARE: Ashley M McDow    amcdow@bakerlaw.com, mdelaney@bakerlaw.com;sgaeta@bakerlaw.com;rojeda@bakerlaw.com;ffarivar@bakerlaw.com
COUNSEL OPUS: Anthony J Napolitano    anapolitano@buchalter.com, IFS_filing@buchalter.com;salarcon@buchalter.com
INTERESTED PARTY: Mary H Rose    mrose@buchalter.com, salarcon@buchalter.com
COUNSEL HOAG MEMORIAL: Randye B Soref    rsoref@polsinelli.com, acruickshank@polsinelli.com
COUNSEL FOR OPUS: Steven M Spector    sspector@buchalter.com, IFS_efiling@buchalter.com;salarcon@buchalter.com
OFFICE UST: United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) August 28, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor
Hoag Urgent Care-Tustin, Inc.
PO Box 8979
Newport Beach, CA 92658

Receiver
David Stapleton
515 South Flower Street, 36th Floor
Los Angeles, CA 90071

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 28, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Presiding Judge (via messenger)
Hon. Theodor C. Albert
U.S. Bankruptcy Court
411 W. Fourth Street, Suite 5085
Santa Ana, CA 92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 28, 2017 | Sandra I. Alarcon | /s/ Sandra I. Alarcon |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.